# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MILWAUKEE ELECTRIC TOOL
CORPORATION, et al.,

       Plaintiffs,                  Case No.: 2:14-cv-01296-JPS

v.

SNAP-ON INCORPORATED,

       Defendant.

## PLAINTIFFS' RESPONSE MEMORANDUM OF LAW
## OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................1

II.   CLAIM CONSTRUCTION..........................................................................................1

      A.    20 Amp Limitation..............................................................................................2

      B.    Nominal Voltage..................................................................................................8

      C.    A Plurality of Cells Supported by the Housing ................................................10

III.  THE PATENTS IN SUIT SUFFICIENTLY ENABLE THE PROPERLY
      CONSTRUED CLAIMS .............................................................................................13

      A.    Legal Standard ...................................................................................................13

      B.    The 20 Amp Limitation is Sufficiently Enabled When Properly Construed. ........15

IV.   EACH OF THE ACCUSED PRODUCTS INFRINGES EACH OF THE
      APPLICABLE ASSERTED CLAIMS............................................................................17

      A.    The Accused Product Packs Include Battery Cells Supported by the
            Housing...............................................................................................................19

      B.    Each of the Accused Product Packs Meets the 20 Amp Limitation. ....................19

V.    THERE ARE DISPUTES OF MATERIAL FACT REGARDING WHETHER
      DEFENDANT WILLFULLY INFRINGED, AND CONTINUES TO
      WILLFULLY INFRINGE, EACH OF THE PATENTS IN SUIT ................................21

VI.   THERE ARE DISPUTES OF MATERIAL FACT REGARDING WHETHER
      PLAINTIFFS ARE ENTITLED TO PRE-SUIT DAMAGES AND IN WHAT
      AMOUNT .....................................................................................................................23

      A.    Legal Standard. ..................................................................................................23

      B.    Plaintiffs' Marking Has Been Sufficiently Consistent and Continuous to
            Provide Constructive Notice Under § 287. ........................................................25

            i.     Plaintiffs Marked All Embodying Products From Issuance
                   Through Today...........................................................................................25

            ii.    Plaintiffs' Licensees Were Required To Mark Substantially
                   All Licensed Products. ..............................................................................25

            iii.   At a Minimum Damages Are Available From Issuance
                   Through September 2013............................................................................27

VII.  CONCLUSION.............................................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*,
   674 F.3d 1365 (Fed. Cir. 2012)................................................................ 22

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
   No. 02 C 2590, 2004 WL 5129997 (N.D. Ill. Dec. 15, 2004) ................................. 24

*ALZA Corp. v. Andrx Pharm., LLC*,
   603 F.3d 935 (Fed. Cir. 2010).................................................................. 14

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*,
   6 F.3d 1523 (Fed. Cir. 1993)............................................................... 23, 24

*Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*,
   494 F. Supp. 2d 54 (D. Mass. 2007) ............................................................ 7

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
   24 F.3d 178 (Fed. Cir. 1994).................................................................. 27

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................... 18

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs Inc.*,
   682 F.3d 1003 (Fed. Cir. 2012)............................................................. 21, 22

*Black & Decker Corp. v. Positec USA Inc.*,
   No. 11-CV-5426, 2015 WL 1543262 (N.D. Ill. Mar. 31, 2015)................................. 24

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*,
   35 F. Supp. 3d 1176 (C.D. Cal. 2014) ....................................................... 3, 5

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
   986 F. Supp. 2d 574 (W.D. Pa. 2013)........................................................... 22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..................................................................... 17, 18, 25

*Clancy Sys. Int'l, Inc. v. Symbol Techs., Inc.*,
   953 F. Supp. 1170 (D. Colo. 1997).......................................................... 24, 28

*Cohesive Techs., Inc. v. Waters Corp.*,
   543 F.3d 1351 (Fed. Cir. 2008) (same)......................................................... 21

*Cole v. Kimberly–Clark Corp.*,
   102 F.3d 524 (Fed. Cir. 1996)................................................................. 18

*Columbia Mach., Inc. v. Besser Co.*,
   No. C10-5667RBL, 2012 WL 1378726 (W.D.Wash. Apr. 20, 2012) ............................. 11

*Eolas Techs., Inc. v. Adobe Sys., Inc.*,
   No. 6:09-cv-446, 2011 WL 11070303, (E.D. Tex. Sept. 23, 2011)............................... 7

*Ethicon, Inc. v. Quigg*,
  849 F.2d 1422 (Fed. Cir. 1988)..................................................................22

*Funai Elec. Co. v. Daewoo Elecs. Corp.*,
  616 F.3d 1357 (Fed. Cir. 2010)............................................................26, 27

*Gillette Co. v. Energizer Holdings, Inc.*,
  405 F.3d 1367 (Fed. Cir. 2005)..............................................................14

*Hilgraeve Corp. v. McAfee Assocs., Inc.*,
  224 F.3d 1349 (Fed. Cir. 2000)..............................................................19

*HTC Corp. v. Tech. Props. Ltd.*,
  No. 5:08-cv-882-PSG, 2013 WL 5225043 (N.D. Cal. Sept. 17, 2013) ...................22

*i4i Ltd. P'ship  v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010)..............................................................21

*iLOR, LLC v. Google, Inc.*,
  631 F.3d 1372 (Fed. Cir. 2011)..............................................................21

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988)..........................................................14, 17

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
  No. 1:09-CV-1685, 2013 WL 1821593 (M.D. Pa. Apr. 30, 2013)....................24, 27

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*,
  687 F.3d 1377 (Fed. Cir. 2012) (citations omitted) ..........................13, 15, 16, 17

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)..........................................................................7

*Marley Mouldings Ltd. v. Mikron Industries, Inc.*,
  No. 02 C 2855, 2004 WL 416359 (N.D. Ill. Feb. 20, 2004),
  *rev'd on other grounds by* 417 F.3d 1356 (Fed. Cir. 2005) ....................14

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996)..........................24

*Metrologic Instruments, Inc. v. PSC, Inc.*,
  No. CIV. A. 99-4876JBS, 2004 WL 2851955 (D.N.J. Dec. 13, 2004) ...........24, 27

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
  252 F.3d 1306 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002)...........10

*Nautilus, Inc. v. Biosig Instruments., Inc.*, 134 S. Ct. 2120 (2014) ...............3

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
  138 F.3d 1437 (Fed. Cir. 1998)..............................................................24

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)..............................................................18

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011)..............................................................21

*Promega Corp. v. Applied Biosystems, LLC*,
  No. 13-cv-2333, 2013 WL 2898260 (N.D. Ill. June 12, 2013)........................14

*Scanner Techs. Corp. v. Icos Vision Sys. Corp. N.V.*,
   253 F. Supp. 2d 624 (S.D.N.Y. 2003)................................................................. 17

*Sears Petroleum & Transp. Corp. v. Archer Daniels Midland Co.*,
   No. CIVA 5:03-cv-1120, 2007 WL 2156251 (N.D.N.Y. July 24, 2007) ................... 7

*Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*,
   400 F.3d 910 (Fed. Cir. 2005)............................................................................ 24

*SmithKline Beecham Corp. v. Apotex Corp.*,
   403 F.3d 1331 (Fed. Cir. 2005)............................................................................. 5

*Takeda Pharm. Co. v. Mylan Inc.*,
   No. 13-cv-04001-LHK, 2014 WL 5862134 (N.D. Cal. Nov. 11, 2014)..................... 5

*Third Wave Techs., Inc. v. Stratagene Corp.*,
   381 F. Supp. 2d 891 (W.D. Wis. 2005) ................................................................. 7

*Von Holdt v. A-1 Tool Corp.*,
   714 F. Supp. 2d 863 (N.D. Ill. 2010) .................................................................. 25

**Statutes**

35 U.S.C. § 112............................................................................................... 2, 3, 8

35 U.S.C. § 112(a) ............................................................................................... 13

35 U.S.C. § 282..................................................................................................... 22

35 U.S.C. § 287..................................................................... 23, 24, 25, 26, 27, 28

35 U.S.C. § 287(a)................................................................................................ 24

**Other Authorities**

1 R. Cary Moy, *Moy's Walker on Patents* § 4:94, Westlaw (database updated Aug. 2015) .......... 5

Dictionary of Engineering (2015)............................................................................. 8

Merriam-Webster Online Dictionary (Merriam-Webster, Inc. 2015) ........................... 8

MPEP 2164.08 (9th ed. Mar. 2014)......................................................................... 14

Oxford Dictionaries (Oxford University Press 2015)............................................. 8, 11

**Rules**

Fed. R. Civ. P. 56................................................................................................... 18

# I.	INTRODUCTION

The patents in suit have been subjected to serial litigation before various examiners, courts, and tribunals for at least six years.  At each stage the interpretation and scope of the key claims faced challenge.  And in each case the claims were found sufficiently definite to construe.  In fact, each examiner, court, and tribunal to consider these patents chose to construe the claims precisely as Plaintiffs now request.

