# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

MILWAUKEE ELECTRIC TOOL
CORPORATION, et al.,

        *Plaintiffs*,

            v.

SNAP-ON INCORPORATED,

        *Defendant*.

Case No. 2:14-CV-01296

Hon. J.P. Stadtmueller

## DEFENDANT SNAP-ON INCORPORATED'S
## MEMORANDUM IN SUPPORT OF ITS OMNIBUS *DAUBERT* MOTION

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................... iii

MOTION TO EXCLUDE OPINIONS OF DR. MARK EHSANI BASED ON TEST
DATA ............................................................................................................................1

    I.       INTRODUCTION ...............................................................................1

    II.      FACTUAL BACKGROUND .............................................................2

           A.      Dr. Ehsani's Opinions Rely on Test Data Generated at MET's
                  Battery Laboratory. ...........................................................................2

           B.      The 2017 Attorney Reconstructed Correlation Between The Test
                  Data Files and the Accused Battery Packs ......................................3

           C.      Dr. Ehsani's Supplemental Testing and Supplemental Test Report ...........4

    III.     LEGAL STANDARD ..........................................................................7

    IV.     ARGUMENT .......................................................................................8

MOTION TO EXCLUDE A PORTION OF THE  DAMAGES OPINION OF JAMES E.
MALACKOWSKI ......................................................................................................11

    I.       INTRODUCTION .............................................................................11

    II.      Malackowski's Purported Valuation Of The Cross-License .................11

    III.     APPLICABLE LEGAL STANDARDS ...............................................12

    IV.     Malackowski's Methodology For Valuing The Cross-License Is Unsound
           In That He Fails To Establish Comparability Between The Twilight
           Patents And The Non-Li-Ion Patents. ................................................13

    V.      CONCLUSION ..................................................................................16

MOTION TO PRECLUDE ALLAN SHAMPINE'S OPINION ON SECONDARY
CONSIDERATIONS OF NONOBVIOUSNESS .......................................................17

    I.       factual background and legal standards ................................................17

    II.      SHAMPINE FAILS TO ESTABLISH A NEXUS BETWEEN THE
           PATENTED INVENTION AND SECONDARY CONSIDERATIONS
           OF NONOBVIOUSNESS. ................................................................17

i

III.    CONCLUSION ..................................................................................................20

CERTIFICATE OF SERVICE ..................................................................................................22

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)...................................................................................8, 9, 13

*Deimer v. Cincinnati Sub-Zero Prod., Inc.*,
    58 F.3d 341 (7th Cir. 1995) ...............................................................................8

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
    851 F.2d 1387 (Fed. Cir. 1988)........................................................................19

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010).................................................8, 9, 13, 15

*Fuesting v. Zimmer, Inc. (Fuesting I)*,
    421 F.3d 528 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936
    (7th Cir. 2006)...............................................................................................9, 10

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997)....................................................................18, 19

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ......................................................14, 15, 16, 17

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)........................................................................14

*Obrycka v. City of Chicago*,
    792 F. Supp. 2d 1013 (N.D. Ill. 2011) ..............................................................11

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006)........................................................................18

*Rambus Inc. v. Hynix Semiconductor Inc.*,
    254 F.R.D. 597 (N.D. Cal. 2008)......................................................................19

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)..............................................................14, 15, 16

*United States v. Gardner*,
    211 F.3d 1049 (7th Cir. 2000) ...........................................................................8

*United States v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) ...........................................................................21

**OTHER AUTHORITIES**

Federal Rule of Evidence 702.................................................................................8, 9, 13

Federal Rule of Evidence 702(2) ...................................................................................19

## MOTION TO EXCLUDE OPINIONS OF
## DR. MARK EHSANI BASED ON TEST DATA

## I.    INTRODUCTION

The infringement opinions of Dr. Mehrdad "Mark" Ehsani that MET intends to offer at trial rely on data generated by tests of battery packs at MET's battery laboratory.  (Ex. A[1] ¶ 2 (citing Exs. B–D).)  In May and August 2015, and again in September 2017, MET apparently tested dozens of battery packs, including those of Snap-on, Chervon, Hilti and MET, among others. (Ex. D at 28–41.)  The results of those tests appear in Dr. Ehsani's reports and declarations filed in this case and related proceedings.

Ehsani's Initial Report (Ex. B), Ehsani's Supplemental Report (Ex. C), and the Ehsani IPR Declaration (Ex. D), contain only the final values purportedly obtained from test data.  The Initial Report does not identify any contemporaneous log or record that would correlate each specific battery pack being tested with the corresponding file of test data generated and stored by the computer.  The computer data output files attached to Dr. Ehsani's Initial Report refer to files, such as "pack 4_5_6_20A discharge.ASC," and contain no reference or identification of the specific battery pack being tested, such as Snap-on CTB6172 pack.  (Ex. G.)  In other words, there is no way Ehsani's Initial Report can be used to link "pack 4_5_6_20A discharge.ASC" to a specific accused Snap-on pack, as opposed to some other pack that was tested.

