UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MILWAUKEE ELECTRIC TOOL
CORPORATION, et al.,

Plaintiffs,

v.                                          Case No. 2:14-CV-01296

SNAP-ON INCORPORATED,

Defendant.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT SNAP-ON
INCORPORATED'S OMNIBUS *DAUBERT* MOTION**

**RESPONSE TO MOTION TO EXCLUDE OPINIONS OF DR. MARK EHSANI BASED
ON TEST DATA**

**Introduction**

**A.      Dr. Ehsani provided in his reports a detailed explanation of the
contemporaneous recording linking the tested packs to the test data files.**

Snap-on's motion to exclude Dr. Ehsani's report is based, in its entirety, on a

misrepresentation.  Snap-on states repeatedly that there is no contemporaneous information

linking Dr. Ehsani's test data to the specific corresponding battery packs that he tested.  (*See e.g.*,

Snap-on's Br., (Dkt. No. 244), p. 1-2.)  Snap-on is wrong.  Dr. Ehsani explained the

contemporaneous information linking his test data to specific tested packs as follows:

> At the time of my testing, the physical pack units that I tested were labelled on the
> surface of the pack with a number in permanent marker to identify each pack.  A silver
> marker was used for the packs tested in May 2015, and a gold marker was used for the
> packs tested in August 2015.  When each test run was set up, a filename was created for
> the file used by the DASYLab software to record the raw data for the test as it was run.
> In each case the filename was created to correspond to the numbers with which the packs
> were labelled.  Because of the permanent physical labelling of the tested packs and the
> test data filenames associated with the labels, there was never any uncertainty regarding
> the association of the raw test data with particular pack models.

Supplemental Expert Report of Dr. Mark Ehsani ("Supp. Rep.") (Dkt No. 245-3) at 2.

Dr. Ehsani went on to provide photographs of the physical packs that he tested, which photos clearly show the silver and gold marking numbers still on the packs. (Supp. Rep. (Dkt. No. 245-3) at 3-5, and Ex. G to Supp. Rep. (Dkt No. 245-7).) The following table was included in Dr. Ehsani's supplemental report to demonstrate the linkage between the packs and data.

| Pack Model | Photo/s | Testing Identification Number |
|---|---|---|
| CTB8185 |  | Silver 5 |
| CTB7185 |  | Silver 7 |
| CTB6172 |  | Silver 22 |

| | | |
|---|---|---|
| **CTB6185** |  | **Gold 19** |
| **CTB 6187** | | **Gold 20** |
| **CTB8172** | | **Gold 21** |

| CTB 7172 | | Gold 22 |
|---|---|---|
| |  | |

*Id*.

The test data files recorded during the testing were delivered to Dr. Ehsani and became the basis for his opinions in this case. (Expert Report of Dr. Mark Ehsani ("Initial Rep.") (Dkt No. 245-2) at 13). Those same test data files were produced to Snap-on in both native and pdf format with the filenames described by Dr. Ehsani intact. (Polakowski Decl. ¶ 4.) So, for example, the test data file with the data for Dr. Ehsani's 20 amp constant current discharge run on the CTB8172 (labelled Gold (for August 2015 testing) 21) and the CTB7172 (labelled Gold 22) bore the file name p21_p22_20A CC discharge.ASC. (Polakowski Decl. ¶ 5, Ex. 1.) Not only is the linkage to pack 21 and pack 22 apparent in the filename, but the file header contains the time stamp of 9:48:01 AM, August 21, 2015 (matching Dr. Ehsani's statement regarding the testing for the Gold numbered packs):

```
DASYLab - V 11.00.02
Worksheet name: 3 pack 3 station _DISCHARGING V02
Recording date    : 8/21/2015,  9:48:01 AM
Block length      : 2
Delta             : 0.2 sec.
Number of channels : 16
```

*Id.*

The same exercise could be performed with all of the packs and test data files to easily understand the linkage.  Using only the file names, the data contained within those files, and the photographs of the packs themselves showing the permanent marked numbers, one can readily determine the correlation between the packs and the test files as indicated below:

| Pack | Label as depicted on photographed tested packs | Corresponding test files |
|---|---|---|
| CTB8185 | Silver 5 | pack 4_5_6_1C discharge.ASC<br>pack 4_5_6_20A discharge.ASC |
| CTB7185 | Silver 7 | pack 7_8_9_1C discharge.ASC<br>pack 7_8_20A CC discharge.ASC |
| CTB6172 | Silver 22 | pack 21_22_23_1C discharge.ASC<br>pack 21_22_23_20A discharge.ASC[1] |
| CTB6185 | Gold 19 | p19_p22_p21_1C discharge.ASC<br>p17_p18_p19 20A discharge.ASC |
| CTB 6187 | Gold 20 | *No test data because Dr. Ehsani determined the pack to be defective. |
| CTB8172 | Gold 21 | p19_p22_p21_1C discharge.ASC<br>p21_p22_20A CC discharge.ASC |
| CTB 7172 | Gold 22 | p19_p22_p21_1C discharge.ASC<br>p21_p22_20A CC discharge.ASC |

All of this information was recorded contemporaneously during Dr. Ehsani's testing and the full explanation was provided to Snap-on to allow it to identify which packs went with which test data files.[2]  In order to make its motion, Snap-on purposefully ignores the existence of all of this information.

---

[1] There is both a silver pack 22 as well as a gold pack 22, indicating that one test occurred in May, 2015 and one occurred in August, 2015.  When one opens the pack 21_22_23 test file, one can readily ascertain by the time stamp that the test occurred in May, 2015, and thus, that these particular files relate to the Silver 22, not the Gold 22.

[2] For the supplemental testing performed in September 2017 and disclosed in Dr. Ehsani's supplemental report, the test data files were named, not with numbers marked on the packs as before, but with the actual serial numbers of the tested packs to provide the link between the packs and the data files.  Once again, these data files, showing the pack serial numbers, were disclosed to Snap-on.  (Polakowski Decl. ¶ 13.)

Instead, in a blatant effort to confuse the issue, Snap-on focuses on a document that has nothing to do with Dr. Ehsani's testing or the actual contemporaneous recordings linking the tested packs to the test data files as described above: an attorney-created cross reference that was never even shown to Dr. Ehsani but had been created *at Snap-on's request* to help them identify the applicable test data within Dr. Ehsani's test data files.

