# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MILWAUKEE ELECTRIC TOOL CORPORATION, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> SNAP-ON INCORPORATED, <br><br> *Defendant*. | Case No. 2:14-CV-01296 <br><br> Hon. J.P. Stadtmueller |

**SNAP-ON'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT'S EXPERT DR. QUINN HORN UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702**

# TABLE OF CONTENTS

        **Page**

SNAP-ON'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* to exclude THE OPINIONS AND TESTIMONY OF DEFENDANT'S EXPERT DR. QUINN HORN UNDER *daubert* AND federal rule of evidence 702 ............................................. 1

I.     DR. HORN'S OPINIONS REGARDING THE SAFT BATTERY CELLS ARE PROPERLY ADMISSIBLE TO DEMONSTRATE OBVIOUSNESS UNDER 35 U.S.C. § 103 (MET MOTION, SECTION III.B.) ............................................................. 2

II.    DR. HORN'S OPINIONS IN HIS REBUTTAL REPORT ARE PROPERLY ADMISSIBLE TO REBUT MET'S INFRINGEMENT CASE (MET MOTION, SECTION III.C.) ................................................................................................ 7

      A.    Dr. Horn's Opinions Properly Apply The Court's Claim Construction To The Accused Products ................................................................................ 7

      B.    Dr. Horn's Opinion Is Relevant To Damages (MET Motion, Section III.C.2.) ... 10

III.   DR. HORN RELIES ON STL TEST DATA ONLY TO CONFIRM THAT THE PROPOSED NON-INFRINGING SUBSTITUTE OPERATES AS INTENDED (MET MOTION, SECTION III.D.) ............................................................... 11

IV.   DR. HORN'S REPORT PROVIDES THE FACTUAL BACKGROUND FOR HIS OPINIONS, NOT A NARRATIVE STATEMENT FOR TRIAL (MET MOTION, SECTION III.E.) ............................................................................. 12

V.    DR. HORN DOES NOT INTEND TO PROVIDE CONCLUSIONS ON SECONDARY CONSIDERATIONS OF OBVIOUSNESS, BUT CERTAIN TECHNICAL OPINIONS MAY BE RELEVANT TO THOSE SUBJECTS (MET MOTION, SECTION III.F.) ............................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accent Packaging v. Leggett & Platt, Inc.*,
   707 F.3d 1318 (Fed. Cir. 2013)...........................................................................................9

*Clark v. Takata Corp.*,
   192 F.3d 750 (7th Cir. 1999) ................................................................................................5

*Fantasy Sports Properties v. Sportsline.com*,
   287 F.3d 1108 (Fed. Cir. 2002)............................................................................................8

*Hauser, Inc. v. Hawk Measurement Systems Pty.*,
   122 F.3d 1040 (Fed. Cir 1997)............................................................................................4

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
   49 F.3d 1551 (Fed. Cir. 1995)..............................................................................................9

*Hilgraeve Corp. v. Symantec Corp.*,
   265 F.3d 1336 (Fed. Cir. 2001)............................................................................................9

*Loontjens v. Sentry Ins.*,
   No. 13-CV-1217-JPS, 2014 WL 5305893 (E.D. Wis. Oct. 15, 2014).................................5

*Mitchell v. Gencorp Inc.*,
   165 F.3d 778 (10th Cir. 1999) .............................................................................................5

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
   739 F.3d 1339 (Fed. Cir. 2014)............................................................................................9

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
   411 F.3d 1332 (Fed. Cir. 2005)............................................................................................6

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
   927 F.2d 1565 (Fed. Cir. 1991)............................................................................................4

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*,
   225 F.3d 1349 (Fed. Cir. 2000)............................................................................................6

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
   550 F.3d 1356 (Fed. Cir. 2008)............................................................................................4

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001)............................................................................................9

**Statutes**

35 U.S.C. § 103...................................................................................................................2

**Rules**

Federal Rule of Evidence 702......................................................................................1, 2

MET has challenged certain opinions of Dr. Quinn Horn as unreliable under the standards of *Daubert* and Federal Rule of Evidence 702. Snap-on addresses each issue in turn, but first describes Dr. Horn's testimony and expertise generally.

