# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MILWAUKEE ELECTRIC TOOL CORPORATION, METCO BATTERY TECHNOLOGIES LLC, AC (MACAO COMMERCIAL OFFSHORE) LIMITED, and TECHTRONIC INDUSTRIES CO. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SNAP-ON INCORPORATED, <br><br> Defendant. | Case No. 14-CV-1296-JPS |
| MILWAUKEE ELECTRIC TOOL CORPORATION, METCO BATTERY TECHNOLOGIES LLC, AC (MACAO COMMERCIAL OFFSHORE) LIMITED, and TECHTRONIC INDUSTRIES CO. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SHOOK HARDY & BACON and MCDERMOTT, WILL & EMERY, LLP, <br><br> Defendants. | Case No. 17-MC-49-JPS <br><br><br><br><br> **ORDER** |

This is a patent case about lithium-ion batteries used in power tools. The case was tried to a jury in October 2017. The jury rendered a verdict in favor of Plaintiffs and awarded nearly $28 million in damages. Before the

Court are the parties' post-trial motions. For the reasons stated below, the Court will deny post-trial relief to Defendant Snap-On Incorporated ("Snap-On"), deny Plaintiffs' motion for enhanced damages, and grant in part Plaintiffs' motion for pre-judgment interest.

1.    BACKGROUND

In the early 2000s, Plaintiff Milwaukee Electric Tool Corporation ("Milwaukee") teamed up with Canadian battery manufacturer E-One Moli Energy (Canada) Ltd. ("Moli") to develop a lithium-ion ("Li-ion") battery usable in a power tool. Cordless power tools were traditionally powered by nickel-cadmium ("Ni-Cd") or nickel-metal hydride batteries, as Li-ion battery cells could not safely or reliably produce sufficient power output for such high-power applications. In what was dubbed the "884 Project," a joint team of Milwaukee and Moli scientists labored for many months to produce a working Li-ion battery pack, which was finally reduced to practice in late 2002. Milwaukee's first line of Li-ion powered tools, the V28, was debuted in 2005 to great acclaim.

In June 2009, Plaintiffs obtained patents on the Li-ion battery pack technology they developed with Moli. The critical independent claim found in all three patents-in-suit recites:

a battery pack for powering a hand held power tool, the battery pack comprising:

a housing connectable to and supportable by the hand held power tool; and

a plurality of battery cells supported by the housing, the battery cells being capable of producing an average discharge current greater than or equal to approximately 20 amps, the battery cells having a lithium-based chemistry.

The penultimate clause is known as the "20 Amp Limitation," and it has featured prominently in the parties' legal and factual disputes in this case. Snap-On developed its own line of Li-ion tools that was launched in September 2009.

This infringement action was filed on October 16, 2014, and is well past its third birthday. The case lived much of its life under a stay granted at Snap-On's request so that it and other accused infringers could seek *inter partes* review ("IPR") of the patents-in-suit before the United States Patent and Trademark Office ("USPTO"). None of the IPRs was successful in invalidating any part of the patents, although appeals of the IPR decisions are still pending in the Court of Appeals for the Federal Circuit.

In December 2016, after the Patent Trial and Appeal Board ("PTAB") issued its decisions on the latest round of IPRs, the Court lifted the stay and discovery proceeded apace. The Court addressed matters of claim construction and the parties' arguments on summary judgment in an order dated September 22, 2017. *Milwaukee Elec. Tool Corp. v. Snap-On Incorporated*, Case No. 14–CV–1296–JPS, 2017 WL 4220457 (E.D. Wis. Sept. 22, 2017).

The case was tried to a jury beginning on October 16, 2017. *See* (Docket #313). During the course of the eight-day trial, the jury was shown hundreds of documents, numerous physical exhibits, and heard testimony from twenty-four witnesses, including seven experts. The jury returned a verdict for Plaintiffs on October 26, 2017. *See* (Docket #316). The jury found that Snap-On's accused products infringed each asserted claim of the patents-in-suit. *Id.* at 1–4. The jury further found that none of the subject claims were invalid as obvious under 35 U.S.C. § 103 and that Snap-On's infringement of the patents was willful. *Id.* at 4–5. Finally, the jury awarded

compensatory damages in the form of a lump-sum reasonable royalty in the amount of $27.8 million. *Id.* at 5.

## 2. ANALYSIS

The parties' post-trial motions cover myriad issues pertaining to liability and damages. Snap-On's two motions seek judgment as a matter of law and a new trial, respectively. Plaintiffs also filed two post-trial motions, the first requesting treble damages and the second seeking pre- and post-judgment interest. The Court will address each motion in turn.

### 2.1 Snap-On's Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 provides that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a). The Rule allows a party to move for judgment on a particular claim when (1) "a party has been fully heard on an issue during a jury trial," and (2) "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50(b) is used to renew after trial a motion under Rule 50(a). *Id.* 50(b). In ruling on the renewed motion, the court may uphold the jury's verdict, order a new trial, or direct entry of judgment as a matter of law. *Id.*

In patent cases, the law of the regional circuit sets the standard applied to motions under Rule 50. *Summit Tech. Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). The Seventh Circuit instructs that

> [i]n deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. The court does not make credibility determinations or weigh the evidence. Although the court reviews the entire

record, the court must disregard all evidence favorable to the moving party that the jury [was] not required to believe.

*Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (internal citations and quotations omitted).

In its renewed motion for judgment as a matter of law pursuant to Rule 50(b), (Docket #347), Snap-On addresses three issues. First, it contends that the evidence at trial proved its obviousness defense, contrary to the jury's verdict. Second, it challenges the finding of infringement as to two of its packs that Plaintiffs' battery expert, Dr. Mark Ehsani ("Ehsani"), could not and did not test. Finally, Snap-On seeks reversal of the jury's finding that its infringement was done willfully.[1]

The bulk of Snap-On's arguments ignore the standard of review, which permits reversal of the verdict only if no reasonable jury could have decided as this jury did. Snap-On seems to think it can succeed if it shows merely that it could have convinced the jury to go its way, but this is no reason to disturb the jury's determinations. A brief examination of each issue shows that the jury's conclusions were supported by sufficient evidence.

### 2.1.1 Obviousness

Snap-On first contends that the asserted claims were obvious in light of the prior art. An obviousness challenge requires a showing that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at

---

[1] Snap-On's original motion for judgment as a matter of law included a challenge to Plaintiffs' product marking within the context of pre-suit damages. (Docket #296-1 at 5–9). It did not renew that argument in the present motion. Pursuant to a stipulation of the parties and the Court's order, the marking issue was withdrawn and will not be considered. *See* (Docket #325, #326).

the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2006).[2] To prove obviousness, one must show that a skilled artisan "would have found it obvious to bridge the differences between the subject matter of the claims and the prior art[.]" *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1343 (Fed. Cir. 2013). This entails consideration of several factors, including "(1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010); *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Patents are presumed valid, *Microsoft Corp. v. i4i Ltd P'ship*, 131 S. Ct. 2238, 2243 (2011), so an invalidity defense like obviousness can only succeed if proven by clear and convincing evidence, *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 993 (Fed. Cir. 2009).

The thrust of Snap-On's obviousness argument to the jury was that Plaintiffs' patents simply substituted Li-ion battery cells, created by Moli, for the Ni-Cd cells used in existing battery packs. *See* (Docket #348 at 8); (Docket #369 at 5). Everything else about the packs, including using the 20 Amp Limitation as an industry-standard performance benchmark, remained the same. (Docket #348 at 8). Because of the simplicity of the change introduced in the patents, Snap-On contended that a person of ordinary skill in electronics and power tool design would have easily

---

[2]The Leahy-Smith America Invents Act ("AIA") made significant changes to the structure of the Patent Act. However, because the applications resulting in the patents-in-suit were all filed before the AIA's effective date, the Court refers to the pre-AIA version of the relevant statutory provisions. *See Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1370 n.8 (Fed. Cir. 2017).

arrived at the same invention. *Id.* at 14–15. The jury did not buy the argument, and there was plenty of evidence introduced at trial to support that finding.

First, the original prototype cells Moli provided to Milwaukee, with a rated capacity of 15 amps, could not meet the 20 Amp Limitation. Snap-On's own expert, Dr. Quinn Horn ("Horn"), conceded this. Second, the later-developed cells, while more powerful, did not support an obviousness claim. Those cells were developed jointly by Milwaukee and Moli, suggesting that they were not prior art at all since they emanated in part from Milwaukee's own work.[3] This is true even though Moli's scientists were certainly the battery experts; Milwaukee's witnesses testified that they contributed performance requirements and other information based on their own expertise as battery pack designers, something Moli did not know anything about. That the Moli contributors now believe they did the lion's share of the work is not conclusive on the point. The jury was entitled to view such testimony with skepticism.

This fact distinguishes the instant case from *Morgan v. Hirsch*, 728 F.2d 1449, 1452 (Fed. Cir. 1984), cited by Snap-On, in which the parties disputed who had invented a particular thermal fabric and a method for manufacturing it. The plaintiff sought to show that he conceived of the fabric before the defendant by pointing to his work with another fabric

---

[3]In ruling on one of Plaintiffs' motions in limine, the Court found that Snap-On could not be precluded from arguing that the Moli cells constituted prior art under Section 102(f), which generally covers information communicated to the patentee by non-inventors. *Milwaukee Elec. Tool Corp. v. Snap-On Incorporated*, Case No. 14-CV-1296-JPS, 2017 WL 4570787, at *3 (E.D. Wis. Oct. 12, 2017). That issue was contested throughout trial, however, (Docket #314 at 18–19), and so the jury was allowed to find that the cells did not constitute prior art as a matter of fact.

maker. *Id.* at 1451. The other maker sent successive samples of product to the plaintiff and he rejected each one until he was happy with the result. *Id.* The court found this insufficient to support the plaintiff's conception of the invention, since he did not actually invent anything: "[h]e only posed the problem." *Id.* at 1452. What the plaintiff did not contribute in that case were any specific requirements for the fabric, only criticisms of the samples he was sent. *Id.* Thus, said the Court of Appeals, he had not engaged in invention. *Id.*

Unlike *Morgan*, here the evidence showed that Milwaukee and Moli worked closely together to develop a working Li-ion battery pack for a power tool. Moli knew battery chemistry, but did not understand how that chemistry needed to work in a final battery pack. Conversely, while Milwaukee could do little to suggest chemical changes to the battery cells, it did not passively receive Moli's samples. Rather, because Milwaukee knew the ultimate performance requirements for the battery packs, it ensured that Moli's cells were tested in conformity with those standards and relayed the deficiencies in the cells as they were developed over time. If this case concerned only the development of battery cells, *Morgan* might be an apt analogy. Yet because Milwaukee made important inventive contributions to the development of the battery pack that is the subject of the patents-in-suit, the analogy fails.

Moreover, the jury apparently believed the testimony from Plaintiffs' experts that testing of individual Moli cells, which is all Horn offered, could not be extrapolated to arrive at what a battery pack containing those cells could do. Either way, the jury was not required to conclude that the Moli cells rendered the patented invention obvious. The

jury was well within its province to find Plaintiffs' experts and their opinions more credible.[4]

Similarly, the jury was permitted to disbelieve Horn's assertion that the Saft battery cells, another component of the prior art, could be combined into a hypothetical pack that would meet the 20 Amp Limitation. No test results confirmed his opinion. Further, one of Plaintiffs' experts, Dr. Jonathan Wood, opined that the Saft brochure introduced at trial did not disclose use of those cells in a handheld power tool, further undermining the notion that a skilled artisan would make that leap.