Defendant's request for summary judgment of invalidity and of non-infringement is based primarily on its assertion that the key claims of the patents in suit should either be found so indefinite that they cannot be construed – at odds with the determinations of every previous examiner, court and tribunal to address these patents – or construed in a manner that contradicts both the logic of the patents and the constructions applied by both the patent office and Judge Callahan of this District.  Even in the context of the recent IPR institution decisions cited by Defendant, the PTAB expressly rejected the arguments made here by Defendant, found the claims definite, and adopted Judge Callahan's constructions – the same urged by Plaintiffs here.

# II.	CLAIM CONSTRUCTION

Defendant asks this Court to construe three terms yet again.  In doing so, Defendant ignores not only the extensive litigation history of these patents, but the plain meaning of the claim terms and the background industry knowledge that would have been part of the context brought to bear by those of ordinary skill in the art at the time.

Viewed properly in context, each of the terms proposed for construction (or a finding of indefiniteness) by Defendant has a clear construction consistent with those determined by Judge Callahan, the original examiner, the USPTO, and the PTAB.

## A.    20 Amp Limitation[1]

Each of the independent claims of each of the patents in suit share a common claim term

labelled in Plaintiffs' own motion for summary judgment as the "20 Amp Limitation":

| Claims | Claim Term | Plaintiffs' Construction | Defendant's Position |
|---|---|---|---|
| '290: 1 '510: 1, 9, 10, 12, 14, 16, and 18 | "battery cells being capable of producing an average discharge current greater than or equal to approximately 20 amps" | "the battery cells, when configured together in a battery pack, are capable of producing reasonably close to 20 amps of discharge current or greater over the course of delivering their entire rated capacity" | Defendant contends that this claim term is indefinite under 35 U.S.C. § 112, ¶2. |
| '173: 1 | "battery cells capable of producing an average battery pack discharge current greater than or equal to approximately 20 amps" | | |

Pls.' Proposed Findings of Fact ¶ 9 (hereinafter "PPFOF").

In their own summary judgment motion (ECF No. 32-1), Plaintiffs set forth the basis for

construing the 20 Amp Limitation as "the battery cells, when configured together in a battery pack,

are capable of producing reasonably close to 20 amps of discharge current or greater over the course

of delivering their entire rated capacity."  This was how the term was understood at the time by those

of ordinary skill in the art (PPFOF ¶ 10); this was how the industry understood at the time to test a

high power cordless tool battery pack for minimum threshold performance (*id.* ¶ 11); this is how

Judge Callahan construed the 20 Amp Limitation in previous litigation over these same patents (*id.*

¶ 12-13); this is how the original examiner applied the term in light of the distinction drawn by the

Gary Meyer declaration between the capabilities of the Moli prototype pack and the pack of the

claimed invention (*id.* ¶ 17-21); and this is how the patent office construed the 20 Amp Limitation

over Defendant's arguments of indefiniteness in the recent IPR petitions (*id.* ¶ 14-16).

---

[1] The 20 Amp Limitation is the core limitation present in each independent claim of each of the patents in suit as discussed more extensively in Plaintiffs' own motion for summary judgment. Pls.' MSJ, ECF No. 32-1.  Because Plaintiffs also sought construction of this limitation in their own motion, Plaintiffs will not repeat all of the argument from Plaintiffs' earlier brief but rather incorporates herein by reference the arguments set forth therein.  *Id.* at 9–24.

In the face of determination after determination that the 20 Amp Limitation is definite and to be construed in the manner Plaintiffs' suggest, Defendant nevertheless argues that this Court should find the 20 Amp Limitation indefinite under 35 U.S.C. § 112. In order to find a claim term indefinite, this Court must determine, as a matter of law, that the term, "viewed in light of the specification and prosecution history, [does not] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments., Inc.*, 134 S. Ct. 2120, 2129 (2014). The standard is one of reasonableness, as "absolute precision is unattainable." *Id.* And the standard must be interpreted in a manner mindful that the intended audience is neither lawyers nor the general public, but rather those skilled in the relevant art who are conversant with usage particular to their field. *See id*. at 2128-29. The determination of definiteness entails a delicate balance and "[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Id*. at 2128 (citation omitted). While indefiniteness is a question of law, Defendant, as the challenger, bears the burden of proof on each supporting fact by clear and convincing evidence. *See Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, 35 F. Supp. 3d 1176, 1182 (C.D. Cal. 2014).

Defendant argues that the 20 Amp Limitation fails to inform a reader how to determine if a given product infringes, suggesting that the claim does not tell a reader the time period, the temperature, the tool used, the application (drilling, sawing, etc.), or whether the discharge is continuous or intermittent. In so arguing, however, Defendant ignores the prosecution history and, in particular, the import of the Gary Meyer declaration. In light of the Gary Meyer declaration, and the distinction drawn therein between the capability of the prototype packs that preceded the invention and capability of the packs of the patented invention, no one of ordinary skill in the art could believe that the 20 Amp Limitation could be met by a pack only capable of discharging at 20 Amps for a period less than that required to deliver its full capacity.

As discussed in Plaintiff's own motion for summary judgment, Gary Meyer, one of the co-inventors, submitted a declaration and test results during the prosecution of the '290 patent addressing the distinction in capabilities between a prototype pack provided by Moli early in Milwaukee Tool's development efforts and the actual packs that are the subject of the patents. PPFOF ¶ 17. The Meyer Declaration described how the prototype packs were put through a variety of tests but failed to demonstrate the capabilities of the claimed invention. *Id.* ¶ 18. Critically for purposes of understanding the meaning of the 20 Amp Limitation, the tests showed that the prototype packs <u>could</u> discharge at 20 amps for certain periods of time less than a full discharge – but that didn't satisfy the 20 Amp Limitation. *Id.* ¶ 19. Similarly, the tests showed that the prototype packs <u>could</u> provide the necessary power to run certain power tools for at least some applications, including powering a circular saw for a series of cuts. *Id.* ¶ 20. But again, that didn't satisfy the 20 Amp Limitation. *Id*. A pack that cannot provide 20 amps of current at any point in delivering its full capacity is not commercially operable.

Had it been enough to discharge at 20 amps for a short period – enough perhaps to make a series of cuts with a circular saw, but not provide the full capacity of the pack at 20 amps – the patents in suit would not have been granted over the prototype packs. The examiner understood, however, that these limited capabilities were not enough. The 20 Amp Limitation specifically required something more: the ability to discharge at 20 amps over the course of delivering the pack's entire capacity. That is the capability that made the patented invention – a pack that could meet the 20 Amp Limitation – distinct from the prototype packs. And that capability – recognized by the examiner in issuing the patents in suit – defines the 20 Amp Limitation.