Dr. Ehsani testified at his deposition on September 29, 2017[2], that he relied on the attorneys to provide him a link between the accused battery packs and the test data. (Ex. E at 187:6–188:3.)  But, no *contemporaneous* document identified in his Initial Report provides the

---

[1]    Citations to "Ex.___" refer to those exhibits attached to the Declaration of Peter F. O'Neill in Support of Snap-on's Omnibus *Daubert* Motion, filed concurrently herewith.  Because this motion presents a broad challenge to Dr. Ehsani's opinion, his deposition is attached in its entirety at Ex. E.

[2]    Dr. Ehsani's deposition was delayed at MET's request until last Friday because he lives near Houston and his home was flooded in the recent hurricane. (Ex. E at 19:2.)

foundational link between the specific pack and the specific output data file; no contemporaneous attorney notes, other records, or the actual data files themselves, identify the pack being tested. Without that foundational link, the results being reported by Dr. Ehsani in his Initial Report are not reliable, and should not be admitted as evidence.

## II. FACTUAL BACKGROUND

### A. Dr. Ehsani's Opinions Rely on Test Data Generated at MET's Battery Laboratory.

Dr. Ehsani has submitted expert reports and declarations on behalf of MET in this Court in the present case, in related cases involving the same patents-in-suit, and in a number of proceedings in the United States Patent and Trademark Office ("PTO") involving the patents in suit. (Ex. A ¶ 2 (citing Exs. B–D).)

Dr. Ehsani's infringement opinions regarding Snap-on's battery packs rely on a subset of the test data generated at MET's "battery laboratory" in May and August 2015, test data that purportedly reports on testing for dozens of battery packs of various companies, including Snap-on, Chervon, Hilti and MET. (Ex. D at 28–41.) In Dr. Ehsani's Initial Report, his Supplemental Report, and his IPR Declaration, Dr. Ehsani reports only final values of rated capacity for testing of the various battery packs. (*See, e.g.*, Ex. B at 14.)

But the data files do not have any entries, or other identifying information linking the final values in Dr. Ehsani's Initial Report to the specific Snap-on battery packs he identifies in his report. The computer data output files attached to Dr. Ehsani's Initial Report refer to files, such as "pack 4_5_6_20A discharge.ASC," and contain no reference or identification of the specific battery pack being tested, such as Snap-on CTB6172 pack. (Ex. G.) In other words, there is no way to link "pack 4_5_6_20A discharge.ASC" to a specific accused Snap-on pack, as opposed to some other pack that was tested. Although the final values in Dr. Ehsani Initial

2

Report can be found in the data files, nothing in the data file links that data file to the Snap-on battery pack that was supposedly tested.

An exhibit to Dr. Ehsani's initial report contains a number of data files, which are identified as, for example, "pack 4_5_6_20A discharge.ASC." (Ex. F.) The internal data files, such as what is recorded in file "pack 4_5_6_20A discharge.ASC," do not contain any identification of the packs Snap-on model number. (Ex. G.) Thus, there is no correlation or link in the Ehsani Initial Report between the test data and the specific accused Snap-on battery packs.

**B.     The 2017 Attorney Reconstructed Correlation Between The Test Data Files and the Accused Battery Packs.**

As part of discovery in this case, Snap-on requested the test data that related to the values reported by Dr. Ehsani in his IPR Declaration. The values reported in the IPR Declaration are the same values that were eventually included in Dr. Ehsani's expert reports in this case. On March 27, 2017, Snap-on sought production of all of the test data that Dr. Ehsani relied upon in his IPR declaration, and intended to rely upon in this case. (Ex. H.) After several rounds of correspondence between the parties, MET produced the test data purportedly relied upon by Dr. Ehsani. Subsequently, Snap-on sent an email dated June 2, 2017 to counsel for MET asking for an explanation of how the test data could be correlated to specific accused battery packs. (Ex. I.)

After further discussion between the parties, Snap-on sent an email on June 5, 2017, which set forth Snap-on's understanding of the agreement between the parties with regard to identification of test data:

> Plaintiffs agree to produce, by Wednesday at the latest, information which will correlate the products identified in the Ehsani IPR and Summary Judgment submissions with the Ehsani test data produced late last week. You indicated that the MET attorneys will be preparing a chart or summary document with this information. Although the summary document will be created by attorneys, we will expect Ehsani to confirm this information at his deposition.