Earlier in the case Snap-on requested that Plaintiffs produce the test data on which Dr. Ehsani would rely long before Dr. Ehsani's expert report was due. (Polakowski Decl. ¶¶ 2-3; *see also* Dkt. No. 245-8.) Plaintiffs produced Dr. Ehsani's test data, in both pdf and native format, producing not only the test files specific to Snap-on, but also all Dr. Ehsani's test data files containing his testing of all the various packs he had tested (which are relevant to the case because they support Plaintiffs' claims of commercial success). (Polakowski Decl. ¶¶ 4-6.) Snap-on then complained that it could not understand which data went with which packs. (Polakowski Decl. ¶ 9; *see also* Dkt. No. 245-9, pp. 2, 4.) Snap-on's difficulty arose not from the lack of contemporaneous linkage between the data files and the packs, but because they had received the data files – *as they requested* – without the context of Dr. Ehsani's expert report to explain the linkage. During a meet and confer on this topic, Snap-on's counsel requested that Plaintiffs' counsel create a cross-reference to assist Snap-on's counsel in interpreting the data. (Polakowski Decl. ¶ 10.) In an effort to be transparent and helpful, counsel for Plaintiffs agreed to provide (again, long before Dr. Ehsani's report was due) a cross reference document created solely for the purpose of helping Snap-on's attorneys decipher the raw data files. (Polakowski Decl. ¶ 11; *see also* Dkt. Nos. 245-11, 245-12.) This document was not shown to or relied upon by Dr. Ehsani, but was created at Snap-on's express request and provided to Snap-on as a

courtesy rather than forcing Snap-on to decipher the data based purely on a close evaluation of many hundreds of pages of dense data. (Polakowski Decl. ¶ 12.)

Snap-on now bases its motion entirely on this attorney-created cross reference and Dr. Ehsani's lack of knowledge about that document, which he did not create and did not use. But Plaintiffs have been clear from the start that Dr. Ehsani never saw or relied on the cross reference; he didn't need to. Instead, Dr. Ehsani explained in his report exactly what contemporaneous information he relied on to link the packs to his test data: the permanent marking of the packs with numbers and the recording in the filenames of the test data those numbers to match the data files to the tested packs.[3] That information is fully sufficient to demonstrate a contemporaneous, reliable link between the physical packs tested and the test data files relied upon by Dr. Ehsani. As such, Snap-on's motion to exclude Dr. Ehsani's opinions should be denied.

**B.** **Dr. Ehsani's inability, at deposition, to correlate unlabeled printouts of data with the attorney-created cross reference he had never before seen does not support Snap-on's argument.**

A reader of Dr. Ehsani's reports, and the test data underlying Dr. Ehsani's initial report, could easily correlate the packs with the data files, as demonstrated above. When Snap-on questioned Dr. Ehsani about this at his deposition, they did so disingenuously. Dr. Ehsani had with him summaries of each and every test, with labels on each data file indicating which pack each test related to. (Polakowski Decl. ¶ 14.) Snap-on's counsel marked a series of unlabeled documents containing only raw data (Polakowski Decl. ¶¶ 15-19), without indication of any

---

[3] During the August, 2015 testing, Dr. Ehsani went further and included the pack numbers in the headers for each data column within the test data files as well. During the May, 2015 testing (the silver numbers) the pack numbers were recorded only in the file names and the column headers use "p1" for the pack number first in the filename, "p2" for the pack number second in the filename, and "p3" for the pack number third in the filename. Both methods are equally reliable for linking the test data to the numbered packs, but the August approach (used with the gold numbered packs) adds greater ease of understanding.

associated file name or label, without any bates number, or informational sheet showing how, when, or even whether it *was* produced, and asked Dr. Ehsani, on the spot, to identify which pack each unlabeled file corresponded to on the attorney-created correlation sheet (the same sheet of which Dr. Ehsani had testified he had no knowledge). (Ehsani Dep. Tr. 203:5-205:4, 209:11-210:2, Dkt No. 245-5.) Ultimately, Dr. Ehsani indicated that he could compare the raw data to his summary data, but to do so would take time (the data files are hundreds of pages long).[4]

---

[4] One such exchange occurred as follows:

> Q: And so I'll show you next what I'll mark as Exhibit 412. I believe this -- and this is entitled 3 pack 3 station dated May 14 2015.
>
> MS. POLAKOWSKI: Do you happen to have file names for these?
>
> MR. ABRAMS: I believe this is -- well, this is METCO515121 I believe. No, I'm sorry, this is Exhibit 412. This is -- Exhibit 412 is METCO514979 I believe.
>
> MS. POLAKOWSKI: What I'm asking is do you have the name of the actual file as it was saved?
>
> MR. ABRAMS: I don't believe so, no.
>
> BY MR. ABRAMS:
>
> Q: And my question is can you take a look at -- well, first of all, am I correct that you are unable to give me any information with regard to what's in 412 and how that relates to the other documents we were looking at, 410, correct?
>
> A: The document --
>
> Q: 410 is the correlation sheet we were looking at. In other words, I asked you previously with the other set of data, and I just want to confirm for this set of data that you -- that's not something you're able to testify about today meaning how Exhibit 410 is correlated to Exhibit 412?
>
> MS. POLAKOWSKI: I'll note for the record that the file name has not been provided.
>
> BY MR. ABRAMS:
>
> Q: Is that correct?
>
> A: This is the first time I've seen this document.
>
> Q: Right. And I understand. I'm just trying to -- I don't mean to interrupt. All I'm doing is I'm just making a record. In other words, you gave me a bunch of answers about the other documents. I want to go through and say you're going to have the same answers with regard to how 410, Exhibit 410, correlates to 412 because today is the first day you've seen Exhibit 410; is that correct?
>
> A: Given time and some discussion with people that generated it, I might be able to. But in the interest of time, I cannot just say oh yes, I know this and I know that and I know my thought about it in the past. No, I have not correlated it in the past.

8

With regard to Dr. Ehsani's more recent testing, Snap-on argues that "Dr. Ehsani was unable to recall or provide details of the testing." While it is true that Dr. Ehsani could not remember the name of the suburb where Milwaukee Tool's headquarters was located or the name of the technician who assisted him, he certainly could remember all functional aspects of the tests, such as the test setup, equipment, and the connection of the thermocouples. (Ehsani Dep. Tr. 87:17-94:8, Dkt No. 245-5.) Snap-on's counsel again put in front of Dr. Ehsani an unmarked, unlabeled, single page of a several-hundred-page document containing only columns of numbers and asked Dr. Ehsani to confirm that it was a test result from Dr. Ehsani's supplemental testing. (*Id.* 210:4-211:9; *see also* Polakowski Decl., ¶ 19, Ex. 7.) It is entirely unsurprising that Dr. Ehsani could not do so from memory on the spot because Snap-on was intentionally refusing to show Dr. Ehsani the actual information he used to correlate packs to test data: the data file names reflecting the packs tested. (*Id.* 203:5-205:4, 209:11-210:2.)

## Legal Standard

The Supreme Court set forth the requirements for the admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Under *Daubert*, the trial judge "plays a 'gatekeeping role,' which 'entails a preliminary assessment of whether the

---

Ehsani Dep. Tr. 203:5-205:4, Dkt No. 245-5.