Dr. Horn has extensive experience in evaluation of battery cell and battery pack designs, and correlation of design and manufacturing issues to problems involving battery packs and cells. (Ex. T ¶¶ 6–9 and Exhibit A.) He received his doctorate in materials engineering in 1998, and from 1998 to 2002 was employed by Energizer/Eveready Battery Company where he conducted failure analysis studies relating to battery pack and battery cell performance problems and battery pack and battery cell manufacturing issues. From 2002 to 2004, Dr. Horn was a Principal Scientist at Physical Sciences Inc., where his work mainly involved design and development of high power lithium-ion battery electrodes and cells. Since 2004, he has been employed by a consulting firm, known as Exponent, where his work mainly involves solving problems relating to safety, performance and reliability of lithium-ion cells and battery packs. Dr. Horn has been involved in hundreds of projects concerning evaluation of battery cell and battery pack designs for commercial clients in a wide range of industries, including power tools, consumer electronics, military, medical devices, and hybrid and electric vehicles.

MET does not appear to attack Dr. Horn's credentials or his knowledge of lithium ion battery technology. Dr. Horn's proffered opinions relate to battery technology; what one of ordinary skill in the art in 2001–02 would have known and understood about nickel cadmium ("NiCd") and lithium-ion ("Li-ion") battery cells and packs; the characteristics of specific battery cells and packs described in the prior art and elsewhere; and, how to modify those cells and packs for various applications, such as handheld power tools. Dr. Horn's proffered opinions also relate to how the accused Snap-on tools interact with the associated battery packs.

MET's Motion *in Limine* seeks to exclude Dr. Horn's opinion (Dkt. No. 234) regarding the prior art Saft battery cells, his opinions relating to non-infringement, and his testimony about a non-infringing modification to the accused products. MET requests that portions of his expert reports be stricken and that Dr. Horn be precluded from testifying on the issue of commercial success. We address each in turn below, explaining how Dr. Horn's opinions and the underlying factual basis for those opinions are relevant under Fed. R. Evid. 702. MET's Motions should be denied for those reasons.

## I. DR. HORN'S OPINIONS REGARDING THE SAFT BATTERY CELLS ARE PROPERLY ADMISSIBLE TO DEMONSTRATE OBVIOUSNESS UNDER 35 U.S.C. § 103 (MET MOTION, SECTION III.B.)

Dr. Horn has reviewed information about the characteristics of prior art Li-ion battery cells commercially available from the Saft battery company in 2002 (collectively referred to as "Saft Battery Cells," where appropriate). (Ex. T ¶¶ 145-60.) Dr. Horn has offered his opinion that the hypothetical person of ordinary skill in the art, at the time of the invention of the patents-in-suit, would be motivated to use and, if necessary modify, the Saft Battery Cells in a battery pack for a power tool in a configuration that meets the 20 Amp Limitation of the claims of the patents-in-suit. The evidence Dr. Horn relies upon for his testimony about the Saft Battery Cells includes published articles about the physical characteristics of the Saft battery cells (with performance data); a Saft company product specification sheet (with performance data); and MET's own documents regarding its understanding of the use of Saft battery cells in a power tool by a competitor company of MET (with performance data). (*Id.*) The Saft Battery Cells, in combination with other prior art references and teachings, form the bases for one or more of Dr. Horn's opinions regarding obviousness.

MET seeks to exclude the Saft Battery Cells as prior art because Dr. Horn did not himself test a 2002-vintage Saft battery cell. It is true that Dr. Horn did not personally test a Saft battery

2

from 2002, nor could he have done so. As MET knows, however, it is impossible to conduct a meaningful scientific test on a 2002 Li-ion battery, even if such a battery could be found in the marketplace. As MET's expert Dr. Ehsani told the Patent Office when he was unable to locate Milwaukee's V28 and other early battery packs from the 2005-2007 time period in order to test whether they met the 20A limitation:

> [I]t is unlikely they can be reliably tested today for the characteristics that they had years ago. Battery cells degrade over time. In other words, battery packs that satisfied the 20 Amp limitation when manufactured would likely have degraded such that I could no longer reliably measure the 20 Amp limitation today.

(Ex. Y ¶ 61.)

Instead, Dr. Horn relied on industry sources and MET's own documents to confirm his analysis of the capabilities of the Saft Battery Cells. In 1999, several Saft battery engineers co-authored an article describing the Saft lithium-ion batteries, and identified a broader group of applications for those batteries, such as use in vehicles, utilities and satellites. The 1999 article described the Saft company's work on a preliminary design of a "dual mode" cell that coupled the high power and high-energy capability. (Ex. T ¶¶ 147–49, 151.) A Saft product specification sheet for a 2001 Saft battery cell product provides performance data for commercial Li-ion cells available from Saft.[1] (Ex. T ¶ 152.)