The addition of the Moli Powerpoint presentations does not alter the analysis. Those presentations showed a Moli employee using a battery pack with Li-ion cells installed to cut wood. The revelations in the presentations, though exciting, did not entice any tool manufacturer except Milwaukee to invest in further development. The jury did not believe that the presentations offered a sufficient motivation to combine the prior art references, and it was entitled to reject Horn's hindsight deduction that combining the prior art references was elementary. On the state of the

---

[4]Snap-On says that the jury could not have discounted Horn's reliance on cell data when the date of reduction to practice was fixed by Plaintiffs based on cell data and when Ehsani used cell data to conclude that several of the accused packs were infringing. (Docket #348 at 11); *see infra* Part 2.1.2. Such views might be inconsistent, but the date of reduction to practice and whether certain packs infringed were not a part of the obviousness analysis. Potential factual inconsistencies across distinct issues in the case do not concern the Court during the post-trial phase. *Lowe v. Consol. Freightways of Del.*, 177 F.3d 640, 642–43 (7th Cir. 1999) ("The fact that [the defendant] presented evidence that is inconsistent with the jury's verdict does not mean that the verdict should be reversed. . . . The jury was there; it weighed the witnesses' credibility, considered the evidence, and reached a supportable conclusion.").

record, the Court cannot say that the jury erred in concluding that Snap-On failed to provide clear and convincing evidence of obviousness.

Finally, secondary considerations of non-obviousness significantly undercut whatever prima facie case Snap-On managed to make. Neither Horn nor any other Snap-On witness addressed these considerations in earnest. What the jury heard, then, was Plaintiffs' evidence that industry analysts saw a need for higher power, lighter cordless tools, that the V28 product line received overwhelming industry accolades, and that the patented technology led to explosive growth of Milwaukee's Li-ion tool sales and lucrative licensing arrangements with competitors. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983) ("[E]vidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not.").[5]

Snap-On attempts to downplay these secondary considerations by attributing Milwaukee's commercial success to non-patented aspects of the V28 products. Snap-On is correct that there must be a nexus between the commercial success of a product and the claimed invention, not the product's unpatented or unclaimed features. *Ormco Corp. v. Align Tech., Inc.*,

---

[5]Snap-On protests that the licenses are not determinative as a secondary consideration, (Docket #348 at 20–22), and the Court agrees. Licenses cannot overcome "a convincing case of invalidity," *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361 (Fed. Cir. 2015), but Snap-On's case for obviousness was not convincing. To the contrary, the secondary considerations Plaintiffs presented to the jury bolstered the existing evidence that showed that the claimed invention was not obvious. To the extent Snap-On believes the licenses were entitled to little weight because they resulted from litigation settlements and were negotiated without knowledge of the Moli cells, (Docket #348 at 19–22), it had the opportunity to argue as much at trial.

463 F.3d 1229, 1311–12 (Fed. Cir. 2006); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). But in making this argument, Snap-On impermissibly isolates the 20 Amp Limitation and asserts that it is the sole inventive aspect of the patent. (Docket #348 at 17). Snap-On claims that Plaintiffs' secondary considerations expert, Allan Shampine ("Shampine"), never established that the 20 Amp Limitation, which it derides as a "laboratory capability," was the moving force behind the success of Milwaukee's products. (Docket #351-1 at 9).

This strawman argument did not convince the jury and does not convince this Court. The law looks to the invention as a whole—here, a Li-ion battery pack used in a power tool. *See Huang*, 100 F.3d at 140; *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329–30 (Fed. Cir. 2016). The jury was permitted to conclude that there existed a nexus between the objective considerations of non-obviousness and the entire patented invention. Granting that the 20 Amp Limitation does not represent how tools are used in the real world, the fact remains that it is a minimum performance characteristic, a baseline that tools performing in high-power situations must meet in order to be reliable. But at a minimum, the 20 Amp Limitation is not the sole inventive aspect of the patent.

It is no wonder, then, that Shampine openly admitted that the 20 Amp Limitation, standing alone, did not lead to Milwaukee's commercial success in the Li-ion market. Instead, he far more reasonably concluded that products embodying the totality of the patented technology enjoyed unbridled success after their introduction. He both controlled for other important product features, such as brushless motors, and reviewed sales of products containing the patented technology versus those that did not. Shampine found that the patented technology carried with it a huge

increase in commercial success. Contrast that with a case like *Huang*, relied upon by Snap-On, where the inventor offered only his own sworn statement that his product was successful, without any meaningful analysis connecting his invention to that success. *Huang*, 100 F.3d at 140. As Shampine's testimony and the corroborating documentary evidence reveals, it was the power and reliability of lithium technology that drove the V28's explosive growth. *See Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013). Thus, Shampine's testimony "concerning the advantages of a patented feature in a multi-featured product is sufficient to support the inference of a nexus between the patented feature and the commercial success." *Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 603 (N.D. Cal. 2008). There was no shortage of cross-examination and argument by Snap-On that he was mistaken and that the V28 product line had many other features that led to its success. The jury simply did not agree.

For the reasons stated above, the trial record contains sufficient evidence to support the jury's finding that Snap-On did not prove clearly and convincingly that the patents-in-suit were obvious.

### 2.1.2  The Untested Packs

Ehsani, Plaintiffs' battery expert, tested all of the accused packs save two, CTB6185 and CTB6187, the samples of which were defective. (Docket #348 at 22–23). Snap-On contends that in the absence of test data substantiating a claim that the packs met the 20 Amp Limitation, the jury's finding of infringement is unsupported. *Id.* But Ehsani testified at trial that despite the lack of testing, he believed that the two packs in question met the 20 Amp Limitation because Snap-On assigned them a "maximum continuous discharge current" of 30 amps. (Docket #354 at 24–25). To be sure, Ehsani's reading of the product specification as evidence of the packs'

capabilities was not as strong as actual test data. But the jury nevertheless believed him, and Snap-On offers no reason that his testimony was totally unworthy of belief. The finding of infringement as to these two packs will stand.

### 2.1.3   Willfulness

Lastly, Snap-On requests that the Court overturn the jury's finding that it infringed the patents willfully. The evidence on this issue will be covered more comprehensively below in the Court's analysis of whether enhanced damages are appropriate under 35 U.S.C. § 284. *See infra* Part 2.3. A short summary of the facts supporting the jury's determination is sufficient for present purposes. It should be remembered that in the posture of Snap-On's request for judgment as a matter of law, the Court construes all evidence in Plaintiffs' favor and disregards contrary evidence. *Passananti*, 689 F.3d at 659. Consequently, its recitation of the evidence here is more generous to Plaintiffs than in the Section 284 context, where the Court is permitted to take its own view of the facts.

With that caveat in place, the Court turns to the jury's willfulness finding. The Supreme Court held in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016)—which will be reviewed in greater detail below—that willfulness is subjective. A finding of willful infringement is permissible on proof that the defendant acted despite a risk of infringement that was "'either known or so obvious that it should have been known to the accused infringer.'" *Id.* at 1390 (quoting *In re Seagate, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc)); *see also Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 2017-1475, 2017 WL 6044237, at *13 (Fed. Cir. Dec. 7, 2017) (observing that the standard for subjective willfulness was not altered

by *Halo*). This must be shown by a preponderance of the evidence. *Halo*, 136 S. Ct. at 1934.

The Court finds sufficient evidence in the trial record to support the jury's willfulness determination. For purposes of this analysis, the Court takes as true that Snap-On did not know of the patents-in-suit prior to October 2011. In that month, Milwaukee sent Snap-On a letter offering to discuss license agreements for sixty-one patents, including the three subject patents in this case. Of course, Snap-On had developed and launched its own Li-ion product years earlier, in September 2009.[6]

Despite this delay in awareness of the patents, the trial testimony showed that Snap-On did not perform adequate research in response to the letter to determine whether its products might infringe the patents-in-suit. Its head engineer for power tools, John Fuhreck ("Fuhreck"), performed a

---

[6]To support the willfulness finding, Plaintiffs point to evidence that Snap-On sought to copy its V28 product line. (Docket #354 at 27–28). That evidence showed that Snap-On was keen to work with Moli to develop its own Li-ion products after Moli's exclusivity period with Milwaukee ended in 2006. The inference that it was looking to copy Milwaukee's work with Moli was bolstered by internal documents showing Snap-On's interest in replicating certain performance requirements found in Milwaukee's V28 line. The jury also heard testimony that Snap-On was motivated to develop infringing products because it needed to quickly adapt to market demands.

However, Plaintiffs do not adequately address the principle that willful infringement cannot occur unless the infringer knows of the patent. *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 258 F. Supp. 3d 1013, 1029–30 (N.D. Cal. 2017); *WBIP*, 829 F.3d at 1341. As explained further below, copying another's ideas rather than his patent can be considered when awarding enhanced damages, but the predicate finding of willfulness is constrained to the latter circumstance. *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 111 (E.D. Tex. 2017); *infra* Part 2.3.1. Snap-On protests that it reviewed Milwaukee's V28 products and developed its competing Li-ion products years before it was apprised of the patents' existence. This conduct cannot, therefore, directly establish willfulness.

cursory study of the patents that was not corroborated by a prior art search or an infringement analysis. He concluded that the patents were related to Snap-On's business, but no one took the matter under further consideration. Snap-On declined to take a license and made no changes to its product offerings to accommodate the possibility of infringement.[7]

Snap-On makes much of Plaintiffs' decision not to accuse it of infringement prior to filing the instant suit in October 2014. Although this decision affects other matters before the Court, including the availability of enhanced damages and pre-judgment interest, it does not fatally undermine the jury's willfulness determination. The course of Snap-On's pre-suit conduct revealed an ongoing lack of concern about the potential for infringement. This was particularly reprehensible in light of the decisions of so many others, including major players in the industry, to pay for a license to the revolutionary Li-ion technology Milwaukee had developed. On that basis, the Court finds that the jury's finding of willfulness cannot be overturned. *See WBIP*, 829 F.3d at 1340 (ultimately unmeritorious non-infringement defenses, developed during litigation, cannot protect years of culpable pre-suit conduct).

Snap-On's cited cases do not suggest a different result. In this case, as in *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, Case No. 2:15-CV-1202-WCB, 2017 WL 2190055, at *2–3 (E.D. Tex. May 18, 2017), the finder of fact did not penalize Snap-On for failing to obtain the advice of counsel as to the potential for infringement. That is prohibited by the Patent Act under

---

[7]Of course, he planned to opine as to the precise nature of his examination and that of other Snap-On employees and consultants, (Docket #348 at 25), but that testimony was properly excluded for other reasons, as explained below. *See infra* Part 2.2.3.

35 U.S.C. § 297, and the jury was expressly instructed to disregard such matters. (Docket #314 at 23). Moreover, in *Eli Lilly* the jury had before it only one piece of evidence to support a willfulness finding: a letter from the patentee indicating that the infringer appeared to be in need of a license. *Eli Lilly*, 2017 WL 2190055, at *2. Here, there was far more evidence that Snap-On carried on years of lucrative infringing sales after failing to respond to the October 2011 licensing letter with a minimally adequate analysis of whether a license would be necessary. Snap-On's knowledge of the existence of the patent was not the sole basis for the jury's finding. *See* (Docket #314 at 23).[8]

The same facts distinguish the present case from *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1235 (Fed. Cir. 1985), where the infringer developed its product without any knowledge of the patented technology and did not know of the patent itself until less than a month before suit was filed, and *Gustafson, Inc. v. Intersystems Industrial Products, Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990), where the infringer learned of the accusations of infringement only on the day suit was filed. By contrast, here the jury could reasonably have inferred that while the 2011 letter might have been more specific in alleging infringement of the patents-in-suit, the fact remains that

---

[8]The Court notes that it would part ways with *Eli Lilly* to the extent that the court required a willfulness finding to be predicated on egregious misconduct. *Eli Lilly*, 2017 WL 2190055, at *1. As the Federal Circuit has emphasized post-*Halo*, the willfulness threshold is crossed where the infringer acted despite a known or obvious risk of infringement. *See Arctic Cat*, 2017 WL 6044237, at *13. Only after that requirement is satisfied does the district court consider the flagrancy of the infringer's conduct in determining whether to enhance a compensatory damages award. *See Apple*, 258 F. Supp. 3d at 1029–30. In any event, in this case the jury was allowed to consider whether Snap-On's conduct was malicious or wanton, (Docket #314 at 23), so the doctrinal disagreement is immaterial.