As such, the prosecution history, which this Court must consider in determining whether the 20 Amp Limitation is sufficiently definite to be construed, informs those of ordinary skill in the art with far more than reasonable certainty exactly what was meant by the 20 Amp Limitation. In

pretending that it can't tell how long a discharge must continue to satisfy the 20 Amp Limitation, Defendant ignores the plain instruction of the prosecution history which demonstrates that discharges of less than a pack's full capacity are insufficient.

Defendant's argument also conflates two issues: indefiniteness and breadth.  A claim that defines the invention as encompassing a wide range of configurations or applications, although broad, is not indefinite.  1 R. Cary Moy, *Moy's Walker on Patents* § 4:94, Westlaw (database updated Aug. 2015).  "[B]readth is not indefiniteness", and merely claiming broadly does not render a claim invalid.  *Takeda Pharm. Co. v. Mylan Inc.*, No. 13-cv-04001-LHK, 2014 WL 5862134, at *9 (N.D. Cal. Nov. 11, 2014) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005).)

Besides mistakenly arguing that the 20 Amp Limitation covers a pack that works only for short periods, Defendant also claims that it cannot tell which tool or application is covered, what temperature is required, or whether the discharge must be continuous or intermittent.  These red-herring arguments are all merely questions of breadth.  The requirements of the 20 Amp Limitation are simple and speak to the capability of the battery pack: if the pack is capable of discharging at reasonably close to 20 amps over the course of delivering its entire capacity, the pack meets the 20 Amp Limitation.  This is so regardless of what tool is used, regardless of what application is performed, regardless of the temperature during discharge, and regardless whether the discharge is continuous or intermittent.  *See* PPFOF ¶ 22-24.  While necessarily broad, that breadth does not render the claim indefinite because it still informs those of ordinary skill in the art about the scope of the claim with reasonable certainty.  *See id.*; *see also*, *Cal. Inst. of Tech.*, 35 F. Supp. 3d at 1190.

Not only did the examiner understand this in issuing the patents in suit, but the PTAB explicitly considered and rejected Defendant's same arguments about the definiteness of the 20 Amp Limitation in the recently issued IPR institution decisions.  *See* PPFOF ¶¶ 14-16.  The PTAB

considered Defendant's argument (made there, just as here) that the 20 Amp Limitation is indefinite because "the claim language and specification fail to explain the time period over which the average discharge is to be measured, or the method or particular application that is to be used[.]" *See, e.g.,* ECF No. 25-72 at 9. The PTAB rejected Defendant's argument, stating "[w]e disagree with Petitioner's argument that the 20 Amp Limitation fails to inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.* The PTAB instead accepted Plaintiffs' position that "the patent claims refer to the ***capability of the battery pack***, irrespective of the particular tool affixed to it[,]" and found that "one of ordinary skill in the art would understand that the battery cells are capable of producing an average discharge current greater than or equal to approximately 20 amps under any set of reasonable operating conditions." *Id.* at 10. The PTAB expressly noted that while this claim is broad, "breadth is not to be equated with indefiniteness." *Id.* The PTAB not only refused to find the 20 Amp Limitation indefinite, but expressly adopted Judge Callahan's construction: "the battery cells, when configured together in a battery pack, are capable of producing reasonable close to 20 amps of discharge current or greater over the course of delivering their entire rated capacity." *Id.* at 11.

Defendant's final argument for indefiniteness is the assertion that the proposed construction itself fails to explain its meaning because the concept of "entire rated capacity" is not understood. Defendant complains uncertainty concerning "numerous other factors, such as the duration of each discharge, the time allowed between each discharge, and the ambient temperature, may affect whether a given pack meets or does not meet the [20 Amp Limitation]." Def. MSJ 9, ECF No. 28-1. This argument again misses the point. The 20 Amp Limitation is expressly a claim limitation that speaks to the <u>capability</u> of a pack. PPFOF ¶ 24. As such, if the pack is capable of delivering the required performance, it meets the limitation. The 20 Amp Limitation is not specific to a particular application, a particular discharge time, or a particular ambient temperature. *Id.* ¶ 22. As the PTAB

recognized, a pack meets the limitation if it can provide the required discharge current "under any set of reasonable operating conditions." *Id.* ¶ 16. And "entire rated capacity" is a standard term well understood by those of ordinary skill in the art. *Id.* ¶ 25. As recognized by Judge Callahan in his decision adopting Plaintiffs' proposed construction for the 20 Amp Limitation, the capacity of a battery pack is a measurement – generally in ampere-hours (Ah) – of how much energy the pack can deliver from being fully charged to reaching full discharge at a manufacturer-determined end-of-discharge voltage. *Id.* ¶ 13. Anyone of ordinary skill in the art would have understood what it meant for a pack to deliver its full capacity and how to measure if it had. *Id.* 25.

Moreover, as explained in detail in Plaintiffs' own summary judgment motion, there is a strong presumption that patents should be construed consistently, applying *stare decisis* to ensure uniformity and predictability. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390-391 (1996) ("[T]he importance of uniformity in the treatment of a given patent as an independent reason to allocate all issues of construction to the court."). The conclusion reached by four sets of professionals – the PTO examiner during prosecution, Judge Callahan during the Hitachi case, the three examiner panel at the PTO again during reexamination, and the three judge PTAB panel in the recent IPRs – weighs heavily in favor of continuing to construe the 20 Amp Limitation as definite and as requiring the pack to discharge at 20 Amps over the course of delivering its entire rated capacity. *See id.*; *see also Third Wave Techs., Inc. v. Stratagene Corp.*, 381 F. Supp. 2d 891, 914 (W.D. Wis. 2005); *Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*, 494 F. Supp. 2d 54, 60 (D. Mass. 2007); *Sears Petroleum & Transp. Corp. v. Archer Daniels Midland Co.*, No. CIVA 5:03-cv-1120, 2007 WL 2156251 (N.D.N.Y. July 24, 2007); *Eolas Techs., Inc. v. Adobe Sys., Inc.*, No. 6:09-cv-446, 2011 WL 11070303, at *1-2 (E.D. Tex. Sept. 23, 2011).

Accordingly, the 20 Amp Limitation should not be found to be indefinite because it informs those of ordinary skill in the art as to the scope of the limitation with reasonable certainty. It should

be construed the same way it was construed by Judge Callahan and the PTAB: "the battery cells, when configured together in a battery pack, are capable of producing reasonably close to 20 amps of discharge current or greater over the course of delivering their entire rated capacity." PPFOF ¶¶ 12, 16.

## B. Nominal Voltage

| Claims | Claim Term | Plaintiffs' Construction | Defendant's Position |
|---|---|---|---|
| '290: 7 '510: 1, 5, 9, 10, 12, 14, 15, 16, and 18 '173: 7 | "nominal voltage" | plain and ordinary meaning or "designated approximate voltage" | Defendant contends that this claim term is indefinite under 35 U.S.C. § 112, ¶ 2. |

Much like the 20 Amp Limitation, the claim term "nominal voltage" has already been considered, determined to be definite, and construed consistently several times, both by Judge Callahan and by the PTAB. Voltage has an undisputed meaning, so the only question is what a "nominal" voltage refers to. "Nominal" is a simple term with a simple meaning: it means "named" or "designated."[2] *Nominal Voltage*, Dictionary of Engineering (2015),

http://www.dictionaryofengineering.com/definition/nominal-voltage.html (last visited Aug. 28, 2015) (defining "nominal voltage" as "A rated or named value[.]") The point of the word "nominal" is that it refers to a designated or named amount that may not be the same as the actual value if it were measured. *Id*. As a result, "nominal voltage" is just the voltage that is designated.