3

> Snap-on agrees that it will not use the creation of this chart or summary document by the attorneys as a basis to assert that Plaintiffs have waived work-product, attorney-client or any other privilege.

(Ex. J.)  In response, MET provided a correlation sheet which was created by its attorneys in 2017.  (Exs. K–J.)

But, the 2017 attorney-created document relies on the end results reported by Dr. Ehsani to correlate the output with battery packs.  It is not a document *contemporaneous* with the testing that would correlate the output files with the tested packs.  Moreover, the attorney-created correlation sheet has its own deficiencies.  For example, pack 4_5_6_20A discharge.ASC is indicated as having three tested packs at terminals "p4, p5, p6."  But, the actual data output identifies data taken at terminals "p1, p2, p3," not "p4, p5, p6."  (Ex. G.)

At his deposition, Dr. Ehsani indicated that the attorney-prepared correlation sheet was not something that he had prepared or even seen prior to his deposition, and he did "not know where it came from."  (Ex. E at 181:24.)  Without the attorney-created correlation, Dr. Ehsani was not able to recall any specific data results from memory. (*Id.* at 193:8–24.)  Dr. Ehsani made clear at his deposition that he will not testify from memory about specifics:

> **The Witness:** I have learned not to rely on my memory about names and specifics of events that I have done over the past 40 years of my professional life including 30 years of sporadically working as an expert witness. So no, I will not try to answer this question in a vague and ambiguous and partial way. But I'm willing to give you everything you want in writing.

(*Id.* at 16:16–23.)

### C.    Dr. Ehsani's Supplemental Testing and Supplemental Test Report

Dr. Ehsani provided his initial report on July 18, 2017.  (Ex. B.)  Snap-on's expert witness, Dr. Quinn Horn, provided a Rebuttal Report on August 17, 2017.  On August 29, 2017, counsel for MET contacted counsel for Snap-on and advised that as a result of Dr. Ehsani's

home being "largely destroyed" in Hurricane Harvey, MET needed to push the date for Dr. Ehsani's deposition back from September 22 to at least September 29, 2017. (Ex. M.) Snap-on's counsel agreed to delay the deposition of Dr. Ehsani until September 29, 2017.

In the interim, on September 15, 2017, Dr. Ehsani provided his Supplemental Report. (Ex. C.) In that Supplemental Report, Dr. Ehsani relies on test data the Dr. Ehsani reportedly obtained at MET's battery laboratory on September 8, 2017. (Ex. C at 8.)

Snap-on understands that MET intends to file a motion *in limine* to prohibit Snap-on's use of a supplemental invalidity report, which was prepared by Dr. Horn *after* the Court's Order regarding summary judgment and claim construction. Snap-on submits that, in the event the Court precludes Dr. Horn's supplemental report, Dr. Ehsani should likewise be precluded from testifying as to matters in the Ehsani Supplemental Report.

In the Ehsani Supplemental Report, Dr. Ehsani, for the first time, provides a further identification of the Snap-on packs. According to the Ehsani Supplemental Report, the Snap-on packs were marked with a "Silver 5" or "Gold 19" identifier. (Ex. C at 3–5.) However, at his deposition, Dr. Ehsani was still unable to explain how this additional "Silver 5" identification is linked to the data output:

> **Q.** . . . My question is how do you personally know that the data that's there matches with the data that was taken with regard to silver number 7 on May 15th or whatever day it was in 2015?
>
> **A.** I did not walk away with the data that I took that day in my possession. I asked for that data to be sent to me. I relied on the fact that there was no chicory going on.
>
> **Q.** All right. So you personally -- you don't have personal knowledge in terms of you can't sit here today and say that you know that the silver 7 pack tested on that day has that data but for the lawyers providing it to you and saying this is what matches, correct?
>
> **MS. POLAKOWSKI:** Objection, form and foundation.

**THE WITNESS:** I took the data, I asked for the list, the list was sent to me, period.

(Ex. E at 188:7–25.) When asked whether he understood how the identification of "Silver 7" matched to the test data, Dr. Ehsani responded as follows:

> **Q.** Do you know whether or not there is a list or some sort of recording that correlates silver number 7 with the particular data file that was being recorded?
>
> **MS. POLAKOWSKI:** Objection, form.
>
> **The Witness:** That was not my job, and I don't care how it was done. All I care about is I saw the data per Snap-on pack. It met my test requirements as I have reported. The data was in the computer, and I asked for it to be sent to me. That's all I know. You can ask that question 10 times forwards and backwards and split in half. The answer is the same. I assume people have integrity and the case is so beautifully clear, it would be suicidal for someone to try to adulterate it. I rely on that in all cases including whatever you provide to me which could be totally fraudulent but I don't think so.

(*Id.* at 189:21–190:13.)