In another, similar exchange:

> Q: Am I correct that the same question that I asked before that you were unable to testify with regard to the correlation between Exhibit 410 and Exhibit 414 because the first time you've seen Exhibit 410 is today?
>
> MS. POLAKOWSKI: And I'll object for the record that the file name has not been provided.
>
> THE WITNESS: I don't want to give a negative impression. Given time, I can probably do this. But when you pull out a document, you know, out of the oblivion and you say do these correlate, I cannot tell you without further examination. There is no reason for me to believe that either one of these two documents is intended to be nonsense. But the correlation requires a deliberation, and I'm happy to do that during or outside of this deposition.

*Id.* 209:11-210:2.

reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015) (quoting *Daubert*, 509 U.S. at 597, 592-93). "[T]he focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Id.* at 1296.

<u>Argument</u>

## I.   DR. EHSANI'S REPORTS, AND UNDERLYING TEST DATA, ARE RELIABLE.

As established above, Dr. Ehsani's underlying test data is readily correlated to the packs he tested and the summary data contained in his reports. Snap-on argues that, in order for expert reports to be admissible, they must not be "wholly speculative." (Dkt. 244, p. 7.) No part of Dr. Ehsani's report is based on "subjective belief or unsupported speculation." Plaintiffs have demonstrated the reasonable basis for Dr. Ehsani's report; it should not be excluded.

Snap-on's argument that "there is no contemporaneous evidence" to link the underlying data to the report, and that "the only link between the raw data files and a specific Snap-on battery pack that was provided during the discovery period is the summary sheet created by MET's attorneys in 2017" is simply false as shown above. Dr. Ehsani has not relied on the attorney-created correlation sheet that was provided as a courtesy to Snap-on's counsel. Instead, he relied on the packs themselves, the contemporaneous permanent marking of the packs with identifying numbers, and the underlying test data which, under Dr. Ehsani's direct supervision

while physically present, was saved in files bearing filenames matching the permanent marking numbers of the tested packs.

That Dr. Ehsani did not leave the lab with a thumb drive containing the data and instead requested that the technician provide the data to him does not, *ipso facto,* make the underlying data unreliable, nor does it indicate "indifference to the way in which his test results were generated, maintained, and ultimately correlated to specific packs." (Dkt. No. 244, p. 9.) Instead, it is quite reasonable, and generally accepted, for Dr. Ehsani to rely on test data provided to him by a lab technician. *See e.g., Monsanto Co. v. David,* 516 F.3d 1009, 1015 (Fed. Cir. 2008) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703.") (*citing Ratliff v. Schiber Truck Co.,* 150 F.3d 949, 955 (8th Cir. 1998) (holding that expert testimony regarding a report prepared by a third party was properly allowed)); *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94, 95 (2d Cir. 2000) (finding that testimony was properly admitted from an expert who did not conduct his own tests). Here, Snap-on does not complain that Dr. Ehsani did not conduct his own tests: he did. And there is nothing improper about Dr. Ehsani directing that the electronic files containing his test data – which had been contemporaneously recorded with identifying labels to allow correlation back to the physical packs tested – be delivered to him electronically.[5]

## II. DR. EHSANI'S SUPPLEMENTAL REPORT, AS WELL AS ANY OPINIONS DR. EHSANI HOLDS REGARDING DR. HORN'S REBUTTAL REPORT, ARE ADMISSIBLE.

---

[5] It's equally meaningless to suggest impropriety because the data were sent to Plaintiffs' attorneys for delivery. All parties understood that the data had to be produced to Snap-on and that the production would come through Plaintiffs' attorneys. There is no suggestion that the data was altered in any way or that the data files actually produced to Snap-on are any different than the files recorded during Dr. Ehsani's testing and relied on by Dr. Ehsani for his opinions in this case. Were any such question to arise, the original files still reside on the original testing equipment and it is trivial matter to verify (as Plaintiffs' attorneys have actually done) that the files are identical. (Polakowski Decl. ¶ 7.)

In a single sentence midway through its recitation of the factual background of this dispute, and a second time at the end of its argument regarding Dr. Ehsani's report, Snap-on suggests that Dr. Ehsani's Supplemental Report should also be excluded and Dr. Ehsani precluded from testifying as to matters therein. (*See* Snap-on Br. at 5 ("Snap-on submits that, in the event the Court precludes Dr. Horn's supplemental report, Dr. Ehsani should likewise be precluded from testifying as to matters in the Ehsani Supplemental Report."); 10 ("*In the event the Court allows admission of Dr. Ehsani's Supplemental Report* … the Court should likewise allow admission of Dr. Horn's Supplemental Report."). (Emphasis supplied).) While this side point is not properly part of a Daubert motion, Plaintiffs will nevertheless address it directly because Dr. Ehsani's supplemental report stands in an entirely different procedural posture from Dr. Horn's purported supplemental report.

The differences between Dr. Ehsani's Supplemental Report and Dr. Horn's Supplemental Report are stark. To avoid repetitive briefing, Plaintiffs incorporate by reference their Motion in Limine seeking exclusion of the Horn Supplemental Report. Dkt. 250. In brief, the Horn Supplemental Report is an attempt to recreate from whole cloth Snap-on's invalidity case in light of the Court's summary judgment decisions. Discovery closed long before any mention was made of a supplemental report from Dr. Horn. Dr. Horn was also deposed long before any mention was made of a supplemental report from Dr. Horn. Plaintiffs will not have a chance to question Dr. Horn regarding his late-offered supplemental report prior to trial. Dr. Ehsani's Supplemental Report, in contrast, was prepared at Snap-on's request; it was prepared and served *before* the close of discovery, and weeks before Dr. Ehsani's deposition. And in addition to providing information requested by Snap-on, it contains material that is wholly responsive to

criticisms of Dr. Ehsani raised by Dr. Horn in Dr. Horn's initial report; material properly included in a sur-rebuttal report under Rule 26.

First, and most simply, Dr. Ehsani prepared, and Plaintiffs provided, the Ehsani Supplemental Report at Snap-on's request. Snap-on asked Plaintiffs for "more documents or sources of information relating to the Ehsani testing and who attended when the tests were performed." (Polakowski Decl. ¶ 20, Ex. 8.) Counsel for Plaintiffs responded to this express request by indicating that Plaintiffs would provide a supplemental report from Dr. Ehsani. (*Id.*) Plaintiffs provided the supplement from Dr. Ehsani accordingly in which Dr. Ehsani more fulsomely explained aspects of his testing questioned by Snap-on. (Dkt. No. 245-3.) Dr. Ehani's explanations included details about who assisted with testing and where testing took place; clarifying points (some for a second or third time) addressed in Dr. Ehsani's Initial Report, such as what chargers were used; and further explaining to Snap-on how it could determine which data correlated with which pack. (*Id.*) This was the information Snap-on requested; Snap-on should not now be permitted to use the Ehsani Supplemental Report it requested as leverage to attempt to have its own untimely supplement from Dr. Horn admitted.