MET is expected to contend, based on its own expert's report, that one of skill in the art in 2001–02 would not consider using the Saft Battery Cells in a battery pack for a power tool. This testimony would be contrary to what MET's own inventors learned about uses of the Saft Battery Cells in a power tool made by a European power tool company, known as Metabo, in

---

[1] As it relates to the Saft Battery Cells, the discussion of the Saft prior art references was revised in the Horn Supplemental Invalidity Report to delete references to several patents that were found by the Court to be barred by the IPR estoppel ruling of the Court. The memorandum addresses only those Saft Battery Cells references that were found not to be subject to the IPR estoppel bar.

2002. (Ex. T ¶¶ 157–60.) In 2002, MET's inventors learned that the Saft battery cells were capable of delivering "20A continuous" in a battery pack in the Metabo power tool. (*Id.*) MET's own documents indicate that the Saft Battery Cells could be used, and were being used, in a power tool battery pack. These documents support Dr. Horn's proffered opinions regarding what one of skill in the art would understand about the use of Saft Battery Cells, as well as any modification of those cells for use in a power tool. (*Id.* ¶ 160.)

MET appears to dispute Dr. Horn's analysis of the Saft Battery Cells and it is entitled to do so during cross-examination. Dr. Horn is testifying, based on his experience in the technology at issue, about how the hypothetical person of skill in the art would understand the capabilities of the Saft Battery Cells from publications and documents. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1361 (Fed. Cir. 2008) (infringement and validity are analyzed "in great part from the perspective of a person of ordinary skill in the art and testimony explaining the technical evidence from that perspective may be of great utility to the factfinder."); *Endress + Hauser, Inc. v. Hawk Measurement Systems Pty.*, 122 F.3d 1040, 1042 (Fed. Cir 1997) ("The 'person of ordinary skill in the art' is a theoretical construct used in determining obviousness under § 103, and is not descriptive of some particular individual.") Dr. Horn does not need to test a physical embodiment of Saft battery cell from 2002 to reach his conclusions. This is because what a prior art reference, such as the Saft Battery Cells, discloses or teaches is determined from the perspective of one of ordinary skill in the art. *Sundance*, 550 F.3d at1361 n. 3, *citing Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991) (reference is evaluated from view of a person of ordinary skill in the field of the invention).

The cases cited by MET are not to the contrary. In *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999), cited by MET, the expert in a product liability case testified about the level of claimant's exposure to certain chemicals in a specific room by studying photographs of chemical spillage in that room and product data safety sheets, rather than conducting actual tests involving the level of chemicals in the specific room. Similarly, *Clark v. Takata Corp.*, 192 F.3d 750, 758-59 (7th Cir. 1999) involved expert testimony in a car roll-over case where the expert offered opinions about the failure of a specific vehicle safety belt to restrain the claimant without any evaluation of the claimant's physical characteristics, e.g., height, weight, and no evaluation of the forces acting on the belt at the precise time of impact and rollover. In those cases, the experts were testifying about the alleged impact of specific products on a specific individual to cause, or fail to prevent, specific injuries, without actual scientific testing. And, even in the context of product liability cases, this Court has found that "it is not the purview of the court as the gatekeeper of evidence to determine the necessity of each and every possible test that could possibly be performed in reaching a valid scientific conclusion. Such determination is better left as the subject of cross-examination." *Loontjens v. Sentry Ins.*, No. 13-CV-1217-JPS, 2014 WL 5305893, at *5 (E.D. Wis. Oct. 15, 2014) (denying motion to exclude plaintiff's liability expert in injury case).

But this is not a product liability case where Dr. Horn is providing an expert opinion about whether a specific Saft battery injured someone in 2002. Rather, this is a patent case in which Dr. Horn is providing an expert opinion about how the hypothetical person of skill in the art would interpret the information made available to him/her about a Saft battery cell in 2002, including a report to MET's inventors that the Saft battery cells were used in a Metabo power tool and the pack was capable of delivering "20A continuous."