Snap-On's response was inadequate and it continued to manufacture and sell closely competing products for years afterward based on what appeared to be a head-in-the-sand approach to infringement. Unlike its cited cases, Snap-On undoubtedly was not "ambush[ed]" with the present claims. *Gustafson*, 897 F.2d at 511.

Because Snap-On has provided no basis on which to question any of the jury's challenged findings, the Court is obliged to deny the renewed motion for judgment as a matter of law in its entirety.

### 2.2    Snap-On's Motion for New Trial

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party on all or part of the issues tried "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). As with Rule 50(b) motions, the law of the regional circuit applies to a Rule 59 motion when asserted in the context of a patent suit. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005). In the Seventh Circuit, Rule 59 is construed to require a new trial where "the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014).

When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011) (citations omitted). But "[a] verdict will be set aside as contrary to the manifest weight of the evidence only if 'no rational jury' could have rendered the verdict." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534

(7th Cir. 2006)). Similarly, an error in admitting or excluding evidence may warrant a new trial, but only when there is a "significant chance" that the error affected the jury's verdict. *Barber v. City of Chi.*, 725 F.3d 702, 715 (7th Cir. 2013). That said, several errors, harmless on their own, can compound to create a need for a new trial. *Id.*

Snap-On's motion for a new trial incorporates, without additional development, the arguments about the weight of the evidence it proffered in its Rule 50(b) motion. *See* (Docket #351-1 at 8–9). Although the legal standards applied under Rules 50 and 59 are different, *see* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 2806 (3d ed. 2017), the reasons detailed above that judgment as a matter of law is unwarranted apply with equal force to protect the jury's determinations from a Rule 59 challenge. The evidence was not close enough to warrant retreading that ground here. *See Lust v. Sealy, Inc.*, 277 F. Supp. 2d 973, 993 (W.D. Wis. 2003); *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 636 (7th Cir. 1996).

Worthier of consideration are Snap-On's evidentiary complaints. First, it challenges the jury's finding of non-obviousness, claiming that the jury was misled by evidence about confidentiality agreements and the Court's decision to admit expert testimony about secondary considerations. Second, Snap-On asserts that it was improperly precluded from offering Horn's opinion about the allegedly unusual testing conditions Ehsani employed. Third, Snap-On believes that the Court unduly limited Fuhreck's testimony about the scope of his response to Milwaukee's October 2011 letter. Finally, says Snap-On, the Court committed a series of prejudicial errors during the damages phase of the evidence that prevented it from fairly presenting its contentions to the jury. For the reasons stated

below, none of these asserted errors were, in fact, erroneous, nor do they warrant a new trial.

### 2.2.1 Obviousness

Snap-On asserts two purported errors in the Court's evidentiary rulings relating to obviousness. First, it says that the Court should have excluded Shampine's testimony on secondary considerations because he "failed to link the inventive aspect of the claims, the 20 Amp Limitation as construed by the Court, to any alleged commercial success, industry praise or long-felt need." (Docket #351-1 at 9). As explained above, Shampine was not required to do more than he did. His testimony showed that the Li-ion technology in the V28 product line drove its massive commercial success and garnered wide praise for achieving a long-sought innovation. Snap-On artificially cabins the scope of the invention in order to state that the nexus requirement has not been met. *See supra* Part 2.1.1.

Snap-On's other objection is directed at the letters of intent between Milwaukee and Moli executed during the 884 Project and the eventual assignment of Moli's rights in the patents to Milwaukee in 2006. According to Snap-On, this evidence misled the jury into believing that the Moli cells provided to Milwaukee during the 884 Project were not prior art at all because the rights to them were somehow owned by Milwaukee. (Docket #351-1 at 11). Snap-On sought a curative instruction explaining that these documents did not affect the prior-art status of the Moli cells. *Id.* at 12.

The Court declined to issue that instruction because the inference Snap-On feared could not reasonably be drawn from the evidence. First, the letters of intent and assignment were not introduced for purposes of the prior art question. *See* (Docket #357-1 at 10–11). More importantly, to the extent the letters or assignment affected the prior-art status of the cells, they

were properly used as circumstantial evidence of Milwaukee and Moli's joint development efforts.

As a definitional matter, prior art under 35 U.S.C. § 102(f) must be something created by another and communicated to the patentee. *See* 35 U.S.C. § 102(f); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1334 (Fed. Cir. 2003). Plaintiffs were within their rights to argue to the jury that because Milwaukee and Moli worked together on them, the Moli cells could not be considered prior art in the first place. The jury was not required to believe them, *see Milwaukee Elec. Tool*, 2017 WL 4570787, at *4, but it did. And the jury was properly instructed that Section 102(f) prior art must be "information from non-inventors communicated to inventors." (Docket #314 at 16). Rightfully, there was no suggestion by either party or in the Court's instructions that the mere existence of the confidentiality agreements or assignment disqualified the Moli cells as Section 102(f) prior art. *See Milwaukee Elec. Tool*, 2017 WL 4570787, at *4.

### 2.2.2 Infringement

Snap-On's evidentiary challenge to the infringement case is that the Court improperly excluded Horn's testimony about the purportedly unusual testing conditions to which Ehsani subjected the accused packs. (Docket #351-1 at 13–14). Specifically, Horn thinks it was inappropriate for Ehsani to test the packs without connecting them to a tool, as Snap-On specially designs its tools with protective circuitry installed in the tool itself that works in conjunction with similar circuitry in the pack. *Id.* Horn opined that testing a pack alone would skew the test results. *Id.*

This was the subject of one of Snap-On's motions in limine that the Court addressed in a written pre-trial decision. *Milwaukee Elec. Tool*, 2017 WL 4570787, at *8–9. The Court considered and rejected Snap-On's position.

Apparently in recognition of this reality, Snap-On devotes barely more than a page to this argument in the instant motion. The issue has been preserved for appeal, but no more need be said of it here.

### 2.2.3 Willfulness

Next, Snap-On asserts that, for purposes of combating an inference of willfulness, it was prejudiced by the erroneous exclusion of certain testimony about its employees' views on the validity of the patents, which it believes would have explained why it declined to take a license to them. At trial, Snap-On's head engineer for power tools, Fuhreck, testified that he was assigned to review the October 2011 letter from Milwaukee that has already been discussed above. Fuhreck planned to further opine that he analyzed the patents-in-suit and found that they were not valid because their only innovation was to replace Ni-Cd battery cells with Li-ion battery cells in power tool battery packs. (Docket #351-1 at 15). This opinion was bolstered in his mind by Milwaukee's failure to actually accuse Snap-On of infringement in the letter. *Id.* He also claims that he discussed his invalidity opinion with two colleagues, who agreed with him and communicated their belief to Snap-On's in-house counsel. *Id.* Finally, two other witnesses, a Snap-On consultant engineer and a former Moli employee, also planned to opine about the lack of innovation in the patents. *Id.* at 16.

The Court excluded this testimony because the witnesses' lay invalidity opinions were not admissible. *SSL Servs., LLC v. Citrix Sys., Inc.*, 769 F.3d 1073, 1092 (Fed. Cir. 2014). In *SSL Services*, the district court excluded the opinion of the defendant's chief engineer that its products were non-infringing as outside the scope of his role as a fact witness and potentially in conflict with the court's claim construction. *Id.* The defendant asked for a new trial, claiming this evidence was key to establishing that it

had a good-faith, if mistaken, belief of non-infringement. *Id.* The Federal Circuit affirmed, noting that the engineer's "personal beliefs regarding non-infringement," which were "formed by a lay person without the benefit of the court's claim construction determinations," had "little probative value and [were] potentially prejudicial." *Id.*[9]

So too, here, although Fuhreck and the other witnesses might have offered a limited window into Snap-On's subjective beliefs regarding invalidity, the danger of juror confusion was too high. The opinions were not from experts and pre-dated the Court's claim construction by several years. As a result, considerations under Federal Rule of Evidence 403 obliged the Court to exclude the testimony.

Neither of Snap-On's cited cases involved the grant of a new trial to hear testimony of this sort. *See Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co, Inc.*, 226 F. Supp. 3d 520, 532 (W.D.N.C. 2016); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, No. 2:07-cv-00331-APG-PAL, 2017 WL 3896672, at *6 (D. Nev. Sept. 6, 2017). Rather, in those cases the court considered testimony by the infringer's employees pertaining to a belief of non-infringement in deciding whether to enhance damages. *See Sociedad*

---

[9]Snap-On attempts to distinguish *SSL Services* on the ground that it was handed down before *Halo* and therefore lacks the required emphasis on the infringer's subjective state of mind. (Docket #351-1 at 16). This is incorrect; the Federal Circuit has taken pains to observe that the standard for subjective willfulness was not altered by *Halo*. *Arctic Cat*, 2017 WL 6044237, at *13. *Halo* abrogated the objective prong of the analysis but left untouched the "'sound legal principles' developed over nearly two centuries of application and interpretation of the Patent Act." *Halo*, 136 S. Ct. at 1935 (quoting *Martin*, 546 U.S. at 139). This includes cases like *SSL Services* insofar as they analyze the subjective component of willfulness. Notably, the testimony of the infringer's engineer formed part of the Federal Circuit's discussion of the subjective, not objective, prong of willfulness. *SSL Servs.*, 769 F.3d at 1092. *Halo* thus affords no basis on which to reject the reasoning of *SSL Services*.

*Espanola*, 226 F. Supp. 3d at 53; *Halo*, 2017 WL 3896672, at *6. That context demands that the district court engage in a wide-ranging review of the totality of the circumstances. *See infra* Part 2.3. This is a far cry from trial, where the jury's attention and its ability to separate reliable from unreliable opinion testimony must be considered. The evidence was properly excluded.

### 2.2.4    Damages

In the portion of its motion for new trial directed at damages, Snap-On offers a host of alleged evidentiary errors that prejudiced its ability to present its damages arguments. (Docket #351-1 at 17–36). Each one can be readily addressed and dismissed.

### 2.2.4.1 The Makita Emails

First, Snap-On contends that the Court inappropriately limited questioning of its damages expert, Thomas Becker ("Becker"), on the Makita license agreement that formed the foundation for the opinions of his opposite number, James Malackowski ("Malackowski"). Snap-On hoped to show, through contemporaneous emails, that Malackowski over-valued the license. *Id.* at 18–19. The emails purportedly revealed that a third of the $30 million cash payment that was part of the Makita agreement was attributable to patents other than the patents-in-suit, and that the cross-license was given in consideration for anticipated future sales in Japan, having nothing to do with the patents-in-suit, which are U.S. patents only. *Id.* Snap-On suggests that these facts call for a dramatically larger downward adjustment from Makita than Malackowski actually made as part of the hypothetical license negotiation between the parties. *Id.* at 19.

The Court excluded the emails in part because of the merger clause in the Makita agreement, finding that the agreement spoke for itself and

could not be modified by the proffered emails, which predated it. The terms described in those emails never made it into the final agreement. As such, the parol evidence rule would not allow them to be considered in the ordinary case. *See Town Bank v. City Real Estate Dev., LLC*, 793 N.W.2d 476, 484–85 (Wis. 2010).