In the patents in suit, the term "nominal voltage" is used exclusively to refer to the "nominal voltage" of a cell or to the combined "nominal voltage" of a plurality of cells in a pack. PPFOF ¶ 30. As such, the "nominal voltage" is merely the designated voltage for the cell or pack, recognizing that any precise, measured voltage of any given cell or pack might differ from the

---

[2] *See also*, *Nominal,* Oxford Dictionaries (Oxford University Press 2015), http://www.oxforddictionaries.com/us/definition/american_english/nominal (last visited Aug. 28, 2015) ("stated or expressed but not necessarily corresponding exactly to the real value"); *Nominal,* Merriam-Webster Online Dictionary (Merriam-Webster, Inc. 2015), http://www.merriam-webster.com/dictionary/nominal (last visited Aug. 28, 2015) ("a designated or theoretical size that may vary from the actual").

designated value. For example, claim 10 of the '510 Patent claims, inter alia, "A battery pack . . . comprising . . . a plurality of battery cells . . . the battery cells having a combined nominal voltage of at least approximately 12 volts." *Id.* ¶ 31. This means that the pack is designated as at least a 12 volt pack. It is common practice in the cordless tool industry to designate packs with a voltage even if the designated voltage does not precisely match any actual measurable voltage of the cells in the pack. *Id.* ¶ 32. Anyone of ordinary skill in this art would have understood that such voltages designations are approximate and are intended to convey to a consumer the relative power of the pack, not a measured voltage. PPFOF ¶¶ 33.

The PTAB understood precisely this point in its recent decisions regarding the IPRs on the patents in suit. Faced with the exact same arguments made by Defendant here, the PTAB considered that "[i]n general, 'nominal' is a term used in technological fields to indicate a stated value is only an approximate, rather than exact value." *Id.* ¶ 28. The PTAB cited additional dictionary examples demonstrating that the term "nominal" referred to designated or named, rather than actual or measured, values. *Id.* Based on this evidence, the PTAB held that the ordinary and customary meaning of the term "nominal voltage" is "an approximate voltage from which the actual voltage may vary." *Id.* 27.

Similarly, Judge Callahan, in construing the term "nominal voltage range" in the context of a related patent that is part of the same patent family as the patents in suit, construed the term "nominal voltage" as "designated expected voltage." *Id.* ¶ 26. Once again, this construction acknowledges the core meaning of "nominal" as something designated or named, not measured, and thus, by definition, approximate or expected rather than actual.

Defendant, ignoring the ordinary meaning of the word "nominal," argues that the term "nominal voltage" is indefinite because it isn't clear if it is meant to refer to the measured voltage when fully charged, the measured voltage when fully discharged, the measured midpoint voltage, or

the voltage measured at some other time. Of course, it's none of these. It's not a measured voltage at all. It's a stated voltage, a designated voltage, a voltage that is named, not measured. As such, there is no uncertainty regarding the scope covered by the claim term "nominal voltage." The term informs those of ordinary skill in the art of the meaning of the claim with far more than the required reasonable certainty. Accordingly, the Court should reject Defendant's request to find the term "nominal voltage" indefinite and either refuse to construe the term, allowing it to have its plain and ordinary meaning, or, if the Court considers that construction is required, construe the term as: "designated approximate voltage."

**C.    A Plurality of Cells Supported by the Housing**

| Claims | Claim Term | Plaintiffs' Construction | Defendant's Construction |
|---|---|---|---|
| '290: 1 '510: 1, 9, 10, 12, 14, 16, and 18 '173: 1 | "a plurality of cells supported by the housing" | "a plurality of cells the weight of which is borne either directly or indirectly by the housing" | "a plurality of cells engaged, and held in position, by the housing" |

Defendant seeks a brazenly outcome-determinative, hindsight-driven construction of the words "supported by" so as to give it a non-infringement argument. These words have a plain and ordinary meaning at odds with the unsubstantiated construction that Defendant seeks to apply. These words also, like the other terms contested by Defendant, were previously construed by Judge Callahan in a manner that contradicts Defendant's proposed construction. PPFOF ¶ 34-35.

Judge Callahan considered the meaning of the words "supported by the housing" in the context of the '257 patent.[3] In that case, Hitachi, much like Defendant here, sought an outcome-determinative construction that construed "supported by the housing" to mean "located entirely within and mounted to the . . . housing." Callahan Order at 10, ECF No. 34-19. Judge Callahan

---

[3] Judge Callahan's claim construction order from the Hitachi litigation covered terms from several patents in Plaintiffs' lithium ion patent family that, for reasons of simplification, are not at issue in this case. The construction of the same claim language used in a related patent is nevertheless instructive here as it would be considered to be used in the same manner with the same meaning. *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1311 (Fed. Cir. 2001), *vacated on other grounds*, 535 U.S. 1109 (2002).

rejected this construction, citing evidence that the term "supporting" does not require direct physical contact. *Id*. Judge Callahan also noted that the key aspect of the meaning of the word "support" is that of bearing, directly or indirectly, the weight of the thing being supported. *Id*. Judge Callahan further relied on cases in which the word "supporting" had previously been construed by other courts to mean "bear the weight of" without any requirement of direct physical contact. *See id.* (citing *Columbia Mach., Inc. v. Besser Co.*, No. C10-5667RBL, 2012 WL 1378726, at *5-6 (W.D.Wash. Apr. 20, 2012)).

As Judge Callahan saw, the plain and ordinary meaning of the word "support" is not to engage and hold in place, but to hold up, to bear the weight of a thing.[4] PPFOF ¶ 34. Just as a foundation supports a building – not to keep it from moving, but to keep it from falling down – the word "support" in the claims refers to the role of keeping a thing – in this case the battery cells – from falling down and away from the tool. A simple thought experiment reveals this truth. The patents in suit refer to hand-held cordless power tools and the battery packs that power them. Imagine holding in hand a cordless drill. The battery pack is connected to the bottom of the handle. Now imagine that the battery pack that lacks a housing. Even if the pack had end-caps on the cells, those cells, end caps and all, would fall away from the tool if the housing did not support (that is bear the weight of) the cells. *Id.* ¶¶ 40-41. It is not the end caps that connect to the tool and keep the cells from falling out. *Id*. Only the housing does that, whether the pack utilizes end caps on the cells or not. *Id*.

Defendant's construction, importing the concept of engaging to hold in place, is designed solely to allow it to argue that it is the end caps doing the "supporting" rather than the housing. But contrary to Defendant's assertions, the end caps, as disclosed in the specification of the patents in suit, perform an entirely different function. Defendant tells the Court that "the specification

_____
[4] For example, the Oxford English Dictionary defines "support" as "bear all or part of the weight of; hold up." (*Support*, Oxford Dictionaries, http://www.oxforddictionaries.com/us/definition/american_english/support (last visited Aug. 28, 2015).

describes two separate sets of embodiments, one in which the battery cells are supported by the housing and another in which the battery cells are instead supported by structures called 'end caps.'" Def. MSJ 13. Defendant's statement is false. Rather, the specification describes only embodiments in which the cells are supported by the housing, but also describes a subset of such embodiments that also utilize the end cap structure within the housing to space out the cells for better airflow and thus better heat dissipation. *See e.g.*, '290 Patent at 10:62-11:22 ("the end cap arrangement can be used for spacing the battery cells" (10:64-65) and "Each end cap can define the cavities a-g in order to create gaps or spaces between the battery cells when the battery cells are positioned within the cavities. This can allow for greater heat dissipation within the battery pack by allowing air to circulate through the gaps and spaces between the cells." (11:16-22)), PPFOF ¶ 42. Nowhere in the specification is it discussed or even suggested that the end caps (instead of the housing) support the cells in any embodiment. The only discussion of end caps is in the context of holding the cells in a particular spacing, primarily for heat dissipation, and also, in some constructions, for the purpose of facilitating cushioning against impact. *Id*. at 11:27-12:10, PPFOF ¶ 43. In all such embodiments, however, the cells (and their end caps) are ultimately placed within a housing. And every mention of supporting the cells that appears anywhere in the specification, expressly indicates that the cells are supported by the housing. *See, generally,* '290 Patent; PPFOF ¶ 44. This demonstrates that the term "supported by the housing" in the claims refers to the housing's role of supporting, directly or indirectly, the weight of the cells, and further demonstrates that the role of the end caps to engage and hold the cells in a particular position within the housing is different role entirely.