Dr. Ehsani brought his own notebooks of test data to his deposition, which contained the test data in a format summarized by the MET attorneys. (*Id.* at 184.) When asked to look at the data in his notebook and explain how to match the data to the specific Snap-on packs, Dr. Ehsani responded, "That I can't tell you. I can tell you that the data was keyed to individual packs." (*Id.* at 185:9–10.)

Even with regard to the tests performed on September 8, 2017, or only a few weeks before his delayed deposition, Dr. Ehsani was unable to recall or provide details of the testing. For example, although Dr. Ehsani testified that he was present at the test being conducted in a suburb of Milwaukee (*Id.* at 211:10–213:18), Dr. Ehsani could not recall the name of any technician who was assisting him or the name of the suburb in which the testing was conducted because he does "not carry trivial information in his head." (*Id.* at 213:4–18.) Nor could Dr. Ehsani recall whether the testing, which took place on September 8, 2017, occurred before or after Hurricane Harvey, but he thought it occurred "before" the storm. (*Id.* at 97:10–14.)

6

Needless to say, Dr. Ehsani does not intend to rely on memory for details of test results – he will be relying on the summaries provided by the attorneys.

In a final effort to clarify this matter, counsel for Snap-on spoke to counsel for MET on October 2, 2017. (Ex. A ¶ 12.) During that conversation, MET's counsel confirmed that the first explanation for the labelling of the packs was supposedly set forth in Dr. Ehsani's Supplemental Report, served on September 15, 2017, even though Dr. Ehsani was unable to provide an explanation at his deposition using his Supplemental Report. Counsel for Snap-on asked MET's counsel if MET was willing to withdraw its opposition to Dr. Horn's Supplemental Report in light of MET's intention to rely on Dr. Ehsani's Supplemental Report. MET's counsel refused.

## III.    LEGAL STANDARD

Federal Rule of Evidence 702 assigns to the trial judge the task of ensuring that an expert's testimony "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). A witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 886 (E.D. Wis. 2010) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). The Court must therefore determine whether the reasoning or methodologies underlying the opinion are reliable before allowing the opinion to be presented to the jury. *Id.* at 887 ("Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by opinion witnesses 'adhere to the same standards of intellectual rigor that are demanded in their professional work.'") (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)).

Part of Rule 702's reliability analysis requires courts to preclude expert testimony based on speculation. *See, e.g.*, *id.* at 899 (excluding expert opinion in part because it was "wholly speculative"); *Deimer v. Cincinnati Sub-Zero Prod., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995)

(noting that the court "must rule out subjective belief or unsupported speculation") (citations and internal formatting omitted); c*f. United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000) ("Before the district court may allow expert testimony into evidence, the submitting party must show that the testimony has a reliable basis."). The Seventh Circuit has also suggested other benchmarks for gauging expert reliability, including (1) whether maintenance standards and controls exist and (2) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. *See Fuesting v. Zimmer, Inc. (Fuesting I)*, 421 F.3d 528, 534–35 (7th Cir. 2005), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006); *Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 887 n.28.

## IV.    ARGUMENT

Dr. Ehsani's opinion that Snap-on's battery packs infringe the Patents-in-Suit is based on test data that lacks the reliable foundation required by Rule 702. *See Daubert*, 509 U.S. at 597. The test data presented with Dr. Ehsani's Initial Report does not identify which specific pack was being tested, and no contemporaneous evidence is identified in that Report to provide that link. Key here is that Dr. Ehsani tested dozens of battery packs from multiple defendants, as well as packs of MET, at the same time. (Ex. D at 28–41.) Thus, the raw data files contain test data for more than just Snap-on's battery packs, but provide no indication as to which pack corresponds to the individual data sets.

The only link between the raw data files and a specific Snap-on battery pack that was provided during the discovery period is the summary sheet created by MET's attorneys in 2017. This presents two obvious foundational problems bearing on the reliability of Dr. Ehsani's opinion: (1) MET's attorneys' hindsight reconstruction is not based upon any personal knowledge of a witness who will testify, or is available to testify, regarding which packs

8

correspond to the specific data files; and (2) the summary sheet was created two years after the tests were conducted without any contemporaneous record by a person with personal knowledge.

Indeed, Dr. Ehsani made clear that he had no input in creating the sheet and did not know who prepared it, when it was prepared, or how it was prepared. (Ex. E at 195:8–13 ("My understanding is that you have been sent some data by some people outside of my knowledge and consciousness and you represent that these are that data sent to you by some people I don't know at dates that I don't know, and you're asking me if they have any correlation. How would I know."))