Second, Dr. Ehsani's Supplemental Report responded directly to critiques of his testing protocol leveled by Dr. Horn in his Rebuttal Report, dated August 17, 2017. Dr. Ehsani necessarily could not have offered his Supplemental Report earlier, as it was directly responsive to Dr. Horn's rebuttal. This is not merely a matter of timing; it also renders those portions of Dr. Ehsani's Supplemental Report proper sur-rebuttal, making them admissible. "[R]elevant case law suggests that sur-rebuttal reports are permissible, as long as they remain within the scope of proper rebuttal testimony…." *La Playita Cicero, Inc. v. Town of Cicero, Illinois*, No. 11-CV-1702, 2017 WL 1151066, at *5 (N.D. Ill. Mar. 28, 2017) (collecting cases). Pursuant to Federal

Rule of Civil Procedure 26, rebuttal reports are limited to "the same subject matter" identified in the other party's expert report. Fed. R. Civ. P. 26(a)(2)(D)(ii). This is to say, "[t]he proper function of rebuttal evidence is to contradict, impeach or defuse the impact of evidence offered by an adverse party." *Peals v. Terre Haute Police Dep't*, 535 F.3d 621, 630 (7th Cir. 2008). That rebuttal reports must be limited to the same subject matter as that in the report being rebutted, however, does not mean that they cannot introduce new facts or data. New methods of analysis, and new data, are both permissible, so long as the sur-rebuttal report addresses the same subject matter and serves the purpose of contradicting, impeaching, or refuting the rebuttal. *Ernst v. City of Chicago*, No. 08 C 4370, 2013 WL 4804837, at *1–2 (N.D. Ill. Sept. 9, 2013) (citations omitted).

Moreover, Dr. Ehsani should not be restricted by the bounds of his Supplemental Report in offering sur-rebuttal testimony at trial:

> A rebuttal report is not necessary to allow an expert who has provided an initial report to testify about why he disagrees with a different expert's opinions provided that in doing so, the expert criticizing the other's opinion does not rely on a basis undisclosed in his initial report. To illustrate: if Expert One says in his initial report that Test A means X is true, and Expert Two opines that X is not true or only partly true in his initial report, Expert One need not provide a rebuttal report in order to critique Expert Two's opinion at trial based on Test A. On the other hand, if in order to rebut Expert Two's opinion, Expert One must rely on Test B which was not disclosed in his initial report, then Expert One may do so only if he provided a rebuttal report making that point.

*Martin v. SMAC Fisheries, LLC*, No. 3:11-CV-00012 JWS, 2012 WL 1951160, at *2 (D. Alaska May 30, 2012).

Dr. Ehsani's Supplemental Report is a true sur-rebuttal report: it contains information that is strictly responsive to Dr. Horn's criticisms. That Dr. Ehsani performed additional testing in order to address Dr. Horn's critique is of no moment. "Rebuttal reports can use, as well, additional data not found in the expert report, so long as it relates to the same subject matter."

*Kirola v. City & County of S.F.,* 2010 WL 373817, at *2 (N.D. Cal. 2010). *See also, Ernst v. City of Chicago,* No. 08 C 4370, 2013 WL 4804837, at *1-2 (N.D. Ill. Sept. 9, 2013 ("Rebuttal reports can use . . . additional data not found in the expert report, so long as it relates to the same subject matter."

Dr. Ehsani's Initial Report is reliable. It is firmly grounded in underlying data, the substance of which Snap-on has not touched. It should not be excluded. Dr. Ehsani's Supplemental Report is entirely appropriate sur-rebuttal to Dr. Horn's rebuttal report, which Snap-on has had a full and fair opportunity to take discovery on. Dr. Ehsani's opinions should not be excluded.

## RESPONSE TO MOTION TO EXCLUDE A PORTION OF THE DAMAGES OPINION OF JAMES E. MALACKOWSKI

In the second portion of its omnibus *Daubert* motion, Snap-on asks that the Court exclude a "portion" of the opinion of Plaintiffs' damages expert, James E. Malackowski. Snap-on does not dispute that the majority of Mr. Malackowski's analysis is reliable and admissible under Federal Rule of Evidence 702 and *Daubert*; rather, it argues only that Mr. Malackowski's valuation of a cross-license to Makita's portfolio of lithium-ion patents should be excluded. Snap-on's request is contrary to applicable law, however. Mr. Malackowski's opinion employed a sound methodology – one that even Snap-on does not disagree with – and sound reasoning. The fact that Snap-on disagrees with Mr. Malackowski's conclusion is not a valid basis to exclude under *Daubert*. *Daubert*, 509 U.S. at 592-93. ("[T]he focus 'must be solely on principles and methodology, not on the conclusions that they generate.'" "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case,

the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Id.* at 595.

In arriving at his damages calculation, Mr. Malackowski considered a settlement and cross-license agreement between Plaintiffs and Makita ("the Makita Agreement")[6] and found it to provide significant insight into a hypothetical negotiation between Plaintiffs and Snap-on. Under the Makita Agreement, Makita received a non-exclusive license to Plaintiffs' Li-ion patent portfolio, including the patents involved in the present suit. In exchange, Makita provided three total pieces of consideration which together compensated Plaintiffs for the Li-ion patents: (1) a one-time lump sum royalty of $10 million at execution; (2) annual lump sum royalty payments for five years after the effective date, totaling $20 million; and (3) a non-exclusive cross-license to 21 U.S. patents and patent applications making up Makita's own lithium-related patent portfolio as well as 6 U.S. patents and applications not related to Li-ion battery technology (collectively "the Cross-License").

In assessing the value of the Cross-License, Mr. Malackowski employed the Relief From Royalty method, a method commonly used in intellectual property valuation.[7] Briefly, under this method, Mr. Malackowski relied on the premise that but for the royalty-free Cross-License, Plaintiffs would likely have had to pay Makita royalties on sales of products embodying Makita's patents, including many of their M12™ and M18™ products. Therefore, Plaintiffs were relieved of future royalty obligations by virtue of the royalty-free Cross-License.

Mr. Malackowski limited his analysis to two of the non-Li-ion patents included in the portfolio: U.S. Patent Nos. 6,318,874 and 6,511,200, directed toward "twilight features" enabling

---

[6] For the Court's ease of reference, Plaintiffs adopt the same terminology when referring to the various agreements at issue as did Defendant.

[7] Defendants do not argue that the Relief From Royalty method is in any way unreliable.

cordless tools to shine a light on a work area for a pre-set period.[8]  He valued those "Twilight

Patents" by comparing them to licenses Plaintiffs obtained for other non-Li-ion patents ("the

Non-Li-Ion Patents") for (1) a terminal-protecting cover design for a battery charger, for which

Plaintiffs paid a 1% royalty on the net sales price of each charger (obtained in an earlier license

actually between Plaintiffs and Makita); and (2) a digital readout screen at the base of a miter

saw, for which Plaintiffs paid a 1% running royalty for the first five years, and 1.5% thereafter

(obtained in an agreement between Plaintiffs and Hitachi, one of the other parties who's

agreements Snap-on's expert finds highly probative of the reasonable royalty in this case).