5

Finally, although Dr. Horn stated his opinion based on the available information that the Saft Battery Cells used in a battery pack would meet the 20 Amp Limitation, the Saft Battery Cells need *not* meet that limitation to be relevant prior art. As Dr. Horn explains in his Report, it would be well within the skill level of a person of ordinary skill in the art to *modify* cell chemistry, cell geometry and size, and modify other aspects of Li-ion battery cells, which would include Saft Battery Cells, to meet the industry standard known at the time set forth in the 20A Limitation. *See Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1338 (Fed. Cir. 2005) ("A suggestion or motivation to modify prior art teachings may appear in the content of the public prior art, in the nature of the problem addressed by the invention, *or even in the knowledge of one of ordinary skill in the art*.") (emphasis added); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000) (same). For example, MET's validity expert, Dr. Wood, agreed at his recent deposition that "at the time of the Milwaukee invention it was within the ability of a person of skill in the art, as [MET and Dr. Wood ] have defined that person, to make adjustments to cell chemistry, cell geometry and size, battery pack management and battery pack design in order to optimize a cell and pack for high power." (Ex.R at 167.) Accordingly, modification of the Saft Battery Cells with regard to cell chemistry, size, battery pack management and battery pack design were well within the ability of the person of skill in the art at the time of the invention.

This information and Dr. Horn's opinion are relevant and helpful to the jury and should be admitted.

## II. DR. HORN'S OPINIONS IN HIS REBUTTAL REPORT ARE PROPERLY ADMISSIBLE TO REBUT MET'S INFRINGEMENT CASE (MET MOTION, SECTION III.C.)

### A. Dr. Horn's Opinions Properly Apply The Court's Claim Construction To The Accused Products

In addressing MET's infringement case, Dr. Horn's Rebuttal Report adopts the claim construction and summary judgment rulings of the Court. Dr. Horn's opinions do not contest the Court's construction of the "20A Limitation," or the Court's confirmation of Dr. Ehsani's constant current test to apply the 20A Limitation to a battery pack.

The accused products in this case are the Snap-on battery packs as intended for use in an appropriate Snap-on tool, however. Two of the asserted claims expressly claim a handheld power tool for use with the battery pack ('510 patent, Claim 19; '173 patent, Claim 12) and the other claims show that the battery pack must be used in a tool to operate. (Ex. S ¶¶ 92–94, 97.)

As Dr. Horn notes in his Rebuttal Report, Snap-on sells its battery packs only for use in Snap-on tools. (*Id.* ¶ 88.) The Snap-on battery packs have a terminal that is designed to connect or "fit" only in an appropriately sized Snap-on tool. (*Id.*) Absent improper modification by a user, Snap-on battery packs have no use (other than as a paper weight) except as connected to and powering an appropriately sized Snap-on tool. (*Id.*) Moreover, each of the accused Snap-on tools, such as the accused Snap-on impact wrenches, cordless drills, and reciprocating saws, have electronics in the tools that must cooperate, or connect, with the electronics in the battery pack in order for the battery pack to operate in its normal and intended condition, i.e., powering a Snap-on tool. (*Id.* ¶¶ 92–94, 97, 99.)

When testing the Snap-on battery packs to determine whether they met the 20 Amp Limitation, Dr. Ehsani bypassed the tools and the protective circuitry that operates to shut off the tool under certain high power conditions, and instead conducted a laboratory test of the battery

7

3990923
Case 2:14-cv-01296-JPS    Filed 10/05/17    Page 11 of 18    Document 258

pack by itself on the bench-top. One of Dr. Horn's main criticisms of Dr. Ehsani's battery pack test is that Dr. Ehsani has necessarily *modified* the Snap-on battery packs by ignoring the electronics in the associated Snap-on tool that must cooperate with the electronics in the battery pack in the normal operation of the battery pack and tool. (*Id.* ¶¶ 113–15, 117–18.) Only by by-passing the protection circuitry in the tool was Dr. Ehsani able to test the Snap-on battery packs in a laboratory condition that is unrelated to the normal use of the battery pack and associated tool. (*Id.* ¶ 118.)

Under Dr. Ehsani's test, the battery pack must be discharged at a constant current of 20A from full discharge to an end voltage, which requires an operation of the tool under a very heavy load for a period of about 4 minutes to 12 minutes. Dr. Ehsani made clear at his deposition that there can be no breaks in the application of 20A current for that entire period of time. (Ex. Z at 208:23–209:3.) Dr. Horn's response is that devising an 4 minute continuous application 20A application for one of the Snap-on tools, which are designed to perform only with intermittent applications of power to remove a series of bolts or insert a series of screws, is an operation that, even if possible on the tool, would likely cause the tool to stop working and abort the constant current discharge test before the end voltage. (Ex. S ¶ 117.)