Snap-On counters that it is a stranger to the Makita agreement and is not bound by the parol evidence rule. (Docket #351-1 at 20). Further, Snap-On maintains that it needed to explore the underlying negotiations to give the jury the best possible sense of the comparability of the Makita agreement. *Id.* at 21. Especially important to Snap-On was demonstrating that something less than all of the consideration in the Makita agreement could be attributed to the patents-in-suit. *Id.*

Assuming for a moment that Snap-On could sidestep the parol evidence rule, the Court's decision to exclude the emails was nevertheless correct. The point in all this was to avoid taking the jury down another of the parties' rabbit-holes, especially when the rabbit-hole was filled with the dizzying nuances of contract interpretation. Snap-On was entitled to argue how to value the Makita license, and it did so. Confusing and contested interpretation of the Makita agreement in light of the emails, however, was a matter properly excluded from the jury's deliberation. Fed. R. Evid. 403.

Snap-On's cited cases deal with a variety of situations having nothing to do with the Court's evidentiary ruling in this case, including the discoverability of parol evidence to resolve ambiguities in comparator license agreements, *Clear with Computers, LLC v. Bergdorf Goodman, Inc.*, 753 F. Supp. 2d 662, 664 (E.D. Tex. 2010), and the generalized need for comparator license or settlement agreements to actually be comparable, *see AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1335–36 (Fed. Cir. 2015);

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). An infringer's attempt to vary the terms of a comparator agreement using parol communications was not presented in either *AstraZeneca* or *LaserDynamics*, and to the extent the district court in *Clear with Computers* would have admitted such evidence at trial, this Court respectfully disagrees that the same approach was appropriate in the context of this case.

The Court's ruling did not contravene Snap-On's ability to argue that the Makita agreement was not comparable. It merely confined Snap-On to arguing the viability of the comparison based on the actual, not aspirational, terms of that agreement. Indeed, *In re MSTG, Inc.*, 675 F.3d 1337 (Fed. Cir. 2012), cited by Snap-On, supports this Court's exercise of its discretion. There, the plaintiff's expert speculated, based on parol evidence, at how the final royalty rates were calculated in his chosen comparator agreement. *Id.* at 1348. It was only fair, then, to permit the opposing party to review the other relevant parol evidence, including the details of settlement negotiations underlying the agreement. *Id.*

Here, however, the Court's view of the interaction between the parol evidence rule and Rule 403 was not one-sided, as Snap-On protests. *See* (Docket #351-1 at 22–23). For instance, Plaintiffs were permitted to put on evidence regarding the value of some of the cross-licenses they received by virtue of the Makita agreement, but this was post-agreement evidence that did not affect the terms of the agreement itself. The analogy between that evidence and Snap-On's proffered emails is unavailing.

### 2.2.4.2 Johnson Transfer Pricing Study

Next, Snap-On says the Court should have admitted evidence and testimony regarding a document dubbed the "Johnson Transfer Pricing

Study" (the "Study"). (Docket #351-1 at 23). It was created by Milwaukee and purportedly contained admissions harmful to its damages contentions. First, the Study showed that certain technological improvements other than those embodied in the patents-in-suit were primarily responsible for Milwaukee's sales growth. *Id.* The Study demonstrated that sales were flat from 2005, when the V28 was released, until these new features were rolled out in 2009. *Id.* Second, the Study suggested that Snap-On was not a major competitor, as Milwaukee's products were geared toward home contractors and not automotive technicians, which comprise the vast bulk of Snap-On's market. *Id.* at 24. Third, the Study reflected criticisms of the V28 line as bulky and cumbersome that were only overcome by improvements to the tools and battery chemistry, not the patented technology. *Id.* Finally, the Study concluded that non-patented technology, not Milwaukee's marketing efforts, contributed to the product's success. *Id.*

These considerations, in Snap-On's view, undermine Plaintiffs' contentions that the patents-in-suit were the driving force behind the success of its Li-ion power tools and that Snap-On was an important competitor. *Id.* at 24–25. They would also dampen Milwaukee's leverage during the parties' hypothetical negotiation, which was to occur in 2009 while sales were still allegedly flat. *Id.*

The Court excluded the Study as irrelevant, cumulative, confusing, and a waste of time. Fed. R. Evid. 403. Snap-On seizes upon the Court's comment at trial that the Study's criticisms of the V28 product line were inconsistent with every other toolmaker's decision to take a license and the explosive growth Li-ion tool sales. (Docket #351-1 at 25). But Snap-On ignores the fact that the Study was barely worth the paper it was printed on. The data and conclusions in it were hard to understand and inconsistent

with the existing, stipulated sales data, the underlying reasoning was absent and predicated on hearsay,[10] and crawling through the document would have consumed vast amounts of the jury's time to make points already gleaned through examination of other witnesses. The Court, in the interest of keeping the jurors focused on the facts and not empty, authorless speculation, found the dangers inherent in the document outweighed whatever probative value it may have had.

### 2.2.4.3 Court Questioning

Third on Snap-On's list of errors relating to damages is the Court's questioning of its witnesses during trial. Snap-On believes that the Court expressed disdain for its positions in front of the jury, coloring their evaluation of the evidence despite an instruction not to take anything from the Court's comments during trial. (Docket #351-1 at 26).

Federal Rule of Evidence 614(b) allows a judge to question witnesses directly. "A district judge is free to interject during a direct or cross-examination to clarify an issue, to require an attorney to lay a foundation, or to encourage an examining attorney to get to the point." *United States v. Washington*, 417 F.3d 780, 784 (7th Cir. 2005). The judge may not assume the role of advocate, however. *Id.* The court cannot signal through its questions

---

[10]Snap-On strenuously protests that the Study was produced by Plaintiffs in discovery, was "worked on" by a Milwaukee employee, and therefore constitutes an admission, circumventing the rule against hearsay. *See* (Docket #370 at 15–16); (Docket #312-2 at 6); Fed. R. Evid. 801(d)(2)(A). But who produced the document is not the same who authored it. Further, Snap-On could not attribute any of the statements in the Study to the one employee whom Plaintiffs' CFO remembered had worked on it at some point. And even if this slender reed could support a finding that the Study qualified as an admission, concerns about the document's provenance formed a part of the Court's Rule 403 assessment. *See Mister v. N.E. Ill. Commuter R.R. Corp.*, 571 F.3d 696, 699 (7th Cir. 2009).

that it thinks a witness is not credible or that it does not buy a party's theory of the case. *See United States v. Barnhart*, 599 F.3d 737, 743 (7th Cir. 2010). To sustain a claim of judge-induced bias, Snap-On must show that the Court in fact conveyed a bias through its questioning and comments and that "serious prejudice" resulted. *United States v. McCray*, 437 F.3d 639, 643 (7th Cir. 2006).

Snap-On's bias theory does not hold water. It claims that the Court unfairly accused its witnesses of lacking documentary support for their testimony, such as when the Court questioned Snap-On's corporate representative, Dave Manka ("Manka"), regarding the company's sales estimates. But the record shows that the Court sought to clarify, in response to Milwaukee's objection to foundation, that Manka's figures needed documentary support and that Plaintiffs' damages expert, Malackowski, predicated his comparisons between Snap-On's competitors on Snap-on's own documents. The Court's clarification was not done in aid of Snap-On's argument, but that does not make it unfair or prejudicial.

Likewise, there was no error in the Court's questioning of Mark Lehnert ("Lehnert"), Snap-On's tool expert, about the interchangeability of its battery packs. The Court expressed the view outside the jury's hearing that how the tools are used in real life has nothing to do with Plaintiffs' patents, which pertain to a battery pack's capabilities. Yet the only words the jury heard from this Court were whether differing load requirements from different tools necessitated use of the 20 Amp Limitation as the benchmark. Lehnert said yes, but reiterated that the 20 Amp Limitation is "just a test specification. No tool actually does that." (Docket #350-1 1375:13–18). The Court responded, "Understood, but that's what patents are all about." *Id.* This lone comment, even if it could be seen as disparaging

Lehnert's opinion, was not prejudicial. The Court's one-liner did not unravel the prior thirty minutes of questioning.

Additionally, Snap-on asserts that the Court improperly admonished Becker, its damages expert, for attempting to opine about the circumstances of the Hitachi settlement agreement. The Court dealt with this problem carefully and clearly before trial, ordering the parties to make no mention of the IPR proceedings or reexaminations. *Milwaukee Elec. Tool*, 2017 WL 4570787, at *7. Reproving Becker to avoid reference of the Hitachi reexamination was both well within the Court's discretion to prevent a violation of its ruling, and understandable in light of the repeated admonishments the Court had already been forced to make on the issue. Over and over again, the parties wanted to make the IPR ruling complicated when it was blindingly simple. The Court's patience was, therefore, already at its end when Becker spoke. Moreover, the Court instructed the jury that it should not infer the Court's views of the evidence from admonishments issued or testimony stricken during trial. (Docket #314 at 3).

Finally, Snap-on complains that the Court was overly harsh in chiding its questioning of Shampine, Plaintiffs' secondary considerations expert. The Court did accuse Snap-On of "flailing in the wind," (Docket #350-1 1676:19—1677:4), but this was no more than the Court's suggestion that the point had been made and it was time to move forward. The jury had well in hand the idea that commercial success must have a nexus with the patented features of the product, not unpatented or unclaimed features. Moreover, Snap-On was allowed to proceed with its line of questioning once it established that it was trying to show a disconnect between the Li-ion patents and commercial success. *See id.* 1676:1–1678:16. The Court's warning that the questioning was becoming cumulative was, therefore, not

prejudicial, and it in fact helped clarify the purpose of the testimony to the jury.

Even putting all these asserted prejudicial comments together, there is no reason to believe that the Court's instruction to disregard any views it might have expressed was inadequate to ensure the jury was not influenced. *McCray*, 437 F.3d at 644 (holding that "such instructions reduce the risk of any prejudice resulting from the court's questioning"); *Barnhart*, 599 F.3d at 746 & n.8 (noting that jurors are presumed to follow limiting or curative instructions). Nor has Snap-On, aside from pointing out the errors, evinced a coherent narrative as to why they fundamentally undermined its ability to try the case it wanted to try. *See Barnhart*, 599 F.3d at 745 (prejudice requires a showing that but for the judge's questioning, the result probably would have been different). The trial record was replete with evidence supporting the jury's damages determination, and the Court's few comments and questions had little, if any, effect in the grand scheme.

### 2.2.4.4 The Gut Check

Lastly, Snap-On asserts that the Court erroneously permitted Plaintiffs' counsel during closing argument to compare the parties' competing lump-sum royalty figures using a running royalty method. This was counsel's "gut check" for the lump-sum payment Plaintiffs were requesting. (Docket #351-1 at 29). Snap-On's objection is without merit, but to arrive at that conclusion requires a close review of what counsel actually did during closing.

Plaintiffs' counsel attempted to compare Malackowski's lump-sum royalty, between $27.8 and $33.1 million, with Becker's far smaller amount, $1.3 million. The experts agreed that during the hypothetical negotiation, the parties would be aware of the total sales of products under the license

by Snap-On—*i.e.*, the total sales through the expiration of the patents in 2023. The parties had stipulated to the admission of certain of Snap-On's existing sales data. Counsel's first move, as he explained to the jury, was to extrapolate Snap-On's existing sales data out to 2023, which resulted in total anticipated sales of 8.4 million units amounting to $1.2 billion in revenue.[11] Notably, he did not increase the number of sales from 2016, the most recent year in the data, through 2023, although the growth of the market has been astronomical. (Docket #338 1911:21–1912:4).

Next, counsel compared anticipated total product sales under the Makita license (relied upon by Malackowski), the Hitachi license (relied upon by Becker), and Snap-On. Counsel argued that Hitachi's anticipated sales were less than half of Snap-On's, weakening Becker's analogy. By contrast, the total estimated Makita sales, 12.14 million, were closer to Snap-On's, bolstering Malackowski's position.