The Court therefore should reject Defendant's attempt to rewrite the patent and give the claim term "a plurality of cells supported by the housing" its ordinary and customary meaning of "a plurality of cells the weight of which is borne either directly or indirectly by the housing."

## III. THE PATENTS IN SUIT SUFFICIENTLY ENABLE THE PROPERLY CONSTRUED CLAIMS

The common specification of the patents in suit enables the 20 Amp Limitation when properly construed. In order to argue otherwise, Defendant pretends that the 20 Amp Limitation is meant to cover any current from 20 Amps up to infinity. Not only is it a physical impossibility to draw anything like an infinite current from a battery pack, but those of ordinary skill in the art would have understood, instructed by the claims and the specification, that the 20 Amp Limitation was meant to refer to discharge currents consistent with the range of currents used by hand-held power tools – the object of the invention.

Unlike the cases cited by Defendant, Plaintiffs are not asserting the patents in suit against a pack designed for a discharge current many times the claimed minimum level. Plaintiffs did not claim a range starting at 20 amps only to assert it against a 1000 amp pack. Plaintiffs assert the patents in suit against Defendant's packs only and precisely for their capability to discharge at approximately 20 amps. Plaintiffs' assertion against these 20 amp capable packs is consistent with the proper understanding of the application of the 20 Amp Limitation and is fully enabled.

### A. Legal Standard

The enablement requirement provides that: "The specification shall [describe] the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the [invention] . . . ." 35 U.S.C. § 112(a). To be enabling, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380 (Fed. Cir. 2012) (citations omitted).[5]

---

[5] A court may consider the following factors when determining if a disclosure requires undue experimentation: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7)

Of course, just because a patent claim includes an apparently open-ended range, does not mean that the claim must be interpreted as claiming the entire range to infinity. *See e.g.*, *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005). Rather, claims with open-ended claim language such as "greater than," "comprising," and "at least" are common[6] and are enabled if a person of skill in the art would know how to make and use the invention in the claimed range. *See Promega Corp. v. Applied Biosystems, LLC*, No. 13-cv-2333, 2013 WL 2898260, at *16-17 (N.D. Ill. June 12, 2013).

In interpreting an open-ended claim for the purpose of evaluating enablement, the Court is required to analyze the claim and subject matter as a whole, not merely the specific phrase that is allegedly not enabled. *See Gillette Co.*, 405 F.3d at 1371 (rejecting an allegation of lack of enablement based on open claim language).[7] The Court is required to consider the logical limits of the claims to understand where an apparently open-ended range claim should be interpreted to end. For example, in *Marley Mouldings Ltd. v. Mikron Industries, Inc.*, No. 02 C 2855, 2004 WL 416359 (N.D. Ill. Feb. 20, 2004), *rev'd on other grounds by* 417 F.3d 1356 (Fed. Cir. 2005), the Court rejected an argument of lack of enablement for a range of "up to 100" on the basis that the range could not extend to include zero because it was impossible and not logically to be considered part of the claimed range for purposes of enablement. *Id.* at *3-4. The Court held that the claim was enabled in light of the specification which made clear that the range was not intended to extend down to include zero even though the claim language, on its face, appeared to include zero in the range. *See id.*

---

the predictability or unpredictability of the art, and (8) the breadth of the claims. *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) ; *see also In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) .

[6] Numerous patents include claims with the same "greater than or equal to approximately" formulation that appears in the 20 Amp Limitation. PPFOF ¶ 53. Under Defendant's argument, all such claims would be automatically invalid because a range to infinity cannot be enabled. This is not reasonable.

[7] Similarly, an examiner "should determine what each claim recites and what the subject matter is when the claim is considered as a whole, not when its parts are analyzed individually." MPEP 2164.08 (9th ed. Mar. 2014).

The cases relied upon by Defendant resulted from situations where a patentee attempted to assert its patent against an accused infringer that practiced well outside the capabilities disclosed in the specification, thus stretching an open-ended range claim far beyond its initial logic. For example, in *MagSil*, the applicable claim was for an open-ended range of "at least 10%" in reference to achieving changes in resistance. *MagSil*, 687 F.3d at 1381. There the specification disclosed that the patentee with its best efforts had achieved resistive changes of up to 11.8% and the inventor testified that known technology at the time could not have yielded more than a 20% change in resistance under any circumstances. *See id*. at 1382-83. Nevertheless, the patentee asserted the claim against resistance changes of 100% or even 1000%. *See id*. at 1382. Leaning heavily on the patentee's vast over-assertion of the scope of its claims, the court held that the claims, <u>as interpreted by the patentee</u>, were invalid for lack of enabling the entire range that the patentee asserted. *See id*. at 1384.

In this case, the 20 Amp Limitation does not extend from 20 amps all the way up to infinity simply because of the open-ended "greater than" language. The specification, the claim language, and the knowledge that would have been possessed by one of ordinary skill in the art demonstrate that the 20 Amp Limitation encompassed only discharge currents consistent with the demands of hand-held power tools. PPFOF ¶ 46-53.

**B.     The 20 Amp Limitation is Sufficiently Enabled When Properly Construed.**

The patents in suit claim a battery pack for a hand-held power tool that is capable of producing reasonably close to 20 amps of discharge current or greater over the course of delivering its entire rated capacity. While not explicitly bound above 20 amps, the disclosures of the specification along with the inherent knowledge of those of ordinary skill in the art (and the simple realities of physics) demonstrate that the 20 Amp Limitation covers a more limited range.

The fact that the claims and the specification specifically identify the 20 Amp Limitation as being applicable to a battery pack for a hand-held power tool demonstrates that the 20 Amp

Limitation was meant to refer to the range of currents consistent with the requirements of such tools. One of the co-inventors, Jeffrey Zeiler, discussed this in a declaration with the patent office in the context of an earlier reexamination of the patents in suit. PPFOF ¶ 47. There he clarified that:

> For a hand held circular saw, the 600W-1500W power range corresponds to currents in the range of, for example, approximately 33A (for an 18V battery pack) and approximately 25A (for a 24V battery pack) at the low end of operational power (i.e., 600W) and approximately 83A (18V) and approximately 62A (24V) at the high end of operational power (e.g., 1500W). For a hand held hammer drill, the 500W-800W power range corresponds to currents in the range of, for example, approximately 27A (18V) and approximately 20A (24V) at the low end of operational power (i.e., 500W), and approximately 44A (18V) and approximately 33A(24V) at the high end of operational power (i.e., 800W).

*Id.*

Defendant itself notes that the circular saw was the most demanding hand-held power tool that was known at the time of the invention. Therefore, the claim and specification's unambiguous limitation to hand-held power tools shows that the intended range of the 20 Amp Limitation would have begun around 20 amps (the low end for the lower-demand tool) and would not have exceeded approximately 83 amps (the high end for the higher-demand tool).[8] *Id.* ¶ 48.

Not only is the 20 Amp Limitation properly understood as claiming only that range of discharge currents consistent with hand-held power tools, but unlike the patentee from *MagSil* and the other cases relied on by Defendant, Plaintiffs here are asserting the 20 Amp Limitation only against products capable of performing at the specifically identified bottom end of the claimed range. There is no question in this case whether a pack capable of an 80 amp, much less a 1000 amp, discharge current falls within the claims. Plaintiffs accuse Defendant's products only of being capable of delivering an average discharge current of approximately 20 amps.