Even if we were to set aside the problems inherent in having attorneys reconstruct the results two years after the fact, Dr. Ehsani's approach to conducting these tests is questionable at best. That Dr. Ehsani conducted his tests at MET's laboratory with unidentified MET technicians is not, by itself, sufficient cause for concern. What does cause concern is that Dr. Ehsani then left all of the resulting test data on MET's servers without seeking any documentation tying the date to the packs, took nothing with him, and later requested that that data be sent to him without any attempt to independently verify the correlation between packs and data. As he stated in his deposition, "the data was in the computer, and I asked for it to be sent to me. That's all I know." (*Id.* at 190:4–5.)

Dr. Ehsani's indifference to the way in which his test results were generated, maintained and ultimately correlated to specific packs demonstrates the unreliability of his opinion. The fact that neither he nor anyone else present at the testing contemporaneously recorded which data file being generated relates to which specific battery pack being tested, and then subsequently all of the resulting data was left in the possession of MET without any understanding as to how that data would be preserved, highlights the lack of "maintenance standards and controls" in his

9

approach. *See Feusting*, 421 F.3d at 534–35. At best, Dr. Ehsani failed to be "as careful as he would be in his regular professional work outside his paid litigation consulting." *Id.* The manner in which Dr. Ehsani seems to have uncritically relied solely on counsel's summary sheet is highlighted by his testimony on the subject: "That was not my job, and I don't care how it was done." (Ex. E at 190:1–13.) Such a callous approach "is not good science or sound methodology," and it does not provide a reliable basis upon which Dr. [Ehsani] may "credibly state that all of his opinions reflect a reasonable degree of scientific certainty within his field of expertise." *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1026 (N.D. Ill. 2011) (citations and internal formatting omitted).

According to MET counsel, Dr. Ehsani's Supplemental Expert Report provides the first explanation for the labelling of the packs. (Ex. A ¶ 12.) Despite having this Supplemental Report, Dr. Ehsani was still unable to provide an explanation of how to correlate the test data to specific packs at his deposition. (Ex. E at 193:8–24.)

The results being reported by Dr. Ehsani in his Initial Report are not reliable, and should not be admitted as evidence. In the event the Court allows admission of Dr. Ehsani's Supplemental Report to allow MET to attempt to cure the failure to provide the necessary foundation, the Court should likewise allow admission of Dr. Horn's Supplemental Report.

## MOTION TO EXCLUDE A PORTION OF THE
## DAMAGES OPINION OF JAMES E. MALACKOWSKI

### I.      INTRODUCTION

James E. Malackowski ("Malackowski") is MET's proposed opinion witness on damages, claiming that MET is entitled to millions of dollars in damages for Snap-on's alleged infringement of the three patents at issue in this case.  Malackowski's damages opinion consists of two parts: (1) his determination that MET's Settlement and Cross-License Agreement with Makita ("the Makita Agreement") is the most informative data point in determining what Snap-on and MET would have agreed to as a reasonable royalty in the required hypothetical negotiation; and (2) his valuation of the two forms of consideration MET received under the Makita Agreement: a cash payment for the Patents-in-Suit, and a cross license to Makita's portfolio of lithium-ion patents ("Cross-License").  Only Malackowski's valuation of the Cross-License is challenged here.  Malackowski's valuation of the Cross-License should not be presented to the jury because he fails to establish that the alleged informative agreements are sufficiently comparable to the Cross-License.

### II.      MALACKOWSKI'S PURPORTED VALUATION OF THE CROSS-LICENSE

The Cross-License provided MET with the right to Makita's lithium-ion portfolio and certain other patents.  Although ███████████████ was assigned to the Cross-License in the agreement by the parties, Malackowski purports to value the Cross-License based on two of the patents in the Cross-License referred to as the "Twilight Patents."  (Ex. N, Malackowski Report at 34.)  These patents ████████████████████████████████████████████ ███.  (*Id.*)  Malackowski sets the value of the Twilight Patents by asserting that they are comparable to patents licensed in two other MET license agreements: (1) ███████████████ ████████████████████████████████████████████

11

████████████████████████████████████████████████████████████████. (*Id.* at 35.) These agreements are referred to by Malackowski collectively as the "Non Li-ion Agreements." (*Id.*)

Under the Non Li-ion Agreements, ████████████████████████████████████ ████████████████████. Malackowski claims that the patents licensed in the Non Li-Ion Agreements are comparable to the Twilight Patents because they are "desirable but not necessary to compete in the li-ion market." (*Id.*) Based on this assertion of comparability, he values the Cross-License at between ██████████████████, roughly comparable at the high end to the ██████ ██████████ MET purportedly received from Makita for the Patents-in-Suit (discounted by Malackowski to ███████████). In other words, Malackowski's opinion implies that as much value should be assigned to the Cross License as to the Patents-in-Suit, which he claims are foundational or blocking patents, by which he means that one cannot compete in the lithium tool market without them.