    Mr. Malackowski noted that the Non-Li-ion Patents fell into the same category as the

Twilight Patents: that is, they covered features of cordless power tool products that were

"desirable but not necessary to compete."  For this evaluation Mr. Malackowski relied on the

testimony of Milwaukee Tool witnesses who assessed the patents as falling into the same

category.  (Malackowski Report (Dkt. No. 245-14), p. 24, fn 224.)  Such testimony is the type of

information an expert in Mr. Malackowski's position general rely upon.  Based on this

categorization, Mr. Malackowski applied a royalty rate of between 1% and 1.5% to the sales of

M12™ and M18™ products, beginning on the date of execution, and ultimately valued the

Cross-License at between $18.0 million and $27.0 million.

    Snap-on challenges only this valuation of the Cross-License.  Snap-on's primary basis is

an argument that Mr. Malackowski failed to establish "technical comparability" between the

Non-Li-Ion patents and the Twilight Patents.  This lack of "technical comparability," according

to Snap-on, means that the 1% to 1.5% figure is unreliable.

---

[8] Accordingly, Mr. Malackowski's calculation understates the actual value of the Cross-License by omitting consideration of U.S. sales of products potentially covered by Makita's Li-Ion patents; it also omits consideration of outside U.S. sales incorporating any licensed Makita patents.  (Malackowski Report (Dkt. No. 245-14) at 35.)

Snap-on has no quarrel with the methodology that Malackowski employed overall. Instead, relying primarily on *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), it argues that Mr. Malackowski's use of the Non-Li-Ion Patents to establish a reasonable royalty rate for the Twilight Patents is unreliable because they are insufficiently "comparable." The facts of *LaserDynamics* are dramatically different from the present case, however, and warrant review in more detail here.

In *LaserDynamics*, the technology at issue was a method of optical disc discrimination enabling an optical disc drive to identify the type of disc inserted automatically. 694 F.3d at 56. The patent asserted had been licensed no fewer than twenty-nine times; with one exception, "all twenty-nine licenses were for lump sum amounts of $1 million or less." *Id.* at 58.

The plaintiff's damages expert, however, did not analyze those twenty-nine licenses. Instead, he based his reasonable royalty calculation on: (1) two patent licensing programs undertaken by third parties in the DVD industry in 2000; and (2) a royalty survey performed by the Licensing Executive Society in 1997, which was not limited to any particular industry at all. *Id.* Based on those three licensing programs, he opined that a 6% running royalty rate was appropriate. *Id.* at 65. Accordingly, the plaintiff sought an award of $10.5 million. *Id.*

The Federal Circuit held that his royalty calculation was unreliable in the context of the full record and should have been excluded, warranting a new trial on damages. The first two licensing programs were DVD-related, but that was all the record revealed. It was not clear what patents they involved or what DVD-related technology they covered; they did not involve any of the same parties. Such "loose or vague comparability between different technologies" did not provide a reliable basis for comparison. *Id.* at 79-80. The licensing survey was more problematic still, as it was "not even limited to any particular industry." *Id.* at 80. Set against

the backdrop of the twenty-nine lump-sum licenses that actually involved the patented technology, which "could not be reconciled" with the expert's theory, *id.* at the Federal Circuit concluded that his 6% royalty rate was "untethered from the patented technology at issue and the many licenses thereto and, as such, was arbitrary and speculative." *Id.* at 81.

The facts here are very different from those in *LaserDynamics*. The Non-Li-Ion patent licenses are not untethered from the technological field at issue here. Nor has Mr. Malackowski sought to link the Non-Li-Ion patents to the Twilight Patents by asserting they are related to "the power tool industry" or a similar vague, general category. Rather, as Mr. Malackowski explained, these two groups of patents are comparable as directed to power tool features that are desirable, but not necessary to compete.[9] What Plaintiffs have paid to license such patents in the past (in one case, from Makita itself – the same licensing party as in the Cross License) is probative of what they might have paid to license additional such patents in the future (again,

---

[9] Mr. Malackowski based this understanding on conversations with Sean Dougherty. Snap-on attacks Dougherty's statement that both the Twilight and Non-Li-Ion Patents are feature patents as "pure hearsay, based on what other people have told him," and thus unreliable. (Snap-on's Br. at 14 n.4.) The testimony Snap-on cites in support, however, for the most part does not relate to "what other people have told" Dougherty at all. (*See* Dkt. 245-16, Dougherty Dep. Tr. at 36:8-38:2.) The exception is 37:9-38:2:

> Q: And you said that when you refer to the patents in suit as fundamental patents, those are -- those statements are based on things you've heard from others. Correct?
>
> MR. HANSEN: Objection. Calls for speculation. No foundation.
>
> A: Yeah, I guess if you could clarify others.
>
> Q: Well, other people than the company. That's what they've told you. Right? And then you told him? And you're not engineering. You've said it like 20 times. Right?
>
> A: Right. I am not engineering.
>
> Q: So the answer is yes then?
>
> MR. HANSEN: Objection to the form.
>
> A: Yeah.

Nothing about this testimony relates to feature patents, or indicates that Dougherty based his statement that the Non-Li-Ion Patents and the Twilight Patents are all "feature patents" on "what other people have told him." To the contrary, Dougherty acknowledged during his deposition that he remembered conveying to Malackowski "that the Twilight patents were, *in [his] view*, a feature patent" (34:3-8 (emphasis added)) and that he had told Malackowski that with respect to the Non-Li-Ion patents, he had told Malackowski that "[*he] viewed* those two patents as feature patents also." (*See Id.,* 35:4-36:11 (emphasis added).)

from Makita).  *See Summit 6*, 802 F.3d at 1296 (using royalty rates "from sufficiently comparable licenses" is a reliable method of estimating a reasonable royalty).  The licenses Mr. Malackowski used to value the Cross License were licenses from the same and a comparable party, for technologies in the exact same industry, that Milwaukee Tool witnesses described as being in the same category for purposes of value.  This is a sufficient basis for Mr. Malackowski's opinion.