Dr. Horn's testimony is entirely consistent with the Court's claim construction, which relates to determining the capacity of a battery pack. However, the question for trial involves an accused product that requires use of the battery pack only in an associated Snap-on tool. "[I]n every infringement analysis, the language of the claims, as well as the nature of the accused product, dictates whether an infringement has occurred." *Fantasy Sports Properties v. Sportsline.com*, 287 F.3d 1108, 1118 (Fed. Cir. 2002).

Dr. Horn's proffered trial testimony is that Dr. Ehsani's bench-top tests ignore the nature of the accused product, which includes electronics in the tool that cooperate with and control the electronics in the battery pack. The conditions of Dr. Ehsani's test, which *disconnect* the battery pack from the tool and operate the pack on a laboratory bench-top, are a modification of the battery pack. The accused products do not involve or contemplate operation of the battery pack separate and apart from the control of the associated Snap-on tool electronics. "[T]ests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (test at issue was "not probative of infringement during normal operation of the accused products").

An accused device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim. *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555-56 (Fed. Cir. 1995) *See also Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (affirming non-infringement; products at issue did "not infringe without modification—the modification of installing the required software"); *Accent Packaging v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1327 (Fed. Cir. 2013) (affirming non-infringement; mere "fact that it is possible" to alter product to make it infringe was insufficient); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) (affirming non-infringement; device that did not meet a limitation "due to a restriction built into [its] software program" did not infringe, even if "the capability of [infringing] is nonetheless present in the [device's] source code").

For these reasons, Dr. Horn's opinions are relevant to the issue of infringement and are consistent with the Court's claim construction and summary judgment rulings.

9

### B. Dr. Horn's Opinion Is Relevant To Damages (MET Motion, Section III.C.2.)

MET further criticizes Dr. Horn for not conducting 20A constant current discharge tests on the Snap-on tools. Under Dr. Ehsani's constant current discharge test for a battery pack, the pack must be discharged *continuously* at 20A constant current from full charge to an end voltage. (Ex. S ¶ 102.) Under Dr. Ehsani's test conditions, the battery pack discharge at 20A requires that the 20A load be applied *continuously* to the pack for a time period that is on order of 4 minutes and in some cases up to 12 minutes. (*Id.*)

Dr. Horn's proffered trial testimony is that the accused Snap-on tools cannot be operated in a normal, accepted condition that makes the associated battery pack capable of discharging 20A constant current for their entire rated capacity. Dr. Horn will explain that applying a 20A constant current load to a battery pack connected to a tool for a *continuous* 4 minutes would be an unsafe condition, if not an impossible condition. For example, operation of a Snap-on cordless drill for 4 minutes at a continuous load of 20A to drill a hole would require drilling a hole over 7 feet deep with a hand-held cordless tool.[2] (*Id.* ¶ 117.) This type of load would likely cause the tool to overheat and stop the operation prior to the required 4 minutes of discharge, and thus it would fail Dr. Ehsani's requirements. (*Id.*)

Dr. Horn's opinion in this regard is relevant not only to non-infringement, but also to the issue of damages. The damages experts will be opining on the "value" of the "20A Limitation" to the accused products. Dr. Horn's examples of the abnormal circumstances needed for operation of a tool to meet the 20A Limitation confirm that the 20A Limitation has no value in the real world to purchasers of tools.

---

[2] In distinguishing the claims over the prior art "Prototype Packs" in the Patent Office, Dr. Ehsani's "constant current" test does not permit intermittent application of current; it must be applied for a *continuous* four minutes, or whatever time is necessary to reach full discharge. (Ex. Z at 208–09.)

10

## III. DR. HORN RELIES ON STL TEST DATA ONLY TO CONFIRM THAT THE PROPOSED NON-INFRINGING SUBSTITUTE OPERATES AS INTENDED (MET MOTION, SECTION III.D.)

As explained above, Dr. Ehsani's constant current discharge test requires a full discharge of the battery pack at 20A for on the order of 4 minutes. Because Snap-on contends that such a situation is never encountered in the ordinary use of its tools, it has identified a non-infringing substitute that would prevent the Snap-on products from operating at a constant current of 20A or greater over the entire rated capacity of the battery pack.