Counsel then sought to compare dollar amounts. He divided each of the experts' lump-sum royalties into Snap-On's projected sales of $1.2 billion through 2023. That arithmetic showed that Becker's lump sum would result in a royalty rate of about one-tenth of one percent, while Malackowski's would be between 2.3–2.7%. In counsel's view, Becker's effective royalty rate was far too low, as it would value the Li-ion technology less than some accompanying "feature" patents, like the twilight patents.

---

[11]Snap-On rightly notes that counsel misstated once during the argument that Snap-On's sales would be 8.4 billion units, not 8.4 million. *See* (Docket #338 1915:1). Yet counsel's calculations were based on the lower figure and there is no suggestion in the jury's verdict that they awarded a sum based on 8.4 billion unit sales. Counsel's passing flub is not a reason for a new trial.

Finally, counsel calculated the effective royalty per pack by dividing the experts' lump sums by the total estimated unit sales. Counsel commented that

> Dr. Becker's number is about 15 cents a pack over that time. Packs that can sell for $150, 15 cents. Mr. Malackowski's number, three and a half to four dollars a pack, still for $150 packs.

*Id.* 1915:2–5. He presented no evidence that Snap-On's battery packs routinely sell for $150 each, but Snap-On's counsel did not object to the statement at the time. The aim of Plaintiffs' counsel was to set in context the relatively small effective royalty rate that either party's proposed lump sum represented, while continuing to advocate for Malackowski's.

Snap-On's objection rests on the Federal Circuit's decision in *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011). There, the Court of Appeals found that the district court erred in allowing a damages expert to apply a "25 percent rule of thumb" check to his reasonable royalty calculation. *Id.* at 1312. "The 25 percent rule of thumb is a tool that has been used to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation." *Id.* The expert used this long-standing method to check his calculation of a lump-sum royalty against what a running royalty might be. *Id.* To do so, he assumed 25 percent of the end product's value would go to the patent owner and 75 percent would remain with the infringer. *Id.* at 1311. Multiplying 25 percent of the product's value by the number of products sold resulted in the "rule of thumb" calculation. *Id.*

*Uniloc* prohibited this practice. *Id.* The court was centrally concerned with the idea that patentees bear the burden to prove damages, including

drawing a sufficient connection between the proposed royalty and the evidence. *Id.* at 1315. Picking 25 percent of a product's value out of thin air as the value of the patented component was not a choice constrained by the facts of the individual case and was therefore indefensible. *Id.*; *see also AstraZeneca*, 782 F.3d at 1338 ("[T]he patentee 'must do more to estimate what portion of the value of [a] product is attributable to the patented technology' if the accused unit is 'a multi-component product containing several noninfringing features with no relation to the patented feature.'"). Put differently, "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics*, 694 F.3d at 67. Indeed, even if one picked a properly tailored royalty rate, showing the jury the entire market value of the product would itself "skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue." *Uniloc*, 632 F.3d at 1320.

As a consequence, utilizing the entire market value of a product containing patented elements is narrowly confined to instances in which "the patented feature drives the demand for an entire multi-component product." *Id.*; *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014). However, it is not enough to show that the patented invention is "viewed as valuable, important, or even essential to the use of the [entire product]." *LaserDynamics*, 694 F.3d at 68. Instead, a patentee may invoke the entire market value rule only where the patented feature "alone" drives the market. *Id.*

Snap-On says that the evidence did not place this case within this narrow exception to the entire market value prohibition. (Docket #351-1 at

33–36). In essence, Snap-On accuses counsel of attempting to put in through closing what his expert could not during the trial's evidentiary phase. *Id.* The Court finds that the extension of *Uniloc* to closing argument does not work.

In closing argument counsel is afforded wide latitude to suggest inferences to be drawn from the evidence. *Soltys v. Costello*, 250 F.3d 737, 745 (7th Cir. 2008); *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 603 F.3d 1325, 1334 (Fed. Cir. 2010) (regional Circuit law controls whether attorney argument requires a new trial). Snap-On stipulated to the data underlying counsel's calculations, and he showed his work to the jury. Moreover, both sides' experts relied heavily on that data to argue that Snap-On was comparable in sales volume and revenue to either Makita or Hitachi. Neither expert disputed that data, and neither used the entire market value approach as proscribed by *Uniloc*.

*Uniloc*, by contrast, involved an expert's use of the infringer's revenue figures to craft a reasonableness check, which was then emphasized again and again by counsel in cross-examination of the opposing side's expert. *Uniloc*, 632 F.3d at 1319–20. The situation here was entirely distinct: it was not the testimony of a damages expert during the evidentiary phase of trial; it was simply counsel's advocacy in the form of an alternative view of the evidence. The jury was instructed that counsel's arguments were not evidence. (Docket #314 at 2–3). And it should be remembered that in a day-long series of closing arguments by both sides, counsel's "gut check" represented only a few minutes' time. A fleeting comparison like this, even if it skirted the admonition of *Uniloc*, is no basis for a new trial. *Valbert v. Pass*, 866 F.2d 237, 241 (7th Cir. 1989) (a "brief and unrepeated part of a lengthy [closing] argument" is not a basis for reversal).

Nor is the Court persuaded that *Uniloc* should extend to this case merely because of the Federal Circuit's concern for planting inflated figures into the jurors' minds. (Docket #370 at 19–20). Snap-On ignores two fundamental defects in its argument, the first being that Plaintiffs' figures were not wrong—they were grounded in stipulated data. Additionally, Snap-On was afforded ample opportunity to argue that counsel's math based on the stipulated data was incorrect. In the end, Snap-On's objection is all form and no substance.

### 2.2.4.5 Cumulative Effect

In closing, Snap-On suggests that even if the Court does not see any of the above-discussed errors as it sees them, it should nevertheless be given a new trial because the cumulative effect of each minor error was to deprive it of a fair trial on damages. *See* (Docket #351-1 at 36–37); *Christmas v. City of Chi.*, 682 F.3d 632, 643 (7th Cir. 2012). Snap-On's half-page gesture at this rule does not carry its burden to show (1) that errors occurred or (2) that such errors compounded to render the trial unfair. *See Jordan v. Binns*, 712 F.3d 1123, 1137 (7th Cir. 2013). Snap-On only points to the alleged errors and claims that they worked in tandem to fundamentally undermine the presentation of its case. (Docket #351-1 at 36–37). What the Court needs is some logical bridge connecting the errors and an explanation as to how they affected the verdict. This doctrine does not exist as a last-ditch, dump-truck tactic to avoid an unfavorable verdict. Snap-On's underdeveloped argument on the matter is unavailing.

Because Snap-On's allegations of error in evidentiary matters are without merit, and because the jury's verdict was not against the manifest weight of the evidence, the Court is constrained to deny the motion for a new trial.

### 2.3 Plaintiffs' Motion for Enhanced Damages

Plaintiffs' first post-trial motion requests an award of treble damages pursuant to 35 U.S.C. § 284. (Docket #341). That statute provides that after a jury awards compensatory damages, the court "may increase the damages up to three times the amount found[.]" 35 U.S.C. § 284. Whether to award enhanced damages and the amount of any enhancement are committed to the discretion of the trial court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 926 (Fed. Cir. 1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). There is no threshold or test set out in the statute for such an award, but the Federal Circuit has traditionally approved such awards "where the infringer acted in wanton disregard of the patentee's patent rights, that is, where the infringement was willful." *Id.* Because the jury found that all of Snap-On's acts of infringement were willful, (Docket #316 at 5), and because Plaintiffs believe that Snap-On acted in the teeth of the patented technology, they ask that the Court exercise its maximum authority and treble the compensatory damages award of $27.8 million. For the reasons stated below, the Court declines to do so.

The Supreme Court's recent decision in *Halo*, 136 S. Ct. 1923, must be the centerpiece of this analysis. There, the Court upended the existing legal standard applicable to enhancing damages under Section 284. In *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc), the Federal Circuit adopted a test for enhancing damages that contained both objective and subjective components. First, the patentee had to "show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 1371. This is "objective recklessness," since it does not turn on what the infringer did or did not know. *Id.* at 1371. Second, the patentee was

required to demonstrate, again by clear and convincing evidence, that the risk of infringement "was either known or so obvious that it should have been known to the accused infringer." *Id.* This is the subjective component of the test. *Id.* Only after both elements were satisfied could a district court proceed to exercise its discretion whether to award enhanced damages. *Id.*

A unanimous Supreme Court abrogated that test as being inconsistent with the statutory text. *Halo*, 136 S. Ct. at 1928. Section 284, the Court noted, contains no textual limit on trial court discretion. *Id.* at 1931. By the same token, however, "'discretion is not whim.'" *Id.* (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). To guide district courts in the exercise of the discretion granted them under Section 284, the Supreme Court explained that

> [a]wards of enhanced damages under the Patent Act over the past 180 years establish that they are not to be meted out in a typical infringement case, but are instead designed as a "punitive" or "vindictive" sanction for egregious infringement behavior. The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate. *See supra*, at 1928–1930. District courts enjoy discretion in deciding whether to award enhanced damages, and in what amount. But through nearly two centuries of discretionary awards and review by appellate tribunals, "the channel of discretion ha[s] narrowed," Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 772 (1982), so that such damages are generally reserved for egregious cases of culpable behavior.

*Id.* at 1932. In the Court's view, promoting innovation and invention demands that district courts decline to award enhanced damages in "garden-variety cases." *Id.* at 1935.

Against this backdrop, the Court held that the objective portion of the *Seagate* test was too rigid. *Id.* at 1932. It led to both undue constraint on trial court discretion and unjust results in cases where the objective element could not be satisfied despite clear evidence of wanton or malicious misconduct. *See id.* at 1932–33. In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), the Court had overturned a similar dual standard that governed the award of attorney's fees in patent cases. There, the Court determined that a focus on subjective bad faith alone was sufficient to separate "exceptional" cases, which warranted an award of fees, from ordinary cases, which did not. *Id.* So too in *Halo*, the Court concluded that the objective component of the Section 284 analysis in *Seagate* was too mechanical and restrictive. *Halo*, 136 S. Ct. at 1933. The Court held that going forward, "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Id.* at 1932.[12]

The Court found it sufficient to commit the matter of enhancement to the trial court's discretion based on the facts of each case, along with the admonition that, "[c]onsistent with nearly two centuries of enhanced damages under patent law,. . .such punishment should generally be reserved for egregious cases typified by willful misconduct" that goes "beyond typical infringement." *Id.* at 1934–35. The Federal Circuit later confirmed this new standard, observing that "[e]nhanced damages are

---

[12]The *Seagate* test also impermissibly required a patentee to cross the clear-and-convincing-evidence threshold to obtain a damages enhancement. *Halo*, 136 S. Ct. at 1934. The Court rejected that heightened burden and held that entitlement to enhanced damages must be proved merely by a preponderance of the evidence. *Id.*

generally only appropriate in egregious cases of misconduct, such as willful, wanton, or malicious behavior," and that "an award of enhanced damages does not necessarily flow from a willfulness finding." *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 2016-2607, 2017 WL 5586049, at *9 (Fed. Cir. Nov. 21, 2017). Nor should Section 284 serve purposes beyond punishment and deterrence, since other provisions of the Patent Act already exist to ensure just compensation to the patentee for both the cost of infringement and litigation expenses. *Halo*, 136 S. Ct. at 1937 (Breyer, J., concurring) (citing 35 U.S.C. §§ 284, 285).