---

[8] This is consistent with the generally understood limit at the time of approximately 25C for Li-Ion cells of the type referenced in the patents. PPFOF ¶ 51. Moreover, all those of ordinary skill in the art would have understood that an infinite current is an impossibility based on simple laws of physics. *Id.* ¶¶ 49-50. Defendant's suggestion that the 20 Amp Limitation was meant to claim up to an infinite current is insupportable.

Defendant does not contend that the properly construed range of the 20 Amp Limitation is not enabled. Defendant limits its argument to its inaccurate assertion that the 20 Amp Limitation covers from 20 amps up to infinity. Nevertheless, even if Defendant were to argue that discharge currents in the 80 amp range, for example, are not enabled, summary judgment would be inappropriate because it is a question of fact as to what degree of experimentation would have been required for one of ordinary skill in the art to practice the invention within the correct range of the 20 Amp Limitation.[9] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988); *see also Scanner Techs. Corp. v. Icos Vision Sys. Corp. N.V.*, 253 F. Supp. 2d 624, 634-35 (S.D.N.Y. 2003) (denying summary judgment regarding degree of experimentation because there was a material issue of fact). In fact, the disputed issues of material fact include, at a minimum: (1) the proper interpretation of the scope of the 20 Amp Limitation; (2) the knowledge of those of ordinary skill in the art as to the known and expected ranges of discharge current used by hand-held power tools; and (3) the level of experimentation that would have been required at the time to permit one of ordinary skill in the art to practice the invention throughout the applicable range. Defendant provides no evidence on which the Court could make the required findings on these issues. Because enablement is a question of law based on underlying factual findings, Defendant bears the burden of proof on these questions of fact by clear and convincing evidence. *See MagSil*, 687 F.3d at 1380. The existence of these disputes, and Defendant's failure to satisfy its burden, prevents summary judgment of no enablement. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## IV. EACH OF THE ACCUSED PRODUCTS INFRINGES EACH OF THE APPLICABLE ASSERTED CLAIMS[10]

Defendant is not entitled to summary judgment of non-infringement. Defendant does not present any evidence of actual testing of any of its products to evaluate infringement. Instead,

---

[9] And, in fact, the record shows that Plaintiffs tested their packs at least through a 40 amp average discharge current. PPFOF ¶ 52.

[10] Defendant asserts that Plaintiffs do not claim infringement by the doctrine of equivalents. This is not accurate. For purposes of this discussion, however, the distinction is immaterial.

Defendant relies exclusively on assumptions derived from the information contained on battery specification sheets. From what Defendant presents, it cannot know whether its products infringe or not. Unlike Defendant, Plaintiffs tested the accused products and determined that they infringe. Plaintiffs attach to this brief, and detail in their Statement of Facts, a declaration of Plaintiffs' expert, Dr. Ehsani, with actual test results, and annotated infringement charts providing evidence – claim-by-claim, limitation-by-limitation, and product-by-product – demonstrating that Defendant's products infringe the patents in suit. PPFOF ¶ 54-65. Based on this evidence, there is at least a genuine dispute of material fact as to whether each of the accused products includes a pack in which the plurality of cells are supported by the housing, and there is at least a genuine dispute of material fact as to whether each of the accused product packs satisfy the 20 Amp Limitation. Defendant does not even dispute any of the other limitations, so they are conclusively established by Plaintiffs' evidence.

Summary judgment is proper only where: (1) no genuine issues of material fact remain; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp.*, 477 U.S. at 322-23. Defendant bears the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[S]ummary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999). Recognizing the fact-intensive nature of the infringement inquiry, the Federal Circuit has directed district courts to approach motions for summary judgment on patent infringement with "great care." *See Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 528 (Fed. Cir. 1996). Courts have repeatedly held that summary judgment is inappropriate when a conflict exists between the parties'

expert opinions.  *See e.g., Hilgraeve Corp. v. McAfee Assocs., Inc.,* 224 F.3d 1349, 1353 (Fed. Cir. 2000).

Here, at worst, the record reflects competing expert opinions as to whether each of the accused products meets the key limitations of the claims of the patents in suit.  The result is genuine disputes of material fact that will be further fleshed out in the expert reports to be exchanged by the parties over the next few months and ultimately decided by the jury.  In light of these disputes, summary judgment of non-infringement would be inappropriate.

**A.      The Accused Product Packs Include Battery Cells Supported by the Housing.**

As explained in Section II.C., above, the proper construction of the term "supported by the housing" in the claims of the patents in suit is that the housing, directly or indirectly, bears the weight of the cells.  Defendant bases its argument entirely on the assertion "support" means "engage and hold in place."  Because Defendant's proposed construction is incorrect, so too is its argument for non-infringement.  In any event, as reflected in the attached annotated claim charts and supporting materials, Plaintiffs provide sufficient evidence to at least create a genuine dispute of material fact regarding whether each of the accused products comprises a plurality of battery cells supported by the housing, as well a54-s meeting each other limitation of each asserted claim of the patents in suit.  PPFOF ¶¶ 54-65.[11]

**B.      Each of the Accused Product Packs Meets the 20 Amp Limitation.**

Defendants assert that four of their packs cannot meet the 20 Amp Limitation.  In support of this assertion, Defendant provides no testing results at all, but merely an interpretation of the theoretical performance of individual cells based on information contained in the data sheets supplied by the cell manufacturers.  Def. MSJ 22–25; Fuhreck Decl. ¶¶ 31–32, 36, 41–45, ECF No. 25-18.  Defendant's discussion provides no support for its assertions because the 20 Amp Limitation

---

[11] Because the products and claims are too numerous to detail in the text, Defendant will only address the testing as to the key 20 Amp Limitation for the products discussed by Defendant in its brief.  The evidence as to each other product and each limitation is set forth in Plaintiffs' Statement of Facts and the supporting materials.

is a limitation applicable to the capability of *the pack*, not the individual cells.  Moreover, even if

cell capability were the proper point of evaluation, which it is not, Defendant's theoretical

conclusions drawn from specifications rather than actual unit testing cannot support Defendant's

assertion that the packs fail to meet the 20 Amp Limitation.  Nevertheless, regardless of those

disputes, summary judgment is conclusively precluded by genuine disputes of material fact because

Plaintiffs' expert tested each of the actual packs in question and determined that each one meets the

20 Amp Limitation.  PPFOF ¶¶ 60-65.

Defendant addresses four accused product packs: CTB8172,[12] CTB8185, CTB6172, and

CTB7172.  Plaintiffs tests demonstrate that each of these packs is capable of discharging at 20 amps

through delivering its entire capacity.  The following chart shows the test results obtained by

Plaintiffs regarding each of these four packs.  In each case, these tests were performed as follows:

(1) fully charge the pack; (2) discharge the pack at an estimated 1C rate;[13] (3) recharge the pack; and

(4) discharge the pack at a constant current of 20 amps.  PPFOF ¶ 61.

| CTB8172 | | | CTB8185 | | | CTB6172 | | | CTB7172 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1C | 20A | % | 1C | 20A | % | 1C | 20A | % | 1C | 20A | % |
| 1.84 | 1.99 | 108% | 3.901 | 3.997 | 102% | 1.359 | 1.313 | 97% | 1.15 | 1.20 | 104% |

*Id.*

The preceding chart shows the measured pack capacity of each pack in ampere hours when

discharged at the applicable rate (1C or 20 amps), as well as a column showing the percentage of

each pack's measured capacity that was delivered during the 20 amp discharge.  When a pack is able

to deliver approximately its entire actual, measured capacity (as shown by a percentage near 100%)

while being discharged at 20 amps it meets the 20 Amp Limitation.  *Id.* ¶ 64.  As shown in the

preceding chart, each of the four packs discussed in Defendant's brief demonstrate the ability to

---

[12] Defendant's brief mislabels this the CTB8182, but the actual name of the accused product pack is the CTB8172.
[13] "1C" refers to the discharge current in amps sufficient to discharge a pack's full capacity in one hour.  Thus, for a 3.0Ah pack, the 1C rate would be 3 amps.  The 1C discharge is performed to establish the rated capacity of a pack and is an industry standard test for determining a pack's capacity.  PPFOF ¶¶ 62-63.

provide approximately their full measured capacity when discharging at 20 amps.  Id. ¶ 65.  As tested, each of the packs meets the 20 Amp Limitation.  Defendant failed to test them at all and is in no position to claim the facts are undisputed.