## III.    APPLICABLE LEGAL STANDARDS

A witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable." *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 886 (E.D. Wis. 2010) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)). The Court must therefore determine whether the reasoning or methodologies underlying the opinion are reliable before allowing the opinion to be presented to the jury. *Id.* at 887 ("Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by opinion witnesses 'adhere to the same standards of intellectual rigor that are demanded in their professional work.'") (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). In the

12

context of a reasonable royalty assessment, the trial court must ensure that the opinion witness has "carefully tie[d] proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citation omitted). The Federal Circuit has made clear that when relying on licenses to establish a reasonable royalty, "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1332 (Fed. Cir. 2009) (insisting that "licenses relied upon by the patentee in proving damages [be] sufficiently comparable").

## IV. MALACKOWSKI'S METHODOLOGY FOR VALUING THE CROSS-LICENSE IS UNSOUND IN THAT HE FAILS TO ESTABLISH COMPARABILITY BETWEEN THE TWILIGHT PATENTS AND THE NON-LI-ION PATENTS.

Malackowski's valuation of the Cross-License is methodologically flawed, untestable, and, correspondingly, unreliable. He provides no reliable evidence or basis to support his assertion that the Non-Li-ion Patents are technically comparable to the Twilight Patents and correspondingly that the license agreements are comparable. He relies on no evidence that MET has actually used the Non-Li-ion Patents, and, if so, how that use is comparable to MET's purported use of the Twilight Patents. He assumes that MET would have agreed to pay Makita a ▮▮▮▮▮▮▮ running royalty for the Twilight Patents, but he provides no evidence that: (1) Makita has, or would have, offered to license the Twilight Patents on that basis; or (2) that Makita has, or would have, offered to license the Twilight Patents at the same running royalty as the Non-Li-ion Patents.[3]

---

[3]    Malackowski gives a one-paragraph description of the Non-Li-ion patents at page 35 of his report, and claims that a "detailed description" of the agreements can be found at Section 10.1.1.5. Turning to that section, the reader finds six lines in which Malackowski claims that the Non-Li-Ion Agreements provide "insight" into the royalty rate that can be used to value the Cross-License, and that one of the two agreements is "particularly helpful" since it pertains to a "relatively minor feature included on a complex power tool." No further discussion is provided in this section, including an explanation of how a

13

In *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012), the Federal Circuit reversed a district court's decision to allow expert testimony concerning a 6% reasonable royalty derived in part from "two DVD-related patent licensing programs." It did so because the expert had failed to establish comparability between the licenses he relied upon and the hypothetical license to be negotiated. *See id.* at 79. It explicitly stated that when "relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."

At his deposition, Malackowski admitted that he made no technical comparison between the Non-Li-ion Patents and the Twilight Patents:

> **Q.** Did you do anything to satisfy yourself that the non lithium patents were technically comparable to the twilight patents?
>
> **A.** No, that was not necessary.

(Ex. O, Malackowski Dep. Tr. at 113:24–114:3.) Nor did he determine through any reliable methodology that the technologies reflected in the Non-Li-ion Patents were comparable to Twilights Patents or that the technologies were similar, or even the degree to which the various features were "desirable" to a consumer. Without such comparisons based on a reliable methodology, Malackowski has no appropriate basis for his conclusion that the reasonable royalty paid for the Non-Li-ion Patents can be extrapolated to the Twilight Patents.[4] *See, e.g.*, *ResQNet.com, Inc.*, 594 F.3d at 873 (finding the district court erred by allowing expert testimony

---

relatively minor feature can command a valuation of ███████████ of the alleged blocking Patents-in-Suit.

[4]  Malackowski relies on a conversation with Sean Dougherty, one of MET's witnesses, to link the various agreements. *See, e.g.*, *Fail-Safe, L.L.C.*, 744 F. Supp. 2d at 888 (finding an expert's reliance on data suspect where the expert made no effort to "independently verif[y]" the veracity of that data) (citation omitted). Dougherty claims that the Non-Li-ion Patents and the Twilight Patents are both "in the same category" of so-called "feature patents." (Ex. P, Dougherty Dep. Tr. at 28:14–16.) But Dougherty's statement is pure hearsay, based on what other people have told him. (*Id.* at 36:8–38:2.) It is by definition unreliable. Regardless, however, such a classification is meaningless without any evidence that each of the "feature patents" concern similar technology. *See ResQNet.com, Inc.*, 594 F.3d at 873.

14

on comparable licenses where the expert made no "factual findings that accounted for the technological . . . differences between those licenses").  Rather, his whole basis for comparability is based on the one liner that each of the ████████████████████████████ ████████████████████████████████████████████ are "feature patents," defined as things that are "desirable but not necessary to compete."  (Ex. N at 35.)  This is exactly the kind of loose generalization that the Federal Circuit deems an insufficient basis upon which an expert's opinion may rely.