*LaserDynamics* relied on two other Federal Circuit cases, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010), and *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), for the proposition that a loose or vague comparability between technologies is insufficient; Snap-on, too, cites those cases in its brief, though without analyzing them; they, too, involve dramatically different facts than those at issue here.  In *ResQNet*, the patented technology was "screen recognition and terminal emulation processes that download[ed] a screen of information from a remote mainframe computer onto a local personal computer."  594 F.3d at 863.  The plaintiff's expert, however, relied on seven licenses, five of which "had no relation to the claimed invention" and "furnished finished software products and source code, as well as services such as training, maintenance, marketing, and upgrades, to other software companies."  *Id.* at 870.  As in *LaserDynamics*, those five unrelated licenses were wholly inconsistent with the other two licenses in the record, which *did* deal with the patented technology and featured in one instance, a lump sum payment, and in the other, a dramatically lower royalty rate.  *Id.*

Finally, in *Lucent Technologies*, the claimed technology was a patent directed to a "method of entering information into fields on a computer screen without using a keyboard." 580 F.3d at 1308.  Lucent relied on eight licenses to support its lump-sum damages award.  Four

of the eight involved running royalties, but the "jury had almost no testimony with which to recalculate in a meaningful way the value of any of the running royalty agreements to arrive at the lump-sum damages aware." *Id.* at 1330. The other four were lump sums, but one of the four involved a license to an *entire patent portfolio*, and there was no evidence in the record as to the subject matter of the others beyond the fact that they were "PC-related." *Id.* at 1328. Mr. Malackowski has offered no such vague generalities as to the comparability of the Li-Ion and Twilight Patents. Accordingly, the rationale of *LaserDynamics*, *ResQNet*, and *Lucent Technologies* does not apply.

Rather, as the Federal Circuit has repeatedly stated and recently reaffirmed, though "loose or vague" comparability may be insufficient, it has "never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) (quoting *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) (internal quotation marks omitted)). Thus, in *Virnetx*, the Federal Circuit affirmed the district court's permission of testimony relying on six licenses, some drawn to the patents-in-suit, others drawn to "related technology." *Id.* at 1330. The licenses were "not immune from challenge," *id.*, but that did not render them inadmissible. *See also, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (reliance on two agreements, one which did not involve the patents in suit or cover the technologies in the case, and the other which covered patents *as well as* software services without any attempt to disaggregate the value of the patents, did not fail to meet reliability requirement of *Daubert* and Rule 702; "The degree of comparability of the Gemstar and Grande license agreements as well as any failure on the part of ActiveVideo's expert to control for

certain variables are factual issues best addressed by cross-examination and not by exclusion");

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) (affirming damages award based on license that differed from hypothetical negotiation in several key ways, because differences "permitted the jury to properly discount" the license).

Just as in *Virnetx*, the licenses utilized by Mr. Malackowski are sufficiently close to support his valuation. Snap-on will have the opportunity at trial to explore the categorization and comparability of these licenses and the jury can assess their adequacy.

The remainder of Snap-on's arguments are underdeveloped, unsupported, and do not warrant exclusion. First, Snap-on attacks Mr. Malackowski's valuation of the Cross-License as a running royalty. (Snap-on's Br., Dkt. No. 244, p. 15.) But, of course, the licenses on which that valuation is *based* are likewise structured as running royalties. Thus, based on defendant's own argument that licenses are probative not only of reasonable royalty amount but also "of the proper form of the royalty structure," *LaserDynamics*, 694 F.3d at 79-80, a running royalty valuation makes sense under these circumstances. Second, Snap-on argues that Mr. Malackowski has "provide[d] no evidence that MET has actually used the Non-Li-Ion Patents and, if so, to what extent such use is comparable to MET's purported use of the Twilight Patents." (Snap-on's Br. at 15.) This single-sentence *non sequitur*, unsupported by any citation to authority, does not provide a basis for excluding Malackowski's valuation. To the extent that Snap-on intends to suggest a reasonable royalty calculation must take that factor into account, any such argument is belied by the Federal Circuit's clear statement that "there may be more than one reliable method for estimating a reasonable royalty," and when parties choose different approaches, "the relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination." *Summit 6,* 802 F.3d at 1296.

Finally, Snap-on focuses improperly on Mr. Malackowski's conclusion, attacking Mr. Malackowski's valuation of the Cross License by suggesting that it is improper that the Cross License is given approximately the same value as the patents in suit which are full blocking patents. This point is simply wrong as well as being legally inapposite.[10] The Cross License was one part of the total value paid by Makita for the license to Plaintiffs' Li-Ion portfolio (the other portion being the cash payments totaling $30 million). Because Mr. Malackowski valued the Cross License at between somewhat less than $30 million, that means that the Cross License is valued at a bit less than half the total value of paid by Makita for the patents-in-suit. There is no equivalency. Moreover, it is an undisputed fact that Milwaukee Tool's annual sales of products under the Twilight Patents of the Cross License average approximately $300 million, more than twice Makita's estimated annual sales under the patents in suit. As a result, Milwaukee Tool's exposure under the Twilight Patents was that much greater, notwithstanding the smaller scope of coverage of the Twilight Patents.

"[E]stimating a reasonable royalty is not an exact science." *Summit 6*, 802 F.3d at 1296. When the licenses are drawn to related technologies and the jury may draw its own conclusions from any relevant differences, *Daubert* is satisfied. Snap-on may cross-examine Malackowski on any flaws it perceives in his analysis, but this does not render his valuation of the Cross-License inadmissible. Accordingly, Plaintiffs respectfully request that Snap-on's *Daubert* motion be denied with respect to Mr. Malackowsi.

### OPPOSITION TO SNAP-ON'S MOTION TO PRECLUDE ALLAN SHAMPINE'S OPINION ON SECONDARY CONSIDERATIONS OF NONOBVIOUSNESS

---

[10] The proper analysis goes only to the reliability of Mr. Malackowski's methodology, not the propriety of his ultimate conclusion. *See Daubert*, 509 U.S. at 592-93.

Snap-on seeks to exclude Plaintiffs' expert Allan Shampine, Ph.D. from testifying at trial regarding secondary considerations of nonobviousness related to the patents-in-suit. In its criticism of Dr. Shampine's opinions, Snap-on ignores Dr. Shampine's extensive analysis expressly linking the patented technology—which Dr. Shampine defined as "the innovations that allowed creation of rechargeable battery packs . . . with the ability to supply 20 or more amps of power"—to secondary considerations of nonobviousness (commercial success, industry praise, or long-felt need for the patented invention). *See* Ex. S (Dr. Shampine's Expert Report, the "Expert Report") (D.E. 245-19) at 2. Snap-on also lodges numerous criticisms, which may be appropriate for cross-examination—not a motion to exclude—as these criticisms (though unfounded) go to the weight the jury should afford to Dr. Shampine's opinions, not the admissibility thereof. Finally, in a misleading fashion, Snap-on implies that Dr. Shampine alone must present the necessary nexus between the secondary considerations and the patented technology. Snap-on is incorrect. Plaintiffs may demonstrate the necessary nexus through other evidence at trial; thus, any decision on exclusion of Dr. Shampine's opinions at this time would be premature.