As explained in Dr. Horn's Rebuttal Report, Section XII, Dr. Horn was asked to consider whether the Snap-on product could have been designed in 2009 in order to prevent the battery pack from operating at a constant current load of 20A or greater for at least 4 minutes. (Ex. S ¶ 129.) The Snap-on battery packs already have a feature that shuts off battery packs if they operate at over 75 amps, for example, for a short period of time or over 80 amps for an even shorter period of time. Snap-on asked STL Technology Co., Ltd. ("STL"), its battery pack supplier, to modify the software code to implement a timer that would stop the tool and battery from discharging in the event a current of 20A or greater is applied for more than 2 minutes. (*Id.* ¶¶ 130–31.) STL made the requested modification by the addition of several lines of software code and implemented the design modification in several battery packs that were then provided to Snap-on. (*Id.* ¶ 135.)

Dr. Horn is relying on the STL report only for confirmation that the proposed modification was made to the sample product for purposes of this case. (*Id.*) Nothing in Dr. Horn's opinion requires Dr. Horn's verification of the testing by STL, and MET can point out on cross-examination that Dr. Horn did not himself conduct the confirmatory tests. Nevertheless, in the event MET has concerns about the details of the tests, an STL employee, Mark Reid, is

11

expected to present live testimony as a witness at trial, and can confirm the modification made to the product at the request of Snap-on.

### IV. DR. HORN'S REPORT PROVIDES THE FACTUAL BACKGROUND FOR HIS OPINIONS, NOT A NARRATIVE STATEMENT FOR TRIAL (MET MOTION, SECTION III.E.)

MET moves to exclude a large portion of Dr. Horn's Report on the grounds that it provides a "factual narrative" regarding Moli battery cells. But Snap-on assumes that no expert report will be entered into evidence and given to the jury at trial. The expert report is not a script of proposed testimony, but a statement of opinions and the factual basis for those opinions.

Dr. Horn's Invalidity Report attempts to provide the complete factual basis for all of his proffered opinions. In this regard, Dr. Horn provides a summary of factual information with detailed citations to various deposition exhibits, deposition transcripts and other materials. Dr. Horn expects to rely on this information at trial and MET cites no basis on which to prevent his reliance. That information is relevant, or at least its relevance should be tested on a question-by-question basis after the Court's final rulings on motions. Even MET does not appear to be asking the Court to "exclude" evidence of the factual basis for Dr. Horn's opinion.

### V. DR. HORN DOES NOT INTEND TO PROVIDE CONCLUSIONS ON SECONDARY CONSIDERATIONS OF OBVIOUSNESS, BUT CERTAIN TECHNICAL OPINIONS MAY BE RELEVANT TO THOSE SUBJECTS (MET MOTION, SECTION III.F.)

Dr. Horn's Invalidity Report, and his deposition testimony, make clear that he is not providing opinions on various secondary considerations of obviousness. He will not offer an opinion that, for example, the invention was or was not a "commercial success" or whether there was or was not industry praise for the invention. That said, Dr. Horn's technical testimony as identified in his report will certainly bear on secondary considerations of obviousness. MET's Motion on this issue should be denied because the Court can determine whether Dr. Horn strays

12

into the realm of offering an "opinion" directly concerning one of the secondary considerations, or merely technical information from his report, that bears on it.

Dated: October 5, 2017                    Respectfully submitted,

By: */s/ Peter F. O'Neill*
Lynn H. Murray
Hugh A. Abrams
George R. Dougherty
Peter F. O'Neill
Jonathon M. Studer
Shook, Hardy & Bacon L.L.P.
111 S. Wacker Drive, Suite 5100
Chicago, Illinois 60606
Phone: (312) 704-7700
Fax: (312) 558-1195
lhmurray@shb.com
habrams@shb.com
gdougherty@shb.com
pfoneill@shb.com
jstuder@shb.com

David R. Cross
Michael T. Piery
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2350
Milwaukee, Wisconsin 53202-4426
Phone: (414) 277-5000
Fax: (414) 271-3552
david.cross@quarles.com
michael.piery@quarles.com

**Attorneys for Defendant and Counterclaim-Plaintiff Snap-on Incorporated**

13

3990923
Case 2:14-cv-01296-JPS    Filed 10/05/17    Page 17 of 18    Document 258

# CERTIFICATE OF SERVICE

I certify that on October 5, 2017, I served the foregoing **SNAP-ON'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE OPINIONS AND TESTIMONY OF DEFENDANT'S EXPERT DR. QUINN HORN UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702** on all counsel of record using the Court's ECF system.

Dated:  October 5, 2017

By: */s/  Peter F. O'Neill*
Peter F. O'Neill