While *Halo* ultimately controls this Court's decision, the Federal Circuit's opinion in *Read* offers a non-exclusive list of factors that can help guide an analysis of the relevant facts. *Read*, 970 F.2d at 926; *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Case No. 09-cv-05235-MMC, 2017 WL 130236, at *4 (N.D. Cal. Jan. 13, 2017). Those factors are: (1) "whether the infringer deliberately copied the ideas of another"; (2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed"; (3) "the infringer's behavior as a party to the litigation"; (4) the "[d]efendant's size and financial condition"; (5) the "[c]loseness of the case"; (6) the "[d]uration of the defendant's misconduct"; (7) "[r]emedial action by the defendant"; (8) the "[d]efendant's motivation for harm"; and (9) "[w]hether the defendant attempted to conceal its misconduct." *Read*, 970 F.2d at 827 (footnote and citations omitted).

The parties structure their arguments around the *Read* factors, and so too will the Court. The Court will then return to the overarching principles enunciated in *Halo* to arrive at a final determination.

### 2.3.1 The *Read* Factors

*Copying*. The first factor focuses on copying the ideas or design of the patentee. *Id.* This includes not only copying strictly the elements of a patent claim but also any commercial embodiment. *Id.* Thus, although the threshold finding of willful infringement relies upon knowledge of the patent's existence, *Word to Info., Inc. v. Google Inc.*, 140 F. Supp. 3d 986, 989 (N.D. Cal. 2015), courts deciding whether to enhance damages may consider copying even if done before the patents have issued, *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 111 (E.D. Tex. 2017).

This factor is neutral, as substantial factual disputes weaken Plaintiffs' allegations of copying. Plaintiffs say their release of the revolutionary V28 product line in 2005 spurred Snap-On to seek to work with Moli in 2006 after its exclusivity period with Milwaukee ended. Plaintiffs believe that the evidence, including testimony and emails showing that Snap-On analyzed Milwaukee battery packs, establishes that Snap-On actively attempted to copy the battery pack designs and capabilities that Moli and Milwaukee had developed.

Snap-On counters that while the designs both companies created with Moli involved the use of Li-ion technology, there the similarities end, since, for instance, Snap-On's products have special features (such as protective circuitry built into the battery packs themselves) that required unique engineering solutions, and Snap-On's battery packs ultimately used different cell sizes and configurations. To the Court, it is an open question whether Snap-On sought to simply reverse engineer the Milwaukee

invention, or whether it chose to work with a knowledgeable firm to quickly make efforts to compete in the new Li-ion marketplace. There is no need for a "smoking gun" to prove copying, *id.* at 112, but there should be more than the conjecture Plaintiffs offer here.

The Court does not find a clear answer to the copying issue in the evidence presented, making this case unlike *Apple Inc. v. Samsung Electronics Co., Ltd.*, 258 F. Supp. 3d 1013, 1027 (N.D. Cal. 2017), where Samsung openly admitted copying Apple's slide-to-unlock feature. Nor is this case similar to *Polara Engineering, Inc. v. Campbell Co.*, 237 F. Supp. 3d 956, 992 (C.D. Cal. 2017), where the infringer ignored counsel's suggestion to avoid infringement by implementing a different solution. Undoubtedly Snap-On perceived that the market would move toward lithium, and that it needed to adapt accordingly, but it is harder to say that it did so simply by copying Milwaukee's work. Additionally, the trial record reveals that toolmakers often had similar output requirements for their battery packs used in high-power cordless tools, rendering it unsurprising that Snap-On's goals in working with Moli were in many ways similar to Milwaukee's. It is not conclusive proof of copying. *See Stryker Corp. v. Zimmer, Inc.*, No. 1:10-CV-1223, 2017 WL 4286412, at *3 (W.D. Mich. July 12, 2017) (finding copying supported enhancement where infringer's lead engineer was instructed to model its design off of the patentee's). Thus, this factor becomes largely neutral.

*Good-Faith Belief of Invalidity or Non-Infringement.* The second factor assesses the extent of the infringer's efforts to determine whether the patent was valid and whether his product infringed upon it. This factor favors Plaintiffs. As noted above, Snap-On assigned Fuhreck to review the October 2011 licensing letter from Milwaukee. He, in consultation with some of his

colleagues, decided that the patents were related to Snap-On's business but were not sufficiently groundbreaking to be valid. Snap-On therefore made no alterations to its products and did not take a license.

Yet Fuhreck's review of the patents was cursory and did not include a prior art search or any meaningful invalidity analysis. *See Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 198 F. Supp. 3d 1343, 1348 (S.D. Fla. 2016). Snap-On recognized that the patents-in-suit were relevant, yet it went no further in its analysis at that time. "The absence of evidence of an adequate investigation" means that Snap-On likely did not hold a reasonable belief that the patents were invalid. *Apple*, 258 F. Supp. 3d at 1032; *Barry*, 250 F. Supp. 3d at 116. It was simply not enough for Snap-On to bury its head in the sand after Fuhreck told them the patents were not innovative; though the willfulness inquiry post-*Halo* focuses on subjective knowledge, failing to conduct a reasonable investigation to inform oneself about the issues cannot be tolerated. Thus, Snap-On's citation to decisions such as the remand in *Halo* are unavailing, for there, the engineer's belief as to invalidity was backed up by other investigations by counsel. *Halo*, 2017 WL 3896672, at *3–4.

The fact that Snap-On may have developed some colorable invalidity or non-infringement theories during litigation—but years after infringement began—cannot remedy that initial oversight. *WBIP*, 829 F.3d at 1340. Additionally, while Snap-On's failure to obtain the opinion of counsel could not be admitted at trial to support the threshold finding of willfulness, 35 U.S.C. § 298, it can be relevant to enhancement, *see Halo*, 2017 WL 3896672, at *3–4 (distinguishing between advice-of-counsel defense at trial and evidence of counsel's opinions during enhanced damages phase).

Nonetheless, it is important to appreciate that Milwaukee's 2011 letter did not actually accuse Snap-On of infringing the three patents-in-suit. It generally referenced a large number of patents for potential licensure. The first unequivocal allegation of infringement did not come until the complaint in this case was served on Snap-On in late 2014. Thus, just as Snap-On's efforts to avoid infringement and determine invalidity could have been more thorough, Plaintiffs could have been more direct in making an early accusation of infringement. This same circumstance led the district court on remand in *Halo* to observe that, after receipt of a letter merely opening the possibility of license negotiations, "it [was] hard to claim that [the defendant] subjectively knew it was infringing at that time." *Halo*, 2017 WL 3896672, at *3–4. Plaintiffs lean heavily on Snap-On's concession that the patents-in-suit were recognized in 2012 as "related to" its business and "of interest" to it. (Docket #342-1 at 8). Yet the urgency of the matter could have been more clearly laid before Snap-On prior to this lawsuit. *See Innovention Toys, LLC v. MGA Entm't*, No. 07-6510, 2017 WL 3206687, at *3 (E.D. La. Mar. 8, 2017) (patentee sent a notice of infringement with a copy of the published patent application); *Church & Dwight Co., Inc. v. Abbott Labs.*, Civ. No. 05–2142 (GEB)(JJH), 2008 WL 2565349, at *10 (D.N.J. June 24, 2008) (infringement could be found willful where infringer "knew that its infringement was an issue" but refused to change its behavior).

*Litigation Behavior*. The third factor looks at the infringer's litigation behavior to see whether it needlessly obstructed the claims or sought obfuscation as a way to avoid liability. The parties treat this factor as an inroad to air grievances about alleged litigation misconduct. *See* (Docket #342-1 at 11–14); (Docket #360 at 19–24). In the main, their disputes about whether a particular witness was prepared, whether an expert should have

disclosed more information, or whether a party's theories were sufficiently defined prior to trial, are all sideshows. The Court will not delve into such minutiae. After reviewing the parties' disagreements about each other's litigation choices, the most it can say is that the case was hard-fought and involved no more than ordinary strategic decisions (and blunders) on both sides. Plaintiffs have uncovered no egregious misconduct. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010) (defining litigation misconduct as including "bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation"); *Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285, 1297 (S.D. Fla. 2010) ("[H]ard-fought, zealous advocacy does not necessarily amount to vexatious or bad faith litigation[.]").

By way of example, both parties accuse their opponent of hiding the ball on their infringement contentions. Courts no longer countenance trial by ambush, but that does not stop litigants from delaying whenever possible the day when they must finally stake their legal positions. Certainly, Snap-On could have narrowed its obviousness combinations or said more about its non-infringement theories, but so too could Plaintiffs have culled the asserted patent claims and their own infringement theories. To punish Snap-On and not Plaintiffs for similar litigation behavior simply because it lost at trial would be unfair. *Polara,* 237 F. Supp. 3d at 993 (finding that although "[b]oth sides assail[ed] their opponent's litigation tactics,. . .the record reveals little behavior by either side that cannot be fairly characterized as zealous and aggressive advocacy"); *Barry*, 250 F. Supp. 3d at 117 ("Enhancement analysis is not an opportunity for this court to penalize a zealous trial team that engaged in hard-fought battles but

ultimately lost the war. Neither party here refrained from delivering hard blows or from attempts to hide the ball.").

*Size and Financial Condition*. The fourth factor is used to ensure that any damages enhancement is not out of proportion with the defendant's size and the scope of its infringing versus non-infringing sales. The maximum potential enhancement, $83.4 million, would amount to about a tenth of Snap-On's total operating earnings. (Docket #360-2 at 29). This is not a small figure, but neither is it out of proportion with the hundreds of millions of dollars Snap-On has earned from sales of Li-ion products. *Powell*, 715 F. Supp. 2d at 1298 (financial condition is used as a check "to ensure that enhanced damages would not prejudice defendant's non-infringing business"). Snap-On is capable of paying an enhanced damages award. Of course, it should also be noted that Snap-On is a far smaller player in the market in comparison to Plaintiffs, a fact that was thoroughly covered at trial. *Artic Cat*, 198 F. Supp. 3d at 1352 (finding that enhanced damages were warranted where the infringer was the far larger company and the market leader).

*Closeness of the Case*. The fifth factor examines whether the case involved a meaningful defense to the claims or whether it was easily decided against the infringer. It ties in closely with the second factor, which looked to whether the infringer had some good-faith basis on which to defend itself. *See Arctic Cat*, 198 F. Supp. 3d at 1352. Here, the Court finds that the case, if not close, was not so one-sided as to favor a damages enhancement.

Plaintiffs make much of the resilience of their patents against reexaminations and IPRs, saying that Snap-On should not have persisted in fighting the claims when the USPTO refused to invalidate the patents.

(Docket #342-1 at 10). But Plaintiffs fail to appreciate (as they have done many times before in this case) that, at least for the IPRs, the PTAB's review was narrowly circumscribed. As far as the Court is aware, the recent trial was the first time any accused infringer of the patents-in-suit was able to make a case for obviousness based on the prototype Moli cells. The argument was not successful, but there were no definitive indications in the record that it was doomed to failure. The speed of the jury's deliberations alone is of little moment in this regard. *PPC Broadband, Inc. v. Corning Optical Comm'ns RF, LLC*, 5:11-cv-761 (GLS/DEP), 2016 WL 6537977, at *7 (N.D.N.Y. Nov. 3, 2016).

Contrast this case with *Artic Cat*, where the infringer raised invalidity defenses based solely on prior art the USPTO considered and rejected. *Arctic Cat*, 198 F. Supp. 3d at 1349. While Snap-On placed a bad bet on the Moli cells, it is hard to say that it should have known that this was a poor gamble from the start. Likewise, although Snap-On relied too much on the invalidation of Plaintiffs' patents in the Hitachi reexamination, a contested reexamination cannot in every case serve as a warning shot that all other potential challenges must be abandoned.