## V.  THERE ARE DISPUTES OF MATERIAL FACT REGARDING WHETHER DEFENDANT WILLFULLY INFRINGED, AND CONTINUES TO WILLFULLY INFRINGE, EACH OF THE PATENTS IN SUIT

The multiple issues of disputed material fact regarding infringement and validity, discussed above, preclude the Court from granting summary judgment of no willful infringement.  Defendant asks the Court to resolve the objective prong of willful infringement in its favor because Defendant "raised multiple substantial questions as to the invalidity and noninfringement of the Patents-in-Suit."  Def. MSJ 25.  That is not the law.  The Court cannot properly resolve the objective prong on summary judgment where, as here, infringement and validity determinations depend on resolution of multiple disputed issues of material fact.

Objective recklessness is "predicated on underlying mixed questions of law and fact . . . ." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs Inc.,* 682 F.3d 1003, 1007 (Fed. Cir. 2012).  For this reason, the Federal Circuit made clear in *Bard* that only "[w]hen a defense or noninfringement theory asserted by an infringer is purely legal (*e.g.,* claim construction), the objective recklessness of such a theory is a purely legal question to be determined by the judge."  *Id.*  The cases relied upon by Defendants confirm this.  Def. MSJ 26 (citing *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1377–78 (Fed. Cir. 2011)) (regarding exclusively legal claim construction-based defense); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008) (same).

Thus, unless Defendant's defenses or noninfringement theories turn purely on a legal issue of claim construction, "the objective recklessness inquiry may require analysis by both the court and the jury."  *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1237 (Fed. Cir. 2011); *i4i Ltd. P'ship  v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010) ("[T]he jury was free to decide for itself whether Microsoft reasonably believed there were any substantial defenses to a claim of

infringement."); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 986 F. Supp. 2d 574, 630 (W.D. Pa. 2013) ("invalidity of the patents-in-suit was a factual determination to be made in this case. As such, the reasonableness of reliance on such invalidity defense was also the prerogative of the jury."). *See e.g.*, *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, No. C11-5973 PSG, 2013 WL 4537838, at *2 (N.D. Cal. Aug. 22, 2013) ("The *Bard* court noted that although the ultimate question of objective willfulness should be made by the judge, it is not error to allow the jury to determine the underlying facts to inform the court's objective willfulness finding.").

Here, Defendant's invalidity and noninfringement positions turn not just (and not even substantially) on purely legal claim construction issues, but on multiple disputed issues of material fact, as discussed in the sections above.[14] Thus, this is not the situation of *Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012), where the Federal Circuit affirmed summary judgment after a district court found no material disputed facts remained. *Id.*

As the party moving for summary judgment, Defendant "must do more than persuade [the court] that its defenses were reasonable." *HTC Corp. v. Tech. Props. Ltd.*, No. 5:08-cv-882-PSG, 2013 WL 5225043, at *8 (N.D. Cal. Sept. 17, 2013) (citation omitted). Rather, Defendant "must establish 'that there is no genuine dispute as to any material fact'" and thus "*no reasonable fact-finder* could find willful infringement." *Id.* (citation omitted). Here, Defendant's reliance on claim constructions that have already been rejected repeatedly doesn't come close.

Here, Defendant cannot deny that it was aware of Plaintiffs' patents, their industry-revolutionizing products embodying those patents, and the likelihood that Plaintiffs would pursue Defendant after it copied Plaintiffs' inventions and brought infringing products to market. Not only

---

[14] The fact that the PTO has instituted IPRs on the Patents-in-Suit is also of no moment, because mere institution of IPR proceedings does not resolve disputed issues of material fact as to validity of the asserted patent claims. Patent claims maintain their presumption of validity unless and until IPR proceedings conclude by rejecting the claims. 35 U.S.C. § 282; *see Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988).

were Plaintiffs' inventions famous in the power tool industry, receiving numerous awards for innovation and performance, but Defendant actually hired one of the inventors on the patents in suit to help its development of competing products. PPFOF ¶ 66-68. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable fact finder could find facts sufficient to support a finding of willful infringement. The Court should deny Defendant's motion as a result.

## VI. THERE ARE DISPUTES OF MATERIAL FACT REGARDING WHETHER PLAINTIFFS ARE ENTITLED TO PRE-SUIT DAMAGES AND IN WHAT AMOUNT

Plaintiffs complied with 35 U.S.C. § 287 because they marked all of their embodying products with the '290 patent from June 2009 through the present and required their numerous licensees to mark all licensed products with the '290 patent.[15] Defendant argues that two out of Plaintiffs' eight licensees were not required to mark for the short time period between September 2013 and October 2014, when the present lawsuits were filed. However, even if these two licensees immediately ceased marking new products after September 2013 (for which there is no evidence) the gap in marking is only thirteen months, and then only by two relatively small licensees as compared with millions and millions of marked units by Plaintiffs and their other licensees. Moreover, by the time any gap may have started, Defendant long since had notice through Plaintiffs' years of consistent marking. These facts undermine Defendant's allegations that Plaintiffs failed to comply with § 287. At the very least, the substantially continuous marking raises a material fact that is fatal to Defendant's motion for summary judgment.

### A. Legal Standard.

In order to collect damages for patent infringement, a patentee must first give actual or constructive notice of the patent and of the allegedly infringing activity. *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993); *Black & Decker Corp. v. Positec USA Inc.*,

---

[15] Plaintiffs only marked with respect to the '290 patent. Plaintiffs do not assert an entitlement to pre-suit damages with respect to the '173 or '510 patents. In nearly all cases, however, there is complete overlap in the products that infringe the three patents-in-suit so there is unlikely to be any change in total available damages.

No. 11-CV-5426, 2015 WL 1543262, at *22 (N.D. Ill. Mar. 31, 2015). Constructive notice is accomplished if "Patentees . . . give notice to the public that [their product] is patented" by marking their product with the patent number. 35 U.S.C. § 287(a).

The scope of marking must be "substantially consistent and continuous in order for the party to avail itself of the constructive notice provisions of the statute." *Am. Med. Sys.*, 6 F.3d at 1537. Whether the patentee's marking is sufficiently consistent and continuous is a question of fact. *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).; *see Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111-12 (Fed. Cir. 1996) (under "rule of reason" applied to licensees, 95% marking was sufficient).

Following the Federal Circuit's guidance, several district courts have also reasoned that § 287 allows a patentee to recover damages for periods of time during compliance, while excluding pre-suit damages during periods of non-compliance. *See, e.g.*, *Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 5129997, at *2 (N.D. Ill. Dec. 15, 2004) (denying motion for a remittitur based, in part, on finding that the patentee and its licensees were in compliance with the marking statute before the alleged infringement because under *American Medical Systems* "once marking has begun in compliance with the statute, *in rem* notice is provided and there is no reason to further limit damages . . .")[16]

Evidence of marking is sufficient if the patentee comes "forth with an affidavit stating that its products were marked, together with documents showing sales in that period." *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005). In short, "to survive the defendants' motion for summary judgment on the issue of notice under § 287(a), the plaintiffs must make an evidentiary showing that could lead a reasonable juror to find that the plaintiffs were, in fact, in

---

[16] *See also Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:09-CV-1685, 2013 WL 1821593, at *4 (M.D. Pa. Apr. 30, 2013); *Metrologic Instruments, Inc. v. PSC, Inc.*, No. CIV. A. 99-4876JBS, 2004 WL 2851955, at *21 (D.N.J. Dec. 13, 2004); *Clancy Sys. Int'l, Inc. v. Symbol Techs., Inc.*, 953 F. Supp. 1170, 1174 (D. Colo. 1997).

compliance with the marking statute." *Von Holdt v. A-1 Tool Corp.*, 714 F. Supp. 2d 863, 868 (N.D. Ill. 2010) (citing *Celotex*, 477 U.S. at 322-23).