In addition to failing to establish comparability between the technologies and patents, Malackowski's valuation of the Cross-License is flawed for two additional reasons.  *First*, he assumes, without evidence or basis, that but for the Cross-License, MET would have agreed to pay Makita ████████ running royalty for the Twilight Patents.  *See, e.g.*, *LaserDynamics, Inc.*, 694 F.3d at 79–80 (finding that licenses are "probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure.").  *Second*, he provides no evidence that MET has actually used the Non-Li-ion Patents and if so, to what extent such use is comparable to MET's purported use of the Twilight Patents.  Each failure constitutes a sufficient basis to preclude Malackowski's valuation of the Cross-License under the case law cited above.

In determining a reasonable royalty, the Federal Circuit requires an opinion witness to make a reliable and testable determination that the technologies are actually comparable, and that the relied-upon licenses have sufficient relationship to each other.  *See, e.g.*, *ResQNet.com, Inc.*, 594 F.3d at 869 ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit.") (citation omitted and emphasis in original).  Malackowski fails to establish the

requisite comparability between the Twilight Patents and the Non-li-ion Patents based on any methodology. Indeed, his opinion—that the value of the Cross-License at the high end is worth roughly as much as the payment Makita made for use of the Patents-in-Suit, is proof of the unreliability of his conclusion. MET's CFO, Sean Dougherty, plainly stated last week at his deposition that he believes that the Patents-in-Suit are "much more valuable" than the Twilight Patents (Ex. P at 36:16–37:2), a result that is at least consistent with MET's position that the Patents-in-Suit are blocking patents. This real life check on Malackowski's valuation is an indication of a flawed conclusion resulting from a flawed methodology.

Malackowski's opinion serves no purpose "other than to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology." *LaserDynamics, Inc.*, 694 F.3d at 80 (citations and internal formatting omitted). It is based on an unreliable methodology that results in a conclusion inconsistent with MET's position that without the rights to the Patents-in-Suit, a company cannot effectively compete in the lithium-ion market. Malackowski fails to establish comparability within the bounds of clear Federal Circuit precedent, and, as such, his valuation of the Cross-License should not be presented to the jury.

## V.    CONCLUSION

For each of the foregoing reasons, Snap-on asks the Court to preclude Malackowski from testifying regarding the value of the Cross-License.

16

**MOTION TO PRECLUDE ALLAN SHAMPINE'S OPINION**
**ON SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS**

**I.     FACTUAL BACKGROUND AND LEGAL STANDARDS**

Snap-on seeks to preclude Allan Shampine ("Shampine") from offering his opinions on secondary considerations of nonobviousness because he has not linked the inventive aspect of the claims, the 20 Amp Limitation as construed by the Court, to any alleged commercial success, industry praise or long-felt need.

Evidence of secondary considerations is only significant if there is a nexus between the claimed invention and the secondary consideration at issue. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed. Cir. 2006). This requires a showing that any alleged commercial success, long-felt need and/or industry praise is "due to the merits of the claimed invention *beyond what was readily available in the prior art*." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (emphasis added).

Here, MET admits that a battery pack for a cordless power tool and lithium ion batteries were known in the prior art. (*See, e.g.*, Ex. Q, Rosenbecker Dep. Tr. at 63:24–71:13; Ex. R, Grzybowski Dep. Tr. at 202:21–203:5.) Thus, the only inventive aspect of the Patents-in-Suit is the 20 Amp Limitation, which the Court has construed to mean: "the battery cells, when configured together in a battery pack, are capable of producing reasonably close to 20 amps of discharge current or greater over the course of delivering their entire rated capacity." (Dkt. No. 232 at 14, 27.)

**II.     SHAMPINE FAILS TO ESTABLISH A NEXUS BETWEEN THE PATENTED INVENTION AND SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS.**

Shampine's opinion is essentially that sales of MET's cordless tools powered by lithium-ion battery packs have increased over time, and that represents commercial success. (Ex. S, Shampine Report at 31–66.) Because a lithium-ion battery pack "is only a component" of the

17

tool, however, and the ability of the battery pack to produce 20 amps of discharge current constantly over its entire rated capacity is only one feature of the pack, Shampine "must show . . . a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Nowhere in his report does Shampine explain how consumer demand for a battery pack *capable of delivering a constant current of 20 amps over its entire rated capacity* correlates to the increase in sales. As this Court recognized in its recent opinion, the 20 Amp Limitation reflects a "capability" rather than something that necessarily has "potential real-world use." (Dkt. No. 232 at 18.) To prove commercial success, long felt need or industry praise, Shampine must tie those things to the features of the patented invention that were not readily available in the prior art. *See J.T. Eaton & Co.*, 106 F.3d at 1571.