For all of these reasons, as explained below in more detail, Snap-on has failed to demonstrate that Dr. Shampine's opinions regarding secondary considerations of nonobviousness are either unreliable or unhelpful to the trier of fact. The Court should therefore deny Snap-on's motion to exclude.

A.      **Secondary Considerations of Nonobviousness.**

Secondary considerations, including commercial success, long-felt need, and industry praise may serve as "indicia of obviousness or nonobviousness." *See Graham v. John Deere & Co.*, 383 U.S. 1, 17-18 (1966); *see also Ruiz v. A.B. Chance Co.*, 234 F.3d 64, 663 (Fed. Cir. 2000). A patentee must show a nexus between the identified consideration and the claimed

invention in order for the secondary consideration to be accorded "substantial weight." *See, e.g.*, *J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). However, a secondary consideration may be afforded some lesser weight even without a showing of nexus. *See, e.g.*, *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305-06 (Fed. Cir. 1985) ("The objective evidence of secondary considerations may in any given case be entitled to more or less weight, depending upon its nature and its relationship to the merits of the invention."); *Medinol Ltd. v. Guidant Corp.*, 412 F. Supp. 2d 301, 326-27 (S.D.N.Y. 2005) (explaining that the weight afforded to secondary considerations will depend on the strength of the nexus between the product and the patents-in-suit).

"[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed." *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000); *see also J. T. Eaton*, 106 F.3d at 1571 ("When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention."). The nexus need not be the only reason for commercial success of a product. *See, e.g.*, *Ecolochem v. Atl. Paste & Glue Co.*, 227 F.3d 1361, 1378 (Fed. Cir. 2000).

**B.    Dr. Shampine's Opinions Regarding Secondary Considerations of Nonobviousness Are Reliable and Will Be Helpful to the Jury**.

**1.    Dr. Shampine Has Established a Nexus Between the Patented Technology and Secondary Considerations of Nonobviousness.**

In his Expert Report, Dr. Shampine demonstrates a nexus exists between the patented technology and commercial success in number of ways. One of the most compelling examples of a nexus is the license Milwaukee entered into with Black and Decker, which Dr. Shampine

describes and notes contains a clause requiring a $23 million contingency fee that Black and Decker agreed to pay Milwaukee in a royalty if the Patent and Trademark Office upheld the validity of certain claims including the 20 Amp Limitation.  *See* Ex. S ¶ 69 (describing this license and $23 million contingent royalty).  There can be no clearer nexus than a direct competitor agreeing to place value directly on the claims at issue in this matter—a fact Snap-on conveniently glosses over.

Additionally, Dr. Shampine analyzes the market to determine the impact of the patented technology, and thus a nexus between the patented technology and the success in the market of the products that embody the patented technology.  First, Dr. Shampine describes in detail that sales of products using the patented technology have grown and gained in market share.  *See* Expert Report ¶¶ 35-39.  Next, Dr. Shampine describes that use of cordless power tools with the patented technology has grown at the expense of corded power-tools.  *Id.* ¶¶ 55-59.  Then, Dr. Shampine describes that the patented technology sells at a premium compared to alternatives that do not contain the patented technology.  *Id.* ¶¶ 43-54.  Finally, Dr. Shampine discusses the fact that sophisticated firms have paid significant value to license the patented technology.  *Id.* ¶¶ 60-69.

Snap-on argues that Dr. Shampine's analysis of the market is "cursory."  D.E. 244-1 at 18.  However, Snap-on's criticisms gloss over Dr. Shampine's analysis.  Snap-on first simplifies Dr. Shampine's opinion by arguing that Dr. Shampine opines that merely because the Milwaukee products containing the patented technology were successful, the patented technology must be the reason for the success.  *See id.*  However, Snap-on's characterization ignores the analysis that Dr. Shampine conducted, which controlled for factors *aside from* the patented technology that may have contributed to commercial success.  For instance, Dr. Shampine compared

Milwaukee's sales of tools with the patented technology to tools without the patented technology and found that sales of tools with the patented technology far surpassed sales of tools without the technology. *See id.* ¶ 35. Dr. Shampine further explained that Milwaukee's sales of tools embodying the patented technology grew in absolute terms and also relative to the rest of the industry, a fact that illustrates the importance of the patented technology to the sales growth. *Id.* ¶ 37. Dr. Shampine also explained that products without the patented technology that contained other industry innovations were less commercially successful than the Milwaukee products that contained the patented technology and other industry innovations—again, demonstrating that the patented technology was the force behind the commercial sales success. *Id.* ¶¶ 37-42.

After controlling for these numerous other variables aside from the presence of the patented technology, Dr. Shampine was left with but one logical economically sound conclusion: the patented technology drives the commercial success of Milwaukee's tools. *See J.T. Eaton*, 106 F.3d at 1571; *Brown & Williamson Tobacco Corp.*, 229 F.3d at 1130. As such, Dr. Shampine is a far cry from an expert who failed to "say[ ] what the claimed inventions are" or "compare[ ] the commercial success of memory devices using the claimed inventions versus the commercial success of memory devices that do not." *See Rambus v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 603 (N.D. Cal. 2008).

Snap-on next criticizes Dr. Shampine's long-felt need and industry praise analyses as "untethered" to the patented invention. But, here again, Snap-on cherry-picks statements from Dr. Shampine's deposition while ignoring the analyses he conducted. Dr. Shampine linked the long-felt need to the capability to meet the 20 Amp Limitation in his Expert Report. *See* Expert Report ¶ 24 (discussing that prior cordless tools could not hold a charge and only could provide "bursts of energy"—the precise problem solved by being about to have a constant current of 20

Amps). Dr. Shampine likewise linked industry praise to the claimed invention relying on, *inter alia*, statements from Milwaukee Tool linking Milwaukee Tool's dramatic increase in market share to the patented technology. *See id.* ¶ 32. That Snap-on disagrees with this industry praise does not provide a basis for the Court's exclusion of Dr. Shampine's opinion.

Snap-on's efforts to artificially limit the merits of the invention for purposes of praise fail. After all, secondary considerations "need only be 'reasonably commensurate with the scope of the claims," and [courts] do not require a patentee to produce objective evidence of nonobviousness for every potential embodiment of the claim." *Rambus, Inc. v. Rea*, 731 F.3d 1248, 1250 (Fed. Cir. 2011). The currently sold Milwaukee battery packs satisfy the 20 Amp Limitation as evidenced by Dr. Ehsani's testing, which Dr. Shampine cites to and relies on in his Expert Report. *See* Ex. S at pp. 3-4; *id.* ¶ 33. Dr. Shampine's discussion of industry praise is focused solely on products that used the patented technology. *See id.* ¶ 33. The fact that Milwaukee tools embody the patented technology is confirmed by numerous other sources. Jeffrey Zeiler, co-inventor of the '290 Patent and Gary Meyer both confirmed that the Milwaukee V28 product meets the 20 Amp Limitation. *See* O'Neill Decl. Ex. D, Dkt. 245-4 (Ehsani Declaration) ¶¶ 16, 64; Polakowski Decl., Ex. 9 (3/2/07 Meyer Declaration) ¶¶ 12-13. So too did the United States Patent Office. *See* O'Neill Decl. Ex. D (Ehsani Decl.) ¶¶ 16, 64. And, David Selby, a Milwaukee engineer with knowledge of the battery packs, confirmed earlier embodiments of the V28 battery packs likewise met the 20 Amp Limitation. *Id.* ¶¶ 16, 63; Polakowski Decl. Ex. 10 (Selby Decl.) ¶¶ 2-6.