Finally, Plaintiffs say that many of Snap-On's defenses did not pass the crucible of summary judgment, (Docket #342-1 at 16–17), but the Court recalls dismissing several of Plaintiffs' major arguments, too, including assignor estoppel, as scarcely founded in fact. *See Milwaukee Elec. Tool*, 2017 WL 4220457, at *21–23. If Snap-On advanced some positions that it should not have, Plaintiffs did the same. Notably, Plaintiffs did not seek summary disposition of the obviousness defense. A claim that proceeds to trial is not strong *per se*, *PPC Broadband*, 2016 WL 6537977, at *7, yet there is no clear

sign that the jury summarily dismissed the defense. This factor weighs against a damages enhancement.

*Duration of Infringement*. Next, the sixth factor analyzes the duration of the infringement, particularly in light of what the infringer knew about the patents. Snap-On's infringement began in 2009, when the hypothetical license negotiation between Milwaukee and Snap-On was to have taken place. That leaves a lengthy period, five years pre-suit and three post, during which infringement has continued. Snap-On contends that it knew of the patents-in-suit only as early as the October 2011 letter from Milwaukee. But even then, infringement has continued for a substantial length of time. *See Polara*, 237 F. Supp. 3d at 993. Moreover, the Court rejects Snap-On's assertion that its period of infringement is "zero" simply because it thinks its actions were non-infringing. (Docket #360-2 at 31). That is one consideration that can color this analysis, *see Read*, 970 F.2d at 827 (noting that a damages enhancement may ramp up if sales are made after a finding of liability), but it does not forgive every transgression. This factor supports an enhancement.

*Remedial Actions*. The seventh factor asks whether Snap-On took action to avoid or remediate infringement once it was a real danger. Unlike the previous factor, the emphasis here is whether conduct during the pendency of the suit evinces an unrepentant defendant. *Polara*, 237 F. Supp. 3d at 993. Whereas Snap-On's pre-suit conduct could be characterized as less than well informed as to whether it was infringing, the Court cannot say that its conduct during this case shows a failure to remediate. Snap-On developed several vigorous non-infringement and invalidity defenses which it pursued here and in the USPTO. Unlike *Polara*, where the infringer ignored clear advice that its chosen course would be infringing and even

lost at summary judgment on infringement, here Snap-On did not act vexatiously in fighting the case to its conclusion. *Id.* at 993. Additionally, Plaintiffs do not assert that Snap-On has continued to infringe since the trial concluded. *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 611 (D. Del. 2007) ("That Defendants failed to take remedial action and continued to infringe until after the liability trial also supports an enhanced award."); *Stryker*, 2017 WL 4286412, at *5 (infringer continued to manufacture and sell products "even after the jury returned its verdict").

*Motivation to Harm.* The eighth factor is difficult to assess in this case. Here, the Court must discern whether Snap-On's infringement was done with a "pernicious" intent to harm Plaintiffs. *Read*, 970 F.2 at 827. On the one hand, Snap-On's conduct could be justified by market pressures. *See id.* (citing *Am. Safety Table Co. v. Schreiber*, 415 F.2d 373, 379 (2d Cir. 1969)). On the other, Snap-On chose to make aggressive moves against a direct competitor, including teaming up with its former battery supplier at the earliest opportunity, notwithstanding its later-conceived invalidity arguments. *Polara*, 237 F. Supp. 3d at 993–94; *Stryker*, 2017 WL 4286412, at *6. In the end, the factor is fairly neutral, since the evidence does not demonstrate to any compelling degree that Snap-On was motivated by "greed," *PPC Broadband*, 2016 WL 6537977, at *8, and because Snap-On and Milwaukee are not the only two players in the power-tool market, *Stryker*, 2017 WL 4286412, at *6.

*Concealment.* Finally, the ninth factor asks whether the infringer sought to conceal its misconduct. This normally involves either a pre-litigation cover-up, *Arctic Cat*, 198 F. Supp. 3d at 1353, or failure to disclose material information in discovery, *Stryker*, 2017 WL 4286412, at *6. For this factor, Plaintiffs accuse Snap-On of being "less than forthcoming" about its

efforts to reverse engineer the patented battery packs and in its discovery disclosures. (Docket #342-1 at 20). Such vague allegations cannot and should not support enhancement. In the Court's view, this factor is limited to instances of overt misconduct, which may not exist in every case. Such circumstances did not arise here. Consequently, this factor does not support enhancement.

### 2.3.2   The *Halo* Standard Revisited

On balance, the *Read* factors suggest an enhancement in this case would not be outside the bounds of the Court's discretion. Yet, when one places those factors within the context of the Supreme Court's teachings in *Halo*, it becomes clear that an enhancement is not warranted here. If the Patent Act permits enhanced damages in egregious cases only, then there must be a set of cases—indeed, a sizable set—in which the defendant loses but is not deserving of a damages enhancement. The latter does not follow from the former.

Recall Chief Justice Roberts' emphasis on the notion that punishing true pirates is the aim of Section 284. Courts imposing enhanced damages have faced infringers of the most nefarious sort, who accuse the patentee of criminal conduct, secretly try to buy the asserted patents, advance frivolous defenses, or falsely represent the facts. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 723–24 (D. Del. 2017); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, 203 F. Supp. 3d 755, 764 (E.D. Tex. 2016); *Arctic Cat*, 198 F. Supp. 3d 1343. Snap-On's defeat at trial is no indication that it acted as a pirate, even when one factors in the jury's finding that the infringement was willful. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996) (trial court must explain reasons for not enhancing damages after a finding of willfulness).

The case was hard-fought, and both sides presented good and bad arguments. Snap-On's defense was vigorous but not out of the ordinary. In the words of Judge Clark in *Barry*, "perhaps the actions of both sides at times may have approached those of a privateer, but they did not sink to the level of a 'pirate.'" *Barry*, 250 F. Supp. 3d at 118 (quoting *Halo*, 136 S. Ct. at 1932).

As the above discussion shows, the worst that can be said of Snap-On's entire course of conduct is that it did not sufficiently research at the outset whether it needed to take a license to the patents-in-suit. The jury's verdict reflects that Snap-On should have taken a license like every other competitor. But there is no reason to layer additional punishment atop this error. The jury's verdict is enough. *Sociedad Espanola*, 226 F. Supp. 3d at 532 (finding enhancement unwarranted in part because "[plaintiff] received a significant damages award for the Defendants' culpable conduct"). The Court appreciates that with punishment comes deterrence, *see Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990); *Applera Corp. v. MJ Research Inc.*, 372 F. Supp. 2d 233, 247 (D. Conn. 2005), but because Snap-On is the lone holdout in an industry of toolmakers who took a license, little general deterrence will be achieved by a punitive wallop in addition to the compensatory award that has been made.

For the reasons stated above, after considering the pertinent authorities and the record in this case as a whole, the Court declines to enhance the jury's compensatory damages award under Section 284.

### 2.4    Plaintiffs' Motion for Pre- and Post-Judgment Interest

Plaintiffs' other motion seeks an order from the Court awarding them both pre- and post-judgment interest. (Docket #343). The Court need not discuss the latter request; post-judgment interest accrues by operation

of 28 U.S.C. § 1961(a) on any civil judgment, although the Court's judgments typically note that post-judgment interest shall accrue as provided for by law. Post-judgment interest will accrue automatically from the date of the Court's judgment in this case. *Pace Commc'ns, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 591 (7th Cir. 1994); *Student Loan Mktg. Ass'n v. Lipman*, 45 F.3d 173, 176 (7th Cir. 1995).

The parties' dispute focuses on pre-judgment interest, which is allowed under 35 U.S.C. § 284. That statute states, in relevant part, that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Under this provision, in "the typical [patent infringement] case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983). In other words, "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award, [and] a decision to award prejudgment interest will only be set aside if it constitutes an abuse of discretion." *Id.* at 657; *Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1358 (Fed. Cir. 2012) ("The award of pre-judgment interest is the rule, not the exception.").

When awarding pre-judgment interest, "[t]he rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986). "In exercising that discretion, however, the district court must be guided by the purpose

of prejudgment interest," which is to compensate the patent holder for use of funds it would have had but for the defendant's infringement. *Id.*

Two issues arise regarding the calculation of pre-judgment interest in this case, which Plaintiffs argue should run from June 2009, the date of the hypothetical negotiation between the parties and thus the beginning of the infringement period, to the date the Court enters judgment on the jury's verdict. *Nickson Indus. Inc. v. Rol Mfg. Co. Ltd.*, 847 F.2d 795, 800 (Fed. Cir. 1988) ("Generally, prejudgment interest should be awarded from the date of infringement to the date of judgment."). The first is whether the Court should allow such interest at all, and the second is how it should be calculated. The Court will address each issue below.

### 2.4.1   Availability of Pre-Judgment Interest

Snap-On asks the Court to deny pre-judgment interest entirely, or at least during the pre-suit period from June 2009 until October 2014, based on Plaintiffs' undue delay in bringing suit. (Docket #361 at 6). According to Snap-On, Plaintiffs do not have a viable excuse for waiting over five years to file the instant suit. *Id.* In its view, Plaintiffs made a strategic decision to sue larger competitors first and then turn on smaller operators like Snap-On, but this should not inure to Plaintiffs' benefit. *Id.* Indeed, Plaintiffs did not even send Snap-On a letter asserting their infringement claims in the years before filing suit, thereby depriving Snap-On of the ability to seek a declaration of rights. *Id.* at 7–8.

Plaintiffs contend that the delay was justified. Between June 2009 and October 2014, Plaintiffs were involved in other litigation, settlement negotiations, reexaminations, and other post-issuance proceedings relating to the patents-in-suit. (Docket #344 at 3). Of particular note was the favorable end result in the Hitachi reexamination in July 2014, after which

Plaintiffs quickly moved to enforce their rights against Snap-On and other competitors. *Id.* at 3–4. Plaintiffs assert that they were not required to sue every potential infringer simultaneously and cannot be said to have unfairly sat on their rights to inflate their pre-judgment interest. *Id.* at 4. Further, say Plaintiffs, the delay in judgment from the institution of this case in October 2014 until the verdict in October 2017 was largely due to Snap-On's filing of IPRs and its request for a stay. *Id.* Consequently, Plaintiffs believe that they are entitled to pre-judgment interest during the pendency of suit as well. *Id.*

The Court finds that Plaintiffs are entitled to pre-judgment interest only from the institution of suit until the entry of judgment. Pre-judgment interest must be the rule, rather than the exception, *Crystal*, 246 F.3d at 1361, but a district court retains discretion to deny pre-judgment interest based on undue delay in filing suit, *General Motors*, 461 U.S. at 657, although the Federal Circuit instructs that the infringer must show some prejudice, *Crystal*, 246 F.3d at 1361.

Such a showing has been made here. Plaintiffs argue that they were busy pursuing other litigation during the five-year period before they sued Snap-On, including fighting the Hitachi reexamination in which their patents were initially invalidated. It may have saved the parties and the courts a great deal of time to resolve the Hitachi reexamination before attending to other cases. But the fact that Plaintiffs were busy with other matters is not *carte blanche* to ignore their potential dispute with Snap-On.

Noticeably absent from Plaintiffs' presentation is any affirmative reason that they could not have filed suit before October 2014, or at the least informed Snap-On of the infringement allegations. Even the critical letter of October 2011 makes no mention of the idea that Snap-On's products were

infringing. (Docket #345-8). It appears to be a letter disseminated *en masse* to competitors seeking to open license negotiations—and with good reason, in light of the value of Plaintiffs' Li-ion innovation. But it is hardly notice to Snap-On that it should capitulate against claims of infringement, and it therefore carries little weight in determining whether Snap-On unduly delayed the day of judgment.