**B.      Plaintiffs' Marking Has Been Sufficiently Consistent and Continuous to Provide Constructive Notice Under § 287.**

Defendant's motion for summary judgment about marking and pre-suit damages should be denied for three reasons:  (1) Plaintiffs marked all of their products from issuance of the '290 to the present; (2) Plaintiffs' licensees were required to mark substantially all of their licensed products; and (3) there no dispute that marking occurred between June 2009 and September 2013, thus pre-suit damages are appropriate for at least this time period.

**i.      Plaintiffs Marked All Embodying Products From Issuance Through Today.**

Plaintiffs have attached a patent label listing U.S. Patent No. 7,554,290 to substantially all patented products sold in the United States.  PPFOF ¶¶ 69-72.  From the end of June 2009 (the date of issuance of the '290 patent) through October 2014 (the date of filing suit), Plaintiffs sold about 33,000,000 products that were covered by the '290 patent, substantially all of which were marked. *Id.* ¶ 71.  Thus, Plaintiffs continuously and consistently marked its patented products for over 64 months prior to the filing of the related cases.  *Id.* ¶ 72.

**ii.      Plaintiffs' Licensees Were Required To Mark Substantially All Licensed Products.**

The vast majority of Plaintiffs' licensees of the '290 patent were also required to mark their licensed products with the '290 patent number continuously.  Plaintiffs granted licenses to at least eight competitors so they could also manufacturer power tools with the advantages conferred by the '290 patent.  *Id.* ¶ 76.  The terms of each of these licenses executed prior to the filing of the Complaint in this case obligated the licensee to mark all of its licensed products.  *Id.* ¶ 77.  The first license to require marking went into effect in September 2009 and all but two of the pre-suit licenses still requiring marking through today.  *Id.* ¶ 78.  Combined this amounts to over 210 months of

consistent marking by Plaintiffs and their licensees.  *Id.* ¶ 79.  Plaintiffs also followed up with their licensees and monitored their products to ensure they complied with their marking obligations.  *Id.* ¶ 80.

Two pre-suit licensees were not contractually obligated to mark their licensed products after September 2013.  Defendant assumes that these two licensees actually stopped marking at some point and that the resulting gap between then and the filing of this lawsuit in October 2014 negates the substantially continuous marking by Plaintiffs and the other licensees.  Def. MSJ at 26–27.[17] However, even if these two licensees were able to immediately remove all marked products from store shelves and cease marking new products, that would only slightly reduce (by at most around 10%) the total percent of time when licensed products where marked.  PPFOF ¶ 79.  Defendant presents no evidence of how many patented products were sold without marking.[18]  Even if some licensees sold unmarked products, such sales would be *de minimis* in view of Plaintiffs' sales of 33,000,000 marked products and the many millions more marked products sold by Plaintiffs' licensee.  Any sale of unmarked products by Plaintiffs' licensees is not sufficient to undermine Plaintiffs' and the other licensees' significant compliance with § 287.

Although the exact percentage of marking necessary to comply with § 287 is left to the discretion of the court, other courts have found compliance with § 287 at levels similar to the marking in this case.  For example, in *Funai*, the Federal Circuit affirmed a ruling that marking approximately 88% of patented products was "substantially consistent and continuous" and where the 12% of unmarked patented products were sold by licensees.  *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375 (Fed. Cir. 2010).

---

[17] Defendant offered no evidence that the marking has in fact stopped, thus it is possible that marked products are still available on store shelves.

[18] Sales by unit for Plaintiffs licensees are not available, but based on estimated market share of products embodying the '290 patent, the percentage of compliance would likely be even higher than that shown by comparing months of compliance.  PPFOF ¶ 86.

Here, the alleged lack of marking by two licenses for a period of a few months in this case only amounts to 10% of the total combined months of marking from June 2009 until October 2014. PPFOF ¶ 79-86. This alleged gap in marking is *de minimis* under Federal Circuit precedent. Plaintiffs and the other licensees marked substantially all of their products and there is no dispute that approximately 90% of the time all licensed products were marked (and an even higher percentage of units sold were marked). *Id.* ¶ 69-86. This satisfies the Federal Circuit's substantially consistent and continuous standard for marking under . *Funai*, 616 F.3d at 1357; *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

### iii.   At a Minimum Damages Are Available From Issuance Through September 2013.

Even if the court finds the alleged gap in marking insufficient under § 287, there is no dispute that Plaintiffs and their licensees properly marked products from June 2009 through September 2013. Several district courts have concluded that even if a patentee ceases marking products at some point in time, the patentee may recover pre-suit damages for the periods during which its products were marked.[19]

Thus, even if the Court finds the alleged marking gap by the two licensees between September 2013 and October 2014 prevents pre-suit damages, it should only do so for that period of time. Defendant has not disputed that marking was proper under  between June 2009 (date of issuance of the patent) and September 2013 (the date when the alleged marking gap began). For at least this reason, the

---

[19] In *Kimberly-Clark*, the court allowed damages between March 12, 2003 (potential start of six year damages period) and May 4, 2005 (date before license agreement without marking requirement), and after March 12, 2009 (date the complaint was filed), but denied pre-suit damages from May 5, 2005 (date of license agreement without marking requirement) through March 11, 2009 (date before complaint filed)). *Kimberly-Clark Worldwide* 2013 WL 1821593, at *4. Similarly, in *Metrologic*, the court denied a motion for summary judgment of no damages during the period of time during which the patentee had continuously marked its product with the asserted patent number (January 1994 to December 1999) because "[d]uring this period of proper marking, would-be-infringers had constructive notice." *Metrologic*, 2004 WL 2851955, at *21.

Court should deny Defendant's motion for summary judgment of no pre-suit damages before

September 2013 for the '290 patent.[20]

## VII.    CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court deny Defendant's

motion for summary judgment.

Dated:  September 3, 2015                          Respectfully submitted,

                                                   *s/ Paul Stockhausen*
                                                   Scott W. Hansen
                                                   shansen@reinhartlaw.com
                                                   Paul Stockhausen
                                                   pstockhausen@reinhartlaw.com
                                                   Jessica H. Polakowski
                                                   jpolakowski@reinhartlaw.com
                                                   James N. Law
                                                   jlaw@reinhartlaw.com
                                                   REINHART BOERNER VAN DEUREN, S.C.
                                                   1000 N. Water Street, Suite 1700
                                                   Milwaukee, WI  53202
                                                   Phone:  (414) 298-1000
                                                   Fax:  (414) 298-8097

                                                   Jason C. White
                                                   Illinois Bar No. 6238352
                                                   jwhite@morganlewis.com
                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                   77 West Wacker Drive, Suite 500
                                                   Chicago, Illinois 60601
                                                   Phone: (312) 324-1775
                                                   Fax:  (312) 324-1001

                                                   *Attorneys for Plaintiffs Milwaukee Electric Tool*
                                                   *Corporation; Metco Battery Technologies, LLC;*
                                                   *AC (Macao Commercial Offshore) Limited; and*
                                                   *Techtronic Industries Co. Ltd.*

32672992

---

[20] Furthermore, Defendant cannot claim to have no knowledge because accused products were launched when both Plaintiffs and all of their licensees were marking their product in compliance with .  As at least once court has noted, as a matter of public policy, this confers knowledge on the accused infringer.  *Clancy Sys.,* 953 F. Supp. at 1174 ("If a defendant began infringing before the new licensee sold unmarked products, that defendant could hardly contend that it did not have sufficient constructive notice of the patent.")