In fact, when asked whether he had seen any consumer demand for the capability of the pack to generate a constant current at or in excess of 20 amps over its entire rated capacity, Shampine stated, "[t]he short answer is, no." (Ex. T, Shampine Dep. Tr. at 48:22.) He also admits that he "ha[s] not tried to parse out what pieces of the patented technology might have contributed to commercial success." (*Id.* at 47:22–24.) Rather, he states only that "[w]hat I can observe is products that embody the patented technology and products that don't, and I can observe that the ones that do embody the patented technology are taking off. (*Id.* at 102:10–14.) This is precisely the type of cursory analysis that courts refuse to send to the jury. *See, e.g.*, *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 605 (N.D. Cal. 2008) ("His reasoning appears to be: the . . . products incorporate Rambus's claimed inventions; those products have been successful; *ergo* Rambus's inventions caused the products' success. Rule 702(2) demands

18

more, and it provides an independent basis for preventing Mr. Murphy from testifying to the non-technical aspects of the commercial success inquiry.").

Internal MET documents show how divorced Shampine's position is from the real world. Shampine repeatedly states that he need not parse out the success resulting from other aspects/improvements of MET's tools over time from the 20 Amp Limitation. But internal MET documents show that MET's first commercial embodiment of the patents, the V28 (introduced in 2005), was not a success and, despite improvements in size and weight in successor products, sales from MET's lithium tools remained "███████████" through 2010. (Ex. U at METCO0161750.) Indeed, in 2008, MET's President, Steven Richman, convened a group consisting of MET's CFO and head of products, in addition to others, to ████████████ ████████████████████████ (Ex. V at METCO0504728–29) The group ████████████████. Only once ████████████████████ ████████████████████████████████ ███. (Ex. U.) None of these (according to MET) drivers relating to the success of MET's lithium-ion tools matter to Shampine because he essentially relies on the same reasoning rejected in the cited *Rambus* case: each MET tool contains the 20 amp feature; sales have gone up; therefore, that success must result from the 20 amp limitation.

Shampine's long-felt need and industry praise analyses are similarly untethered to the patented invention. His long-felt need analysis focuses on the power tool industry's desire for a high-powered lithium-ion battery pack. (*See* Ex. S at 15–25.) Not once does he mention the industry's need for a lithium-ion battery pack capable of delivering a constant current of 20 amps over its entire rated capacity. On industry praise, Shampine highlights the industry's approval of the lithium-ion battery pack's ability to generate more power and run time, while still weighing

19

less than its NiCd counterpart.  (*See* Ex. S at 25–31.)  Again, he never attempts to explain how the capability of a pack to meet the 20 Amp Limitation either reduces weight, increases run time, or generates more power for a consumer.

Shampine's entire report is untethered from the merits of the claimed invention and therefore irrelevant for purposes of an analysis of secondary considerations.  To the extent MET has factual evidence tying the actual patented invention to increased sales or industry praise, it can present that evidence.  But a gratuitous expert opinion that fails to make that link will serve only to confuse the jury about the nexus required for secondary considerations to apply, and it should be excluded on that basis.  *See United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

## III.    CONCLUSION

For each of the foregoing reasons, Snap-on asks the Court to preclude Shampine from testifying regarding secondary considerations of nonobviousness.

Dated:  October 2, 2017                     Respectfully submitted,

By: */s/ Peter F. O'Neill*
    Lynn H. Murray
    Hugh A. Abrams
    George R. Dougherty
    Peter F. O'Neill
    Jonathon M. Studer
    Shook, Hardy & Bacon L.L.P.
    111 S. Wacker Drive, Suite 5100
    Chicago, Illinois 60606
    Phone:  (312) 704-7700
    Fax:  (312) 558-1195
    lhmurray@shb.com
    habrams@shb.com
    gdougherty@shb.com
    pfoneill@shb.com
    jstuder@shb.com

    David R. Cross
    Michael T. Piery
    Quarles & Brady LLP

20

411 East Wisconsin Avenue, Suite 2350
Milwaukee, Wisconsin 53202-4426
Phone: (414) 277-5000
Fax:  (414) 271-3552
david.cross@quarles.com
michael.piery@quarles.com

**Attorneys for Defendant and
Counterclaim-Plaintiff Snap-on Incorporated**

21

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 2, 2017, I served the foregoing **DEFENDANT SNAP-ON**

**INCORPORATED'S MEMORANDUM IN SUPPORT OF ITS OMNIBUS** *DAUBERT*

**MOTION** on all counsel of record using the Court's ECF system.

Dated: October 2, 2017

By: *<u>/s/ Peter F. O'Neill</u>*
Peter F. O'Neill

22