### 2. Snap-on's Criticisms Go to the Weight to Be Afforded to Dr. Shampine's Opinions, Not Their Admissibility.

Snap-on's factual disagreements regarding evidence Dr. Shampine relied upon pertain to the weight the jury should give Dr. Shampine's opinions, not the admissibility of those opinions.

For instance, Snap-on's argument that Dr. Shampine's opinion on commercial success is "divorced" "from the real world" based on Snap-on's interpretation of Plaintiffs' internal documents (D.E. 244-1 at 18-19) is an issue for potential cross-examination, not a basis for exclusion. Likewise, Snap-on's critique of Dr. Shampine's opinion for allegedly failing to parse out what pieces of the patented technology might have contributed to commercial success (*id.* at 18-19), fails to provide a basis for exclusion. The relevant inquiry is comparing products with the patented technology (which meet the 20 Amp Limitation) to products that do not contain the patented technology and cannot meet the 20 Amp Limitation.[11] No additional parsing is needed because Dr. Shampine performed this exact analysis in his Expert Report, and the results were clear: the patented technology contributed to the success and increase in sales of Plaintiffs' products, as well as others that use the patented technology. To the extent Snap-on claims such results are flawed, it can question Dr. Shampine regarding these results during cross-examination and let the jury determine the proper weight to be afforded to Dr. Shampine's opinion. *See United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2007 WL 809641, at *3 (S.D. Ill. Mar. 15, 2007) ("question of whether the expert's theories are correct given the circumstances of a particular case is a factual one that is left for the [factfinder] to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based"); *see also St. Joseph Abbey v. Castille*, Civ. A. No. 10-2717, 2011 WL 2182046, at *1 (E.D. La. June 3, 2011) ("Courts should not be lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its

---

[11] As Dr. Shampine explained in a portion of his deposition testimony omitted from Snap-on's selective quotation: "[t]he evidence does show . . . that the 20 [A]mp [L]imitation . . . is a useful screening tool for battery characteristics generally" such that parsing out further characteristics is unnecessary. *See* Ex. T (D.E. 245-20) at 48:22-49:4.

admissibility [and] challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility.")

### C.  Snap-On's Criticisms Regarding a Purported Lack of Nexus Are Premature.

Snap-On's contention that Dr. Shampine's testimony on secondary considerations is inadmissible under *Daubert* is based on the legally incorrect view that Dr. Shampine's testimony *alone* must provide the proof of a nexus between the asserted evidence of secondary considerations and the patents-in-suit. However, even if the Court is inclined to find that Dr. Shampine's Expert Report in and of itself is insufficient to make out a *prima facie* case of the requisite nexus (even though, as set forth above, the Expert Report does make such a case), Plaintiffs may prove the nexus between the secondary considerations and inventions through other evidence at trial.

Dr. Shampine's testimony is not inadmissible simply because Plaintiffs may rely on other evidence to show a nexus. The issue of whether there is a sufficient nexus goes to the weight, not the admissibility of Dr. Shampine's opinions. *See Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1277 (Fed. Cir. 2004) (affirming district court's consideration and discounting of evidence of commercial success where no nexus was shown); *In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("To the extent that the patentee demonstrates the required nexus, his objective evidence of nonobviousness will be accorded more or less weight"); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 316 (Fed. Cir. 1985) (considering evidence of commercial success and copying but finding it of little weight due to lack of a nexus with the claimed invention); *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 460 F. Supp. 2d 659, 664 (D.N.J 2006) ("The Court also notes that the Federal Circuit has not found that the lack of such nexus evidence warrants preclusion. In such cases, courts simply accord little weight to the [secondary consideration] evidence; they do not preclude its admission altogether.").

As such, any ruling that there is an insufficient nexus between the secondary considerations and the patented technology would be premature at this point, and decision on this issue should be reserved for trial. *See Mformation Techs., Inc. v. Research In Motion Ltd.*, No. C 08–04990 JW, 2012 WL 1142537, at *7 (N.D. Cal. Mar. 29, 2012) ("[E]xclusion of this testimony based on failure to establish a nexus would be premature at this time."), *criticized on other grounds in* 767 F.3d 1308 (Fed. Cir. 2014).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should deny Snap-On's Omnibus *Daubert* Motion to Exclude.

Dated: October 5, 2017.                          Respectfully submitted,

                                                 *s/ James N. Law*         
                                                 Scott W. Hansen
                                                 shansen@reinhartlaw.com
                                                 David Hanson
                                                 dhanson@reinhartlaw.com
                                                 Paul Stockhausen
                                                 pstockhausen@reinhartlaw.com
                                                 Jessica H. Polakowski
                                                 jpolakowski@reinhartlaw.com
                                                 James N. Law
                                                 jlaw@reinhartlaw.com
                                                 Monica A. Mark
                                                 mmark@reinhartlaw.com
                                                 Reinhart Boerner Van Deuren, S.C.
                                                 1000 N. Water Street, Suite 1700
                                                 Milwaukee, WI 53202
                                                 Phone: (414) 298-1000
                                                 Fax: (414) 298-8097

                                                 Jason C. White
                                                 jwhite@morganlewis.com
                                                 Sanjay Murthy
                                                 smurthy@morganlewis.com
                                                 Scott D. Sherwin
                                                 scott.sherwin@morganlewis.com
                                                 Maria Doukas
                                                 maria.doukas@morganlewis.com
                                                 MORGAN, LEWIS & BOCKIUS LLP
                                                 77 West Wacker Drive, Suite 500
                                                 Chicago, IL 60601
                                                 Phone: (312) 324-1000
                                                 Fax: (312) 324-1001

                                                 Jeffrey G. Killian
                                                 Jeffrey.killian@morganlewis.com
                                                 MORGAN, LEWIS & BOCKIUS LLP
                                                 1111 Pennsylvania Avenue, NW
                                                 Washington, DC 20004
                                                 Phone: (202) 739-3000
                                                 Fax: (202) 739-3001

                                                 *Attorney for Plaintiffs Milwaukee Electric Tool*
                                                 *Corporation; Metco Battery Technologies, LLC;*
                                                 *AC (Macao Commercial Offshore) Limited; and*
                                                 *Techtronic Industries Co. Ltd.*

32