Perhaps trying out their claims against the bigger industry players was a smart tactical decision on Plaintiffs' part, but that decision had consequences. The Court will not be left to speculate as to the business rationale where Plaintiffs' delay needlessly inflated the potential pre-judgment interest sum by nearly $5.5 million. *Crystal*, 246 F.3d 1362 (a "self-serving" two-year delay warranted denial of pre-judgment interest); *Kaneka Corp. v. SKC Kolon PI, Inc.*, 198 F. Supp. 3d 1089, 1124 (C.D. Cal. 2016) (denying pre-judgment interest where patentee delayed filing suit for four years despite awareness that defendant was infringing); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N.A., Inc.*, 707 F. Supp. 2d 737, 766 (N.D. Ohio 2010) (same). That massive amount of potential pre-judgment interest is prejudice enough for Snap-On.

Plaintiffs' cited cases do not help their argument. First is *Studiengesellschaft Kohle mbH v. Dart Industries, Inc.*, 549 F. Supp. 716 (D. Del. 1982), which has nothing to say about pre-judgment interest. There, the court considered whether the equitable doctrine of laches precluded an award of damages. *Id.* at 754. Plaintiffs do not explain the connection between laches and Section 284, and the Court is not satisfied that they have much to do with each other. While laches is applied to preclude an award of damages entirely, here the Court considers only whether pre-judgment interest is appropriate. *See Humanscale Corp. v. CompX Int'l, Inc.*, No. 3:09–

CV–86, 2010 WL 3397455, at *2 (E.D. Va. Aug. 23, 2010). Nothing about this decision will disturb the jury's damages award.

Second, Plaintiffs cite *Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed. Cir. 1990), but the facts of that case are distinguishable. There, the Federal Circuit forgave a delay of eight years in filing suit because the plaintiff had in the interim pursued litigation against another entity. *Id.* at 1486. Crucial to that decision, however, was the fact that the defendant both knew of the prior case and "controlled and financed" the defense of that case. *Id.* No such connection exists between this litigation and the Hitachi reexamination or the prior lawsuits between Plaintiffs and other toolmakers. In the end, all the Court is left with is the general rule that pre-judgment interest should normally be awarded, but the facts of this case oblige the Court to exercise its discretion and deny such interest for the pre-suit period.

That said, Snap-On offers no viable reason why pre-judgment interest should be denied for the period of delay it caused by its IPRs during the pendency of this action. Snap-On seems to believe that Plaintiffs' delay in filing suit taints the entire proceeding, but the Court can readily differentiate the period of delay occasioned by Plaintiffs, June 2009 to October 2014, and the delay caused in primary part by Snap-On, from October 2014 until the present. Plaintiffs did not agree to a stay of proceedings during the IPRs, so the significant delay caused thereby cannot be attributed to them. As such, the Court believes that the general rule in favor of pre-judgment interest should apply for the period since suit was instituted on October 16, 2014, until the entry of judgment.

### 2.4.2 Calculation of Pre-Judgment Interest

Having determined the proper period for an award of pre-judgment interest, the Court must now calculate the amount using the appropriate rate and method of compounding. Plaintiffs ask for the calculation to be done using the prime rate and quarterly compounding. (Docket #344 at 4–5). Snap-On counters that the Court should use the much lower Treasury Bill rate, and although it does not actually propose a method of compounding, it suggests that the Court should structure the accrual of interest in line with the Makita license agreement that Plaintiffs relied upon during trial. (Docket #361 at 11–12).

First, the Court finds that the prime rate should be used in this case. Snap-On argues that Plaintiffs must justify resort to the prime rate, perhaps by showing that Snap-On is a default risk or that they borrowed at the prime rate, (Docket #361 at 9), but this is inconsistent with Seventh Circuit decisions on pre-judgment interest, which control in this instance, *see Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999). The prime rate is in this Circuit the "benchmark for prejudgment interest" and may be departed from only if the district court "engages in 'refined rate-setting' directed at determining a more accurate market rate for interest." *First Nat. Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999) (quoting *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998)). True, the Seventh Circuit applied the prime rate to account for a risk of default in *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989), but that risk is not a prerequisite to adopting the prime rate. Likewise, while Plaintiffs could offer evidence that they borrowed at the prime rate or higher, they were not

required to do so. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

The parties have not supplied authorities, evidence, or argument that equips the Court to engage in the nuanced rate-setting analysis needed to depart from the prime rate. Though other courts in other Circuits may have been within their discretion to do so based on the evidence before them, *see, e.g., Mars, Inc. v. Coin Acceptors, Inc.*, 513 F. Supp. 2d 128, 132–137 (D.N.J. 2007); *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997), this Court is also within its discretion to rely upon the prime rate here, *see IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 227 (D. Del. 2007) ("Courts have recognized that the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'") (quoting *Mars, Inc. v. Conlux USA Corp.*, 818 F. Supp. 707, 720–21 (D. Del. 1993), *aff'd*, 16 F.3d 421 (Fed. Cir. 1993)). Moreover, because the Court has already accounted for Plaintiffs' delay in bringing suit, *see supra* Part 2.4.1, it will not further penalize Plaintiffs for that delay by selecting Snap-On's proposed interest rate, *see* (Docket #361 at 11).

Second, the Court will apply quarterly compounding, as suggested by Plaintiffs. Snap-On does not directly oppose this proposal. Rather, it offers its own unique approach, arguing that the Court should model interest accrual in this case on the Makita license agreement's installment payment structure. *Id.* at 12. No doubt the Court has wide discretion to determine the method of calculating interest that fits the case before it. But discretion can be abused when untethered to the law and facts, and thus the Court declines to venture out on the limb offered by Snap-On. Snap-On

cites not a single case espousing anything like its proposal. Because of this, the Court concludes that this case demands no more than the ordinary approach to interest calculation, and finds Plaintiffs' middle ground between continuous and annual compounding to be reasonable. *See Matter of Oil Spill by Amoco Cadiz Off Coast of France on Mar. 16, 1978*, 954 F.2d 1279, 1332 (7th Cir. 1992) ("[C]ompound interest is the norm in federal litigation."); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) (affirming award of prejudgment interest at prime rate compounded quarterly).

### 2.4.3   Pre-Judgment Interest Calculation

Neither party has supplied a calculation for pre-judgment consistent with the legal rulings made above, perhaps because the Court did not adopt either party's position in full. The Court is no accountant, however, and it leaves to the parties the actual calculation of the pre-judgment interest award in this case. That number will be proposed in a joint notice to be filed no later than Friday, January 5, 2018.

### 2.5   Subpoena Enforcement Proceeding

On September 11, 2017, a month before trial, Plaintiffs filed a miscellaneous action in this Court, designated Case No. 17-MC-49-JPS (E.D. Wis.), seeking to enforce compliance with a subpoena issued to counsel for Snap-On. The subpoena requested information relevant to Plaintiffs' contention that Snap-On had colluded with Moli, thereby warranting the application of assignor estoppel against Snap-On. Plaintiffs hoped the documents from Snap-On's lawyers might show a privity relationship between Snap-On and Moli.

The Court dismissed the assignor estoppel defense in its summary judgment order. *Milwaukee Elec. Tool*, 2017 WL 4220457, at *21–23. It

appeared, then, that the subpoena enforcement proceeding had been rendered moot. Plaintiffs maintained their request, however, on the theory that the documents sought would reveal witness bias even if they fell short of demonstrating privity. The Court disagrees. The only conceivable use for a subpoena directed at Snap-On's counsel was to establish assignor estoppel. Documents tending to show witness bias could be sought from the witnesses themselves without intruding upon the files of opposing counsel. Moreover, as Plaintiffs did not request a ruling on their motion either before or during trial, the Court now considers the matter to be fully mooted by its summary judgment order and Plaintiffs' opportunity to probe witness bias through cross-examination at trial. The motion to enforce the subpoena will be denied and that proceeding will be closed.

### 2.6    Motion to Redact Trial Transcript

The final matter to be resolved before entry of judgment in this case is the parties' joint motion to redact portions of the trial transcript. (Docket #367). The parties report that certain matters discussed at trial are deemed confidential under the Court's protective order. Disclosure would work a competitive disadvantage to both sides. As a result, they ask that designated portions of the trial transcript be redacted.

Although the parties reached an agreement as to redaction, the Court is obliged to deny the request. The Court has an independent duty to review requests for sealing in light of the public's interest in open judicial proceedings. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944–45 (7th Cir. 1999). Redacting the record runs against the norm that cases are litigated in public. *Id.* at 945. Not only has the public paid to subsidize Plaintiffs' and Snap-On's dispute, it has an independent right to inspect the proceedings of its judiciary. *See id.* As such, requests for

redaction or sealing must be justified by a special need for confidentiality, such as the disclosure of trade secrets or embarrassing details of a private person's life. *Id.* The trial judge may not "rubber stamp a stipulation to seal the record." *Id.*; *Hicklin Eng'r, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006).

The Court, mindful of these principles, entered an order permitting the parties to engage in fulsome pretrial discovery with the protection of mutual confidentiality. (Docket #23). The Court also permitted the parties to file certain materials under seal in connection with their motion practice. *Id.* However, the Seventh Circuit in *Citizens First* admonished the district court for permitting trial exhibits to be sealed, *Citizens First*, 178 F.3d at 945, and the First Circuit case it cited noted the important distinction between cause sufficient to merit sealing of discovery materials and that required to support sealing the trial transcript, *Polinquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993). The trial phase of a case is presumptively public, while discovery is presumptively private. *Id.* As a consequence, a far greater burden rests on the party seeking to seal portions of the trial transcript. *Id.*

The parties offer no such justification here, relying instead on conclusory statements about protecting competitive data. This satisfied the Court with respect to discovery and motion-related filings, but cannot with respect to the trial transcript. That proceeding was held in public, and the transcripts of the proceeding were made public for nearly a month before the parties requested redaction. Whatever business interest they had in keeping the confidential information secret is hard to square with that delay, and post-hoc sealing cannot put the cat back in the bag. As such, the Court must deny the motion.

3.     **CONCLUSION**

This case took a great deal of effort from the parties, counsel, and the Court to try to conclusion. The jury has rendered its verdict, and Snap-On advances no viable reason to disturb it. By the same token, Plaintiffs largely overreach in their requests to pile additional sums on top of the jury's substantial damages award in the form of enhanced damages and pre-judgment interest. Thus, the Court must largely deny both parties' post-trial motions.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to compel compliance with a subpoena, filed in Case No. 17-MC-49-JPS (E.D. Wis.), be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the action bearing Case No. 17-MC-49-JPS (E.D. Wis.) be and the same is hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Defendant's renewed motion for judgment as a matter of law (Docket #347) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's motion a new trial (Docket #349) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for an award of enhanced damages (Docket #341) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for an award of pre- and post-judgment interest (Docket #343) be and the same is hereby **GRANTED in part** and **DENIED in part** as stated herein;

**IT IS FURTHER ORDERED** that the parties shall file a joint notice no later than **Friday, January 5, 2018**, containing the calculation of pre-

judgment interest to be awarded in this case consistent with the Court's rulings herein;

     **IT IS FURTHER ORDERED** that the parties' joint motion to redact portions of the trial transcript (Docket #367) be and the same is hereby **DENIED**;

     **IT IS FURTHER ORDERED** that the parties' motions to restrict certain documents filed in connection with the instant motions (Docket #340, #346, #353, #356, #359, #368), which were designated confidential pursuant to the Court's protective order, be and the same are hereby **GRANTED**; and

     **IT IS FURTHER ORDERED** that, once the parties have supplied the amount of the pre-judgment interest award, the Clerk of the Court shall enter judgment in accordance with the jury verdict of October 26, 2017 (Docket #316) and **DISMISS** this action.

     Dated at Milwaukee, Wisconsin, this 29th day of December, 2017